1  JEFFREY W. BROKER – State Bar No. 53226
   PAMELA J. ZYLSTRA – State Bar No. 147977
2  BROKER & ASSOCIATES PROFESSIONAL CORPORATION
   18191 Von Karman Avenue, Suite 470
3  Irvine, CA 92612-7114

4  Telephone:  (949) 222-2000
   Facsimile:  (949) 222-2022
5  email:      jbroker@brokerlaw.biz

6  General Reorganization Counsel
   for Debtor and Debtor-in-Possession
7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                  RIVERSIDE DIVISION

11

12  In re

13                                          Case No.  6:08-bk-23006-BB
                                            Chapter 11 Proceeding
14  THE PRESERVE, LLC, a California Limited
    Liability Company,                      REPLY BY DEBTOR AND DEBTOR-IN-
15                                          POSSESSION TO OPPOSITION BY
                                            POINT CENTER FINANCIAL TO
16                                          MOTION OF DEBTOR AND DEBTOR-IN-
                                            POSSESSION FOR ORDER (1)
17            Debtor and                    AUTHORIZING EXTENSION OF
              Debtor-in-Possession          DEADLINE TO FILE A PLAN AND
18                                          DISCLOSURE STATEMENT AND (2)
                                            EXCLUSIVITY PERIOD REGARDING
19                                          SOLICITATION OF ACCEPTANCES AND
                                            REJECTIONS TO PLAN;
20                                          MEMORANDUM OF POINTS AND
                                            AUTHORITIES AND SUPPLEMENTAL
21                                          DECLARATIONS OF SCOTT KRENTEL
                                            AND JEFFREY W. BROKER IN SUPPORT
22                                          THEREOF

23                                          [DECLARATION OF JOHN C. NOLAN
                                            FILED CONCURRENTLY HEREWITH]
24
                                            Date:  March 11, 2009
25                                          Time:  11:00 a.m.
                                            Ctrm:  303
26

TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY JUDGE;

27  THE OFFICE OF THE UNITED STATES TRUSTEE; OBJECTING PARTY POINT

28  CENTER FINANCIAL, INC. AND ITS ATTORNEYS, AND PARTIES IN INTEREST:

1     THE PRESERVE, LLC, a California Limited Liability Company, the Debtor and Debtor-

2    in-Possession in the within Chapter 11 case (the "Debtor"), hereby presents its Reply to the

3    Opposition (the "Opposition") filed by Point Center Financial, Inc. ("Point Center") to the

4    Debtor's *MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION FOR ORDER (1)*

5    *AUTHORIZING EXTENSION OF DEADLINE TO FILE A PLAN AND DISCLOSURE*

6    *STATEMENT AND (2) EXCLUSIVITY PERIOD REGARDING SOLICITATION OF*

7    *ACCEPTANCES AND REJECTIONS TO PLAN* (the "Motion").  Annexed hereto are the

8    Supplemental Declaration of Scott Krentel (the "Krentel Supplemental Declaration") and the

9    Supplemental Declaration of Jeffrey W. Broker (the "Broker Declaration") in further support of

10   this Reply.  In addition, filed concurrently herewith is the Declaration of John C. Nolan (the

11   "Nolan Declaration") in further support of this Reply.

12            **MEMORANDUM OF POINTS AND AUTHORITIES**

13                        **I.**

14                   **OVERVIEW**

15     This voluntary Chapter 11 case was filed in response to actions and activities taken by a

16   predatory arranger of a secured loan to the Debtor as part of what has turned out to clearly be a

17   **lend to own** Ponzi Scheme followed by a **scorched earth**[1] approach in this case.  This financial

18   predator, Point Center Financial, Inc. ("Point Center"), the sole opposing party herein, has

19   heretofore caused significant damage and disruption to the Debtor's business operations through its

20   illegal activities and efforts to acquire title to the Debtor's Legacy Highlands project, directly

21   resulting in the initiation of this Chapter 11 case.  Point Center is presently involved in a great deal

22   of litigation aside from that brought against it pre-petition by the Debtor:  Litigation in Orange

23   County Superior Court with over thirty investors, litigation with other borrowers over the failure to

24

25   ---

[1]  Examples include objecting to the motion to borrow funds from Scott Krentel in order to fund the case
26   (overruled by the Court per its Order entered on November 26, 2008), objection (later withdrawn) to insider
      compensation, and a motion for a single asset real estate determination that was denied (per Order entered
27   on December 24, 2008).  No reconsideration or appellate review was taken with respect to any of the
      aforementioned Orders.

28                          -2-

fully fund transactions, and Point Center has recently informed the press in an interview by Dan

Harkey with a reporter from the Los Angeles Times that it is under investigation by the Securities

and Exchange Commission ("SEC").

Point Center diverted for its own purposes **$7.675 million of the Debtor's funds** out of a

purported $39 million loan. In addition, at the time of the origination of the $39 million loan,

Point Center was paid a loan broker fee of **$2.34** million which was calculated based upon a fully

funded $39 million loan (which was obviously never fully funded). *There is a minimum of over*

*$10 million in damages just attributable to those two items alone.* The Debtor's dispute with Point

Center existed for approximately a year prior to the Petition Date. Point Center has never provided

any evidence to this Court that it has *standing* to participate in this case. It should be specifically

noted that Point Center has been scheduled in this case as a "purported servicing agent on behalf of

multiple lenders holding fractional interests" (emphasis added) and was specifically characterized

as the holder of a ***contingent, unliquidated and disputed*** claim in this case.

The disclosure by Point Center in approximately October 2007 that $7,675,980.00 of the

funds attributable to the $39 million loan arranged by Point Center in 2006 **were not existent** left

the Debtor 'in the lurch' without the full use of the anticipated proceeds from the Loan for its use

in the ongoing development process involving the Legacy Highlands project. Those funds were

specifically earmarked to pay for "soft costs" or related interest reserves relating to the ongoing

development of the Legacy Highlands project, which include but are not limited to consulting fees,

'contingency', legal and insurance, management fees, property maintenance and property tax

reserves. The failure to fund meant no remaining interest reserve for the Loan; the nonpayment of

interest was the basis for the recording of the notice of default in the first place! In other words,

the Debtor would not be here, but for the defalcation by Point Center and the failure to fund,

among other items, sufficient funds to have carried the interest on the Loan for fourteen months

beyond October 2007. In addition, there was a commitment to have the Loan extended for an

additional two years beyond its original maturity date.

1    Point Center demanded that the Debtor fund the purported shortfall without any reduction

2    in the fees and costs that were taken at the inception of the "Loan". After the *existence of the*

3    *shortfall* was disclosed to the Debtor by Point Center, the Debtor made arrangements to raise

4    money through Deep Canyon Holdings, Inc. ("DCH") in order to assist in the replacement of the

5    missing proceeds. After DCH provided over $1.3 million to Point Center and was granted a

6    definitive fractionalized interest in the Loan in its own name, further funding by DCH was refused

7    by Point Center in violation of the terms of its own loan modification with the Debtor, and Point

8    Center indicated that no further investment would be allowed by DCH in connection with the

9    Loan. DCH has its own issues with Point Center and is represented by its own separate legal

10   counsel in this case, who has advised Debtor's counsel that *Point Center does not speak for DCH*

11   *in connection with the instant Loan.*

12       Notwithstanding objection by Point Center, this Court approved the proposed post-petition

13   borrowing from Mr. Krentel (in an amount up to $2 million for the purpose of funding the Debtor's

14   post-petition cash needs) pursuant to its Order entered on November 26, 2008. The Debtor has

15   been proceeding forward in its reorganization efforts with *replacement funding* from Mr. Krentel

16   for that purpose.

17       As the Motion and this Reply again demonstrate, this case has significant complexities and

18   only one entity – Point Center who is itself not a creditor and only an *alleged* "servicer"– has been

19   an ongoing impediment to the reorganization process. It has not filed a proof of claim and has not

20   provided the court with any <u>evidence</u> that it has any standing at all at the present time to represent

21   anyone. As a result, the Court should afford <u>no weight</u> to any position taken by Point Center in this

22   matter. There are other acknowledged secured creditors in this case holding over $10 million in

23   claims <u>as well as</u> unsecured creditors holding in excess of $6 million in claims who have <u>not</u>

24   objected to the Debtor's Motion. There were <u>no</u> evidentiary objections asserted by Point Center to

25   the declarations filed in support of the Motion. When the Court considers the source of the

26   Opposition, the fact that there was <u>no evidence</u> attached to the Opposition, and the true motive on

27   the part of Point Center of diverting attention away from the pre-petition **defalcation** which

28

-4-

1  negatively impacted the Debtor and caused the filing of this Chapter 11 case in the first instance,

2  the Court must overrule the Opposition and grant the Motion.

3  **II.**

4  **INTRODUCTION**

5        This case was commenced by the filing of a voluntary Chapter 11 petition by the Debtor on

6  September 25, 2008 (the "Petition Date"). The Debtor is in the business of acquiring and making

7  real estate investments, and by and through the efforts of its consultants, both political and

8  technical, designs, plans and delivers their projects consisting of single family residential lots,

9  commercial and industrial projects to then sell to the public and private builder-developers

10  throughout the United States at a profit.

11      **A.**    **The Purported Loan Arranged by Point Center**

12        Prior to the Petition Date, in or about September 2006 the Debtor entered into a loan

13  transaction arranged by Point Center for a $39,000,000.00 fully funded development loan (the

14  "Loan") with 24 months of draws, and was promised two (2) one-year extensions (to extend the

15  loan to September 2010) wherein the Debtor was the borrower, secured by a Deed of Trust on real

16  property in the County of Riverside, State of California consisting of approximately 1,300 acres

17  known as the "Legacy Highlands" project. Among other aspects of the Loan was that

18  $9,650,000.00 would be retained by Point Center as a 24-month interest reserve and there was a

19  further soft cost holdback of $7,251,736.00 placed in a trust account on behalf of the Debtor.

20  Interest reserves in commercial loans are typically set aside on "day one" and are untouchable for

21  any other purpose. Point Center was paid a loan broker fee of $2,340,000.00 which was calculated

22  based upon a fully funded $39 million loan. See, Supplemental Krentel Declaration at ¶3, which

23  attaches collectively as Exhibit "1" the Escrow Closing Statement and "HUD-1"[2] received by the

24  Debtor from the Escrow that confirm the foregoing details, including (i) a $39,000,000.00 fully

25

---

26  [2]  The HUD-1 states the following at page 3 thereof: "WARNING: It is a crime to knowingly make false
statements to the United States on this or any other similar form. Penalties upon conviction can include a
27  fine or imprisonment. For details see: Title 18 U.S. Code Sections 1001 and 1010." See, Exhibit 1, page
24

28  -5-

1  funded loan, (ii) a 24 month interest reserve of $9,650,000.00, (iii) a holdback of $7,251,736.00

2  and (iv) a loan broker fee of $2,340,000.00.

3  **B.    The Purported Loan Arranged by Point Center Was Not Fully Funded**

4  In or about October 2007 the Debtor was advised by Point Center that the Loan was <u>not</u>

5  <u>fully funded</u> as previously represented and that there was a *shortfall* of approximately

6  $7,675,980.00.  As a direct result of the missing funds of approximately $7,675,980.00 described

7  above, there were no funds available from the Loan after the tenth draw to pay for "soft costs" or

8  related interest reserves relating to the ongoing development of the Legacy Highlands which

9  include but are not limited to consulting fees, 'contingency', legal and insurance, management fees,

10 property maintenance and property tax reserves, as well as there being no remaining interest

11 reserve for the Loan all as indicated on closing statements and other transactional documents as of

12 the date of the original funding.  <u>See</u>, Supplemental Krentel Declaration at ¶4.

13 **C.    Efforts by Debtor to Assist in Causing the Shortfall to be Made Up**

14 After the *existence of the shortfall* was disclosed to the Debtor by Point Center, the Debtor

15 made arrangements to raise money through Deep Canyon Holdings, Inc. ("DCH") in order to assist

16 in the replacement of the missing proceeds.  After DCH provided over $1.3 million to Point Center

17 and was granted a definitive fractionalized interest in the Loan in its own name, further funding by

18 DCH was refused by Point Center in violation of the terms of its loan modification with The

19 Preserve, and Point Center indicated that no further investment would be allowed by DCH in

20 connection with the Loan.  In order to keep the development processes moving forward and as a

21 direct consequence of no funds being available from the Loan after the tenth draw as described

22 above, commencing in or about October 2007, Scott Krentel arranged for loans to the Debtor, at a

23 great personal hardship to Mr. Krentel.  As of the Petition Date the loans arranged by Mr. Krentel

24 to the Debtor were in the total principal amount of $1,117,497.00.  <u>See</u>, Supplemental Krentel

25 Declaration at ¶5.

26

27

28

1

### D.    The Point Center Litigation Initiated by Debtor Pre-Petition

2    A lawsuit was filed by the Debtor against Point Center and others relating to the transaction

3    which is the subject matter of that claimed interest prior to the Petition Date (the "Point Center

4    Litigation").  The relief sought in the Point Center Litigation is based upon claims set forth in the

5    Debtor's Complaint for Civil Rico, Fraud, Conversion, Breach of Contract, Breach of the Implied

6    Covenant of Good Faith and Fair Dealing, Rescission, Reformation, Injunctive Relief and the

7    Appointment of a Receiver.  Significant monetary damages in an amount in excess of $60 million

8    and other relief is sought in that litigation on behalf of the Debtor.  The Point Center Litigation was

9    removed by the Defendants to the United States District Court in Riverside, and referred by the

10    District Court Judge to this Court to oversee the discovery process and will ultimately be sent back

11    to the District Court for the conducting of a jury trial which is anticipated to take place early next

12    year.  See, Krentel Declaration filed in support of Motion at ¶6.

13

### E.    The Debtor's Post-Petition Borrowing to Fund Ongoing Operations

14    The disclosure by Point Center in approximately October 2007 that $7,675,980.00 of the

15    funds attributable to the $39 million loan arranged by point center in 2006 **were not existent** left

16    the debtor 'in the lurch' without the full use of the anticipated proceeds from the loan for its use in

17    the ongoing development process involving the legacy highlands project.  Notwithstanding

18    objection by Point Center, this Court approved the proposed post-petition borrowing from Mr.

19    Krentel (in an amount up to $2 million for the purpose of funding the Debtor's post-petition cash

20    needs) pursuant to its order entered on November 26, 2008 and the debtor has been proceeding

21    forward in its reorganization efforts with *replacement funding* from Mr. Krentel.  See,

22    Supplemental Krentel Declaration at ¶6.

23

### F.    The Debtor is Properly Managing its Chapter 11 Case

24    From a bankruptcy administrative standpoint the Debtor is properly managing its case:

25    appropriate Orders authorizing employment of professionals, full compliance with United States

26    Trustee requirements, and Court approval of a post-petition borrowing facility of up to $2 million

27    to fund post-petition cash needs (the latter over the objection of Point Center).  Most importantly,

28

1   the Debtor described in detail in the Motion its ongoing actions vis-à-vis the entitlement process

2   involving the Legacy Highlands, its most valuable asset.  See, Krentel Declaration filed in support

3   of Motion at ¶¶4, 5 and 7.  It should be especially noted that there is <u>no comment</u> in the Opposition

4   criticizing those ongoing actions to enhance the value of the Legacy Highlands project via the

5   entitlement process, *using funds that should have come from the Loan, were not funded by Point*

6   *Center but instead diverted for its own purposes, and were replaced to a limited degree by the*

7   *Debtor through the vehicles of Court-approved borrowings from Mr. Krentel.*

8       **G.**     **<u>Recent Developments Involving the CEQA Challenge</u>**

9         The trial of the CEQA Challenge took place on January 23, 2009, which was after the filing

10   of the instant Motion.  The trial court judge concluded that, in his opinion, some, (but far from all

11   that had been alleged) CEQA "violations" had occurred.  Specifically, the trial count found that the

12   water supply for the next 20 years had not been adequately reviewed.  Recognizing that the scope

13   of items reviewed under CEQA can be, and often is, extensive the statutes require that the court

14   "itemize" its determination of any shortfall.  This, then, enables the agency to redo that portion (<u>and</u>

15   <u>that portion only</u>) that was found to be inadequate.  Accordingly, this project will be returned to the

16   City of Beaumont to "correct" those portions of CEQA's requirements that were found wanting.

17   The Debtor has, even before trial, conducted its own further water analysis and can with relative

18   ease supply the City with additional factual data about water as well as more information regarding

19   the unacceptability of the suggested alternatives and furnish more support for the overriding

20   benefits of the project.  Although precise time lines are somewhat uncertain for situations such as

21   this, it is believed by Debtor's Special Litigation Counsel to be likely that the correction activities

22   can be completed within the next 4 to 6 months and then submitted to this same court for

23   confirmation and the matter of the CEQA Challenge concluded favorably to the Debtor and the

24   City of Beaumont.  See, Nolan Declaration at ¶¶1-12. The Debtor is continuing with all dispatch in

25   the entitlement process for the Legacy Highlands project and is pleased that the CEQA Challenge is

26   in the process of being favorably concluded within approximately the next 4 to 6 months.

27

28

**H.    Recent Developments Involving Point Center**

It appears that Point Center continues to have its own well-publicized problems with its investors and is now under investigation by the SEC.  See, Broker Declaration at ¶2, and Exhibits 2, 3 and 4 thereto.  Point Center has been sued by a group of over thirty investors in Orange County Superior Court.  See, Broker Declaration at ¶3.  How does Point Center explain the funding *shortfall* of approximately $7,675,980.00 which included within it scheduled interest payments to its investors, while being paid a loan broker fee of $2,340,000.00 which was calculated based upon a fully funded $39 million loan?  The Debtor believes that is just the tip of a massive iceberg.

Point Center has been sued by another borrower in San Bernardino County Superior Court as well as by yet another borrower in the Superior Court in New Britain Connecticut on facts strikingly similar to the ones sued upon by the Debtor – fraud, misrepresentation and failure to fully fund.  Those matters are pending.  See, Broker Declaration at ¶¶4-5.  In addition, the Debtor through its counsel has been in direct contact with DCH, through its counsel, and has been advised by counsel for DCH that *Point Center does not speak for DCH in connection with the instant Loan.*[3]  See, Broker Declaration at ¶6.  **Where there is smoke there is fire**.  In addition, the Debtor also believes that Point Center will never represent to this Court under oath that:  (1) the $39 million loan was fully funded (the escrow closing statement and HUD-1 indicate a fully funded loan);  (2) it has fully earned its loan broker fee of $2.34 million based upon a fully funded $39 million loan; and (3) it has disclosed to its "investors" the fact that the loan was not fully funded <u>and</u> that the Debtor had initiated the Point Center Litigation in September 2008 against it in connection with the Loan.  The Debtor believes that in the near future Point Center will be likely replaced by a *fiduciary* – in the form of a receiver appointed as a result of an SEC enforcement action, a State Court receiver as a part of the pending 'investor' litigation in Orange County

---

[3] DCH holds the largest non-Point Center affiliate fractionalized interest in the Loan and was scheduled in the amount of $1,341,660 as an undisputed secured creditor, and is the Debtor's largest unsecured creditor, being scheduled in the undisputed amount of $4,302,000.

1    Superior Court, a bankruptcy trustee or perhaps Point Center may become headed by a new

2    'responsible officer.'

3                                              **III.**

4                                          **ARGUMENT**

5    A.    **DEMONSTRATION OF CAUSE**

6            The Debtor in the Motion cites the Court to *In re Gibson* and other cases on the issue of

7    *cause*. The cases cited amalgamate the following relevant factors (*see also*, In re Henry Mayo

8    Newhall Memorial Hospital, 282 B.R. 444, 452 (9th Cir. BAP 2002):

9        • Was this the first extension requested

10       • Was the case complicated

11       • Was the case pending for a long time relative to its size and complexity

12       • Was the debtor proceeding in good faith

13       • Was the debtor paying current operating expenses

14       • Was there a reasonable prospect for filing a viable plan and prepare adequate

15           information

16       • Was there satisfactory progress negotiating with key creditors

17       • Was the extension sought to pressure creditors

18       • Was there an unresolved contingency

19           This is the first extension requested by the Debtor in this case. The request by the Debtor

20   was made timely.

21           The Debtor submits that this case is complex for three reasons. The first is the magnitude

22   and inherent complexity of the Legacy Highlands project in and of itself that has been worked on

23   for well over six years. The entitlements process is substantially completed which the Debtor

24   contends has enhanced the value of the Legacy Highlands project. *There is no suggestion in the*

25   *Opposition that there has been a diminution in the value of the Legacy Highlands project post-*

26   *petition.* The second is the fact that the CEQA Challenge is still a few months away from its

27   anticipated favorable completion and the EIR certification beyond further attack. This important

28

-10-

information was not known to the Debtor at the time of the filing of its Motion. The Debtor has demonstrated significant progress in the entitlement processes, has proactively pursued the defense of the CEQA Challenge and believes it will be favorably resolved within the next 4 to 6 months after identified corrections are submitted to the trial court. The third is the pending litigation against Point Center, which will be tried before a jury in the United States District Court next year. **Stated simply, Point Center took money that belonged to the Debtor, paid itself a fee that it did not earn, and through its improper actions precipitated the filing of this case**. The Debtor urges this Court to afford no weight to the Opposition considering its source.

This case has not been pending for a "long time" since it was filed on September 25, 2008, just five months ago relative to its size and complexity described above. The Debtor has made progress in both the entitlement processes and in its prosecution of the pending litigation against Point Center.

The Debtor asserts that it filed its Chapter 11 case in good faith and is proceeding in good faith in its efforts to reorganize. The Debtor is current in its administrative operating expenses through Court-approved borrowing (over the objection of Point Center) and is in complete compliance with the requirements of the Office of the United States Trustee.

A plan in this case is inextricably intertwined with the amount, *if anything*, that is found to be owed on the Loan. The Debtor has no objection to the matter being referred (again) to mediation with Point Center. However, the Debtor believes that Point Center does not represent the interests of most if not all 'investors' relevant to the Loan and the Debtor is evaluating how to proceed with a *diversity of constituents* apparently present here: (i) DCH, which has appeared several times in this case and has indicated that Point Center does not speak for it in connection with the Loan, (ii) Point Center investors who are plaintiffs in pending litigation in Orange County Superior Court against Point Center who may be interested in connection with the Loan, and (iii) perhaps even the SEC itself or a receiver or other fiduciary.

The Debtor has not pressured any of its creditors with regard to a particular payment proposal, although there have been discussions with parties *other than* Point Center post-petition in

-11-

1    that regard.  Finally, there are the unresolved contingencies of what the Debtor actually owes with

2    regard to the Loan, *if anything*, at the end of the day, and whether it is validly secured in the first

3    instance, the completion of the entitlement process, as well as the final resolution of the CEQA

4    Challenge.

5        The authorities cited by Point Center on the issue of cause, most notably In re R.G.

6    Pharmacy, Inc., 374 B.R. 484 (Bankr. D. Conn. 2007) miss the mark.  In R.G. Pharmacy, the case

7    dynamics were significantly different than those at bar.  First, Debtor did not show good cause

8    pursuant to 11 USCS §1121(d) to further extend debtor's exclusivity period where debtor's

9    bankruptcy case was not particularly large (debtor had assets of just under $ 4,000,0000) and there

10   was no support by any constituency (the two major secured and unsecured creditors both opposed

11   the extension of exclusivity).  The major secured creditor held a claim of $2.5 million (82% of

12   total scheduled secured debt), and the major unsecured creditor held an unsecured claim of $1.6

13   million (98% of total scheduled unsecured debt), *$1.025 million of which was a stipulated allowed*

14   *administrative claim*.  In addition, the United States and the State of Connecticut (both

15   unscheduled) had filed proofs of claim asserting an estimated aggregate unsecured claim of $2.7

16   million.  There was a breakdown in negotiations between the Debtor, the secured creditor and the

17   major unsecured creditor who both opposed extending the exclusivity period.  In fact, the secured

18   creditor also had motions pending for the appointment of a trustee as well as for relief from stay to

19   enforce its security agreement.  The Court also noted that the adversary proceeding against the

20   secured creditor was filed just prior to the date of the hearing on the exclusivity extension motion,

21   and denied the Debtor's request for an extension of the exclusivity period.

22       In the case at bar, the case has more complexities than any cited by Point Center.  There

23   have been ongoing communications with Deep Canyon as well as other individual investors in the

24   Loan who have contacted the Debtor's manager.  The Debtor is willing to mediate again in this

25   case.  The Debtor submits that it has established good cause to grant the requested extension of the

26   exclusivity periods.

27

28

1

**V.**

**CONCLUSION**

2

3    This is the first requested extension of the exclusive period in a young case which is

4    complex for the reasons outlined above.  Based upon the foregoing, the Debtor respectfully submits

5    that good cause exists for this Court to grant the relief requested in this Motion and urges the Court

6    to do so.

7    DATED: March **4** , 2009                **BROKER & ASSOCIATES**
                                             **PROFESSIONAL CORPORATION**

8

9                                            By: _____

10                                               Jeffrey W. Broker
                                                General Reorganization Counsel for Debtor and
11                                              Debtor-in-Possession

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SUPPLEMENTAL DECLARATION OF SCOTT KRENTEL

I, Scott Krentel, declare and state as follows:

1.      The matters stated herein are true and correct and are within my personal knowledge, and if called upon to testify as a witness, I could and would testify competently thereto. I am the manager of Beaumont 1600, a California Limited Liability Company, which is the manager of the Debtor.

2.      I reincorporate by reference the testimony in my declaration that was filed in connection with the original Motion in this matter.

3.      Prior to the Petition Date, in or about September 2006 the Debtor entered into a loan transaction arranged by Point Center for a $39,000,000.00 fully funded development loan (the "Loan") with 24 months of draws, and was promised two (2) one-year extensions (to extend the loan to September 2010) wherein the Debtor was the borrower, secured by a Deed of Trust on real property in the County of Riverside, State of California consisting of approximately 1,300 acres known as the "Legacy Highlands" project. Among other aspects of the Loan was that $9,650,000.00 would be retained by Point Center as a 24-month interest reserve and there was a further soft cost holdback of $7,251,736.00 placed in a trust account on behalf of the Debtor. Interest reserves in commercial loans are typically set aside on "day one" and are untouchable for any other purpose. Point Center was paid a loan broker fee of $2,340,000.00 which was calculated based upon a fully funded $39 million loan. Attached hereto collectively as Exhibit "1" is a true and correct copy of a letter received by Debtor from Escrow Professionals, Inc. dated October 25, 2006 enclosing the Escrow Closing Statement and "HUD-1" that confirm the foregoing details, including (i) a $39,000,000.00 fully funded loan, (ii) a 24 month interest reserve of $9,650,000.00, (iii) a holdback of $7,251,736.00 and (iv) a loan broker fee of $2,340,000.00.

4.      In or about October 2007 the Debtor was advised by Point Center that the Loan was not fully funded as previously represented and that there was a *shortfall* of approximately $7,675,980.00. As a direct result of the missing funds of approximately $7,675,980.00 described above, there were no funds available from the Loan after the tenth draw to pay for "soft costs" or

1    related interest reserves relating to the ongoing development of the Legacy Highlands which

2    include but are not limited to consulting fees, 'contingency', legal and insurance, management fees,

3    property maintenance and property tax reserves, as well as there being no remaining interest

4    reserve for the Loan all as indicated on closing statements and other transactional documents as of

5    the date of the original funding.

6         5.      After the *existence of the shortfall* was disclosed to the Debtor by Point Center, the

7    Debtor made arrangements to raise money through Deep Canyon Holdings, Inc. ("DCH") in order

8    to assist in the replacement of the missing proceeds.  After DCH provided over $1.3 million to

9    Point Center and was granted a definitive fractionalized interest in the Loan in its own name,

10   further funding by DCH was refused by Point Center in violation of the terms of its loan

11   modification with The Preserve, and Point Center indicated that no further investment would be

12   allowed by DCH in connection with the Loan.  In order to keep the development processes moving

13   forward and as a direct consequence of no funds being available from the Loan after the tenth draw

14   as described above, commencing in or about October 2007, I arranged for loans to the Debtor, at a

15   great personal hardship.  As of the Petition Date the loans arranged by me to the Debtor were in the

16   total principal amount of $1,117,497.00.

17        6.      The disclosure by Point Center in approximately October 2007 that <u>$7,675,980.00</u>

18   <u>of the funds attributable to the $39 million loan arranged by point center in 2006</u> **were not existent**

19   left the debtor 'in the lurch' without the full use of the anticipated proceeds from the loan for its

20   use in the ongoing development process involving the legacy highlands project.  Notwithstanding

21   objection by Point Center, this Court approved the proposed post-petition borrowing from me (in

22   an amount up to $2 million for the purpose of funding the Debtor's post-petition cash needs)

23   pursuant to its order entered on November 26, 2008 and the Debtor has been proceeding forward in

24   its reorganization efforts with *replacement funding* from me.

25        7.      The Debtor attended an unsuccessful mediation before retired District Judge Gary

26   Taylor that took place prior to the filing of the Chapter 11 case.  The Debtor is ready, willing and

27

28

1  able to attend a mediation again in this matter regarding the purported Loan arranged by Point

2  Center.

3          I declare under penalty of perjury under the laws of the State of California and the United

4  States of America that the foregoing is true and correct and that this declaration was executed this

5  3rd day of March, 2009 at Riverside, California.

6

7                                                        _____

8                                                        Scott Krentel

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-16-

## SUPPLEMENTAL DECLARATION OF JEFFREY W. BROKER

I, Jeffrey W. Broker, do hereby declare and state as follows:

1.      I am an attorney at law, duly licensed to practice before all courts of the State of California and am admitted to practice before the above-entitled Court. I am a member of Broker & Associates Professional Corporation, a California corporation, general reorganization counsel to THE PRESERVE, LLC, a California Limited Liability Company, the Debtor and Debtor-in-Possession (the "Debtor") in the within Chapter 11 case. All of the matters testified to herein are based upon my own personal knowledge, are true and correct and, if called upon to testify, I could testify competently thereto.

2.      It appears that investors have voiced complaints about Point Center and Point Center has indicated that it is now under investigation by the SEC. Attached hereto as Exhibits "2," "3," and "4" are true and correct copies of articles published in the Los Angeles Times on February 18, 2009; the Los Angeles Times on February 25, 2009; and the Orange County Register on February 26, 2009, respectively, on those topics.

3.      Point Center has been sued by a group of over thirty investors in Orange County Superior Court in an action entitled "LLOYD CHARTON, as Trustee on behalf of the Lloyd and Stella Charton 1999 Trust, et al., vs. NATIONAL FINANCIAL LENDING, LLC, a California Limited Liability Company; POINT CENTER FINANCIAL, INC., a California corporation; DAN HARKEY, an individual; DIANE L. HARKEY, an individual; M. GWEN MELANSON, and DOES 1-150, inclusive," Case No. 30-2008 00114401. That matter is pending.

4.      Point Center has been sued by another borrower in San Bernardino County Superior Court based upon claims similar to the ones sued upon by the Debtor (fraud, misrepresentation and failure to fully fund) in an action entitled "HAMPTON LAND, L.P., a California limited partnership, vs. POINT CENTER FINANCIAL, a California corporation, et al.," Case No. CIV SS8070726. That matter is pending.

5.      Point Center has been sued by another borrower in Counterclaims based upon claims similar to the ones sued upon by the Debtor (fraud, misrepresentation and failure to fully

1    fund) asserted in the Superior Court J.D. of New Britain at New Britain, Connecticut, Case No.

2    HHB-CV-08-5007101-S by way of counterclaims in an action brought by Point Center against

3    BRISTOL HEIGHTS ASSOCIATES, LLC.  That matter is pending.

4         6.      Debtor, through declarant as its counsel, has been in direct contact with Deep

5    Canyon Holdings, Inc. ("DCH"), through its counsel, Mark Schnitzer, Esq., and has been recently

6    advised by Mr. Schnitzer that *Point Center does not speak for DCH in connection with the instant*

7    *Loan.*  DCH holds the largest non-Point Center affiliate fractionalized interest in the Loan and was

8    scheduled by the Debtor in the amount of $1,341,660 as an undisputed secured creditor with its lien

9    pertaining to the Legacy Highlands property, and DCH also is the Debtor's largest unsecured

10   creditor, being scheduled by the Debtor in the undisputed amount of $4,302,000.

11        I declare under penalty of perjury under the laws of the State of California and of the United

12   States of America that the foregoing is true and correct, and that this declaration was executed by

13   the undersigned this 4th day of March, 2009 at Irvine, California.

14

15                                        _____
                                          Jeffrey W. Broker
16

17

18

19

20

21

22

23

24

25

26

27

28

## Escrow Professionals, Inc.

33161 Camino Capistrano Unit H
San Juan Capistrano, CA 92675
P: (949) 661-8066 • F: (949) 661-9727

The Preserve LLC                                                      Date: October 25, 2006
                                                                     Escrow No.: 57323
7006 Magnolia Avenue #909
Riverside, Ca. 92506

RE: Property Address:  1.300+ Acres Located Beamont, Ca, , CA

We are please to inform you that the above referenced escrow was closed on **October 23, 2006** and we enclose the following for your records:

> Our Check in the amount of **$218,062.17** representing your refund.   WIRED
> Final HUD-I and Closing Statement.

**Loan Information:**

> First Deed of Trust in favor of: **Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries.** (Lender will notify you regarding payments.)

Any documents to which you are entitled will be forwarded to you directly from the appropriate governing party.

We hope this transaction has been handled to your satisfaction, and that we may serve you again in the future.

**Escrow Professionals, Inc.**

Beverly A. Miali
Escrow Officer / Manager

Exhibit _____1_____
Page _____19_____

# ESCROW CLOSING STATEMENT

POINT CENTER FINANCIAL, INC.
30900 RANCHO VIEJO ROAD, #100
SAN JUAN CAPISTRANO CA 92675

Escrow Number: 206070
Escrow Officer: Beverly A. Miali
Date Recorded:

Borrower: THE PRESERVE LLC, a California limited liability company

Property: SW of I-10 and SR60
Beaumont CA

Page: 1

| DESCRIPTION | DEBIT | CREDIT |
|---|---:|---:|
| **Funds Deposited To Escrow:** | | |
| RICHARD T. BREENE  ( 0.13%) | | 49,920.00 |
| STEVEN C. COLBURN  ( 0.13%) | | 49,920.00 |
| PAUL P. KRASNER, M.D., TRUSTEE  ( 0.13%) | | 49,920.00 |
| Point Center Mortgage Fund I, LLC   (Jul-12-2006  99.49%) | | 38,800,320.00 |
| DONOVAN H. RITTENBACH, TRUSTEE  ( 0.13%) | | 49,920.00 |
| **Demands Paid Through Escrow:** | | |
| Point Center Financial, Inc. | | |
| Principal | 19,000,000.00 | |
| Interest From 10/01/06 To 10/30/06 | 173,602.70 | |
| Less the Trust Account Balance | -4,890.13 | |
| | 19,168,712.57 | 19,168,712.57 |
| **Payments Made on Authorization of Borrower:** | | |
| Beneficiary Statement Fees | 45.00 | |
| Credit for Partially Funded Loan | | 6,456.02 |
| Re-imbursemnt of Appraisal to THE PRESERVE, LLC | 16,000.00 | |
| **Costs and Expenses:** | | |
| Escrow Fee | 10,250.00 | |
| Title Insurance Policy | 28,000.00 | |
| Notary Fee | 40.00 | |
| Recording Fees | 200.00 | |
| Credit Investigation Fees | 81.00 | |
| Processing Fee | 500.00 | |
| Underwriting Fee | 5,000.00 | |
| Documentation Fee | 300.00 | |
| Securitization Fee | 1,000.00 | |
| County Property Tax Reserves (24 months) | 250,000.00 | |
| Interest Reserves (24 months) | 9,650,000.00 | |
| PCF Inspection Site Fee | 250.00 | |
| Construction Hold Back | 7,251,736.00 | |
| **Other Items Paid Through Escrow:** | | |
| Broker's Commission | 2,340,000.00 | |
| Prepaid Interest From 10/30/06 To 11/01/06 @ $13,356.16/day | 26,712.32 | |
| **Check To Borrower** | 257,629.13 | |
| **Totals** | 39,006,456.02 | 39,006,456.02 |

Exhibit ____1____

Page ____20____

**Escrow Professionals, Inc.**

33161 Camino Capistrano, Unit. H
San Juan Capistrano, CA 92675
Phone: (949) 661-8066 • Fax: (949) 661-9727

BORROWER STATEMENT
Final

| | |
|---|---|
| Escrow Number:   57323 | Title Order Number:   09301656-12 |
| Escrow Officer:   Beverly A. Miali | Date:   10/25/2006 - 10:30:29AM |
| | Closing Date:   10/23/2006 |
| Borrower:   The Preserve LLC | |

Property:   1.300+ Acres Located Beamont, Ca, CA

| DESCRIPTION | DEBITS | CREDITS |
|---|---|---|
| **TOTAL CONSIDERATION** | | |
| **TITLE CHARGES** | | |
| Lender/Mortgagee Premium for 39,000,000.00: Land America Lawyers Title | 26,520.00 | |
| Mortgage Recording Fee: Land America Lawyers Title | 223.00 | |
| Agreement fee: Land America Lawyers Title | 82.00 | |
| UCC Financing Statement: Land America Lawyers Title | 20.00 | |
| Inspection fee: Land America Lawyers Title | 50.00 | |
| **ESCROW CHARGES TO: Escrow Professionals, Inc.** | | |
| Escrow Fee | 10,250.00 | |
| Wire Fee | 45.00 | |
| Audit & Assessment Fee | 9.50 | |
| **LENDER CHARGES** | | |
| New to Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries: | | 39,000,000.00 |
| Loan Fee @ 0.00 %: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 2,340,000.00 | |
| Interest Adjustment From 10/20/2006 To 11/01/2006, 11 Days, @ 7,520.3300/per day: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 90,243.96 | |
| Underwriting Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 5,000.00 | |
| Credit Investigation Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 81.00 | |
| Processing Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 500.00 | |
| Documntation Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 300.00 | |
| Securitization Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 1,000.00 | |
| County Property Tax Resrves (24 Months): Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 250,000.00 | |
| Interest Reserves (24 Months): Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 9,650,000.00 | |
| Pcf Inspeciton Site Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 250.00 | |
| Construction Hold Back: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 7,251,736.00 | |
| **LOAN PAYOFF: Point Center Financial** | | |
| Principal Balance                     19,000,000.00 | | |
| Interest Per Diem From 10/01/2006 To 10/19/2006, 18 Days, @ 6,069.4444     113,739.70 | | |
| Less The Trust Account Balance               -2,434.58 | | |
| Total Loan Payoff | 19,113,739.70 | 2,434.58 |
| **TAXES:** | | |
| Property Tax to: Riverside County Tax Collector | 44,322.25 | |
| **ADDITIONAL DISBURSEMENTS:** | | |
| Reimbursement Of Appraisal: The Preserve LLC | 16,000.00 | |
| Funds Returned To PCF For Reserves: Point Center Financial | 202,062.17 | |
| **TOTALS** | 39,002,434.58 | 39,002,434.58 |

Exhibit    1
Page    21

| A.  U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT | | B.  TYPE | OF | LOAN | | OMB No. 2502-0265 |
|---|---|---|---|---|---|---|
| SETTLEMENT STATEMENT | | 1. ☐ FHA | 2. ☐ FHMA | 3. ☒ CONV. UNINS. | | |
| | | 4. ☐ VA | 5. ☐ CONV. INS. | | | |
| | | 6. FILE NUMBER: 57323 | | 7. LOAN NUMBER: | | |
| | | 8. MORTGAGE INS. CASE NO.: | | | | |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. NAME & ADDRESS OF BORROWER: | The Preserve LLC |
|---|---|
| E. NAME & ADDRESS OF SELLER: | |
| F. NAME & ADDRESS OF LENDER: | Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries 30900 Rancho Viejo Road #110, San Juan Capistrano, CA 92675 |
| G. PROPERTY LOCATION: | 1.300+ Acres Located Beamont, Ca, , CA |
| H. SETTLEMENT AGENT: | Escrow Professionals, Inc. |
| PLACE OF SETTLEMENT: | 33161 Camino Capistrano Unit H, San Juan Capistrano, CA  92675 (949) 661-8066 |
| I. SETTLEMENT DATE: | 10/23/2006   Final |

| J. | Summary of Borrower's Transaction | | K. | Summary of Seller's Transaction | |
|---|---|---|---|---|---|
| 100. Gross Amount Due From Borrower: | | | 400. Gross Amount Due To Seller: | | |
| 101. Contract sales price | | | 401. Contract sales price | | |
| 102. Personal property | | | 402. Personal property | | |
| 103. Settlement charges to borrower: (line 1400) | | 19,844,372.63 | 403. | | |
| 104. Property Tax | | 44,322.25 | 404. | | |
| 105. Payoff To Point Center Financial | | 19,111,305.12 | 405. | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| Adjustments For Items Paid By Seller In Advance: | | | Adjustments For Items Paid By Seller In Advance: | | |
| 106. City/town taxes | to | | 406. City/town taxes | to | |
| 107. County taxes | to | | 407. County taxes | to | |
| 108. Assessments | to | | 408. Assessments | to | |
| 109. | | | 409. | | |
| 110. | | | 410. | | |
| 111. | | | 411. | | |
| 112. | | | 412. | | |
| 113. | | | 413. | | |
| 114. | | | 414. | | |
| 115. | | | 415. | | |
| 116. | | | 416. | | |
| 120. Gross Amount Due From Borrower: | | 39,000,000.00 | 420. Gross Amount Due To Seller: | | |
| 200. Amounts Paid By Or In Behalf Of Borrower: | | | 500. Reductions In Amount Due To Seller: | | |
| 201. Deposit or earnest money | | | 501. Excess deposit (see instructions) | | |
| 202. Principal amount of new loan(s) | | 39,000,000.00 | 502. Settlement charges to seller (line 1400) | | |
| 203. Existing loan(s) taken subject to | | | 503. Existing loan(s) taken subject to | | |
| 204. | | | 504. Payoff 1st Mtg. Ln. | | |
| 205. | | | 505. Payoff 2nd Mtg. Ln. | | |
| 206. | | | 506. | | |
| 207. | | | 507. | | |
| 208. | | | 508. | | |
| 209. | | | 509. | | |
| | | | | | |
| | | | | | |
| Adjustments For Items Unpaid By Seller: | | | Adjustments For Items Unpaid By Seller: | | |
| 210. City/town taxes | to | | 510. City/town taxes | to | |
| 211. County taxes | to | | 511. County taxes | to | |
| 212. Assessments | to | | 512. Assessments | to | |
| 213. | | | 513. | | |
| 214. | | | 514. | | |
| 215. | | | 515. | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218. | | | 518. | | |
| 219. | | | 519. | | |
| 220. Total Paid By/For Borrower: | | 39,000,000.00 | 520. Total Reductions In Amount Due Seller: | | |
| 300. Cash At Settlement From/To Borrower: | | | 600. Cash At Settlement From/To Seller: | | |
| 301. Gross amount due from borrower (line 120) | | 39,000,000.00 | 601. Gross amount due to seller (line 420) | | |
| 302. Less amount paid by/for borrower (line 220) | | 39,000,000.00 | 602. Less reductions in amount due seller (line 520) | | |
| 303. Cash (☐ FROM) (☐ TO)  Borrower: | | 0.00 | 603. Cash (☐ TO) (☐ FROM)  Seller: | | 0.00 |

Previous Edition Is Obsolete
Form No. 1581
3/86

Page 1 of 3

SB-4-3538-000-1
HUD-1 (3-86)
RESPA, HB 4305.2

Exhibit ___1___

Page ___22___

| | Paid From Borrower's Funds At Settlement | Paid From Seller's Funds At Settlement |
|---|---|---|
| 700. Total Sales/Broker's Commission: Based On Price $ @ %= | | |
| **Division of Commission (line 700) As Follows:** | | |
| 701. $ to | | |
| 702. $ to | | |
| 703. Commission paid at settlement | | |
| 704. | | |
| **800. Items Payable In Connection With Loan:** | | |
| 801. Loan Origination fee % | | |
| 802. Loan Discount % | | |
| 803. Appraisal fee to: | | |
| 804. Credit report to: | | |
| 805. Lender's inspection fee | | |
| 806. Mortgage insurance application fee to | | |
| 807. Assumption fee | | |
| 808. Loan Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 2,340,000.00 | |
| 809. Securitization Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 1,000.00 | |
| 810. County Property Tax Reserves (24 Months) To: Point Center Financial, Inc., as Designated Lender for M | 250,000.00 | |
| 811. Interest Reserves (24 Months) To: Point Center Financial, Inc., as Designated Lender for Multi-Benef | 9,650,000.00 | |
| 812. Pcf Inspeciton Site Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiari | 250.00 | |
| 813. Construction Hold Back To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiarie | 7,251,736.00 | |
| 814. Underwriting Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 5,000.00 | |
| 815. Credit Investigation Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiar | 81.00 | |
| 816. Exhibit "C" Attached Hereto | 800.00 | |
| **900. Items Required By Lender To Be Paid In Advance:** | | |
| 901. Interest from 10/20/2006 to 11/01/2006 @$ 7,520.3300 /day | 90,243.96 | |
| 902. Mortgage insurance premium for mo. to | | |
| 903. Hazard insurance premium for yrs. to | | |
| 904. Flood insurance premium for yrs. to | | |
| 905. | | |
| 906. | | |
| **1000. Reserves Deposited With Lender:** | | |
| 1001. Hazard insurance months @ $ per month | | |
| 1002. Mortgage insurance months @ $ per month | | |
| 1003. City property taxes months @ $ per month | | |
| 1004. County property taxes months @ $ per month | | |
| 1005. Annual assessments months @ $ per month | | |
| 1006. Flood insurance months @ $ per month | | |
| 1007. months @ $ per month | | |
| 1008. Aggregate Adjustment | | |
| 1009. | | |
| **1100. Title Charges** | | |
| 1101. Settlement or closing fee to Escrow Professionals, Inc. | 10,250.00 | |
| 1102. Abstract or title search to | | |
| 1103. Title examination to | | |
| 1104. Title insurance binder to | | |
| 1105. Document preparation to | | |
| 1106. Notary fees to | | |
| 1107. Attorney's fees to | | |
| (includes above item Numbers: ) | | |
| 1108. Title insurance to Land America Lawyers Title | | |
| (includes above item Numbers: ) | 26,520.00 | |
| 1109. Lender's coverage $ 39000,000.00 Premium: $26520.00 | | |
| 1110. Owner's coverage $ | | |
| 1111. Wire Fee to Escrow Professionals, Inc. | 45.00 | |
| 1112. Audit & Assessment Fee to Escrow Professionals, Inc. | 9.50 | |
| 1113. Agreement fee to Land America Lawyers Title | 82.00 | |
| 1114. Exhibit "D" Attached Hereto | 70.00 | |
| **1200. Government Recording and Transfer Charges:** | | |
| 1201. Recording fees: Deed $ ;Mortgage $ 223.00 :Releases $ | 223.00 | |
| 1202. City/county tax/stamps: Deed $ :Mortgage $ | | |
| 1203. State tax/Stamps: Deed $ :Mortgage $ | | |
| 1204. | | |
| 1205. | | |
| **1300. Additional Settlement Charges:** | | |
| 1301. Survey to | | |
| 1302. Pest inspection to | | |
| 1303. Reimbursement Of Appraisal to The Preserve LLC | 16,000.00 | |
| 1304. Funds Returned To PCF For Reserves to Point Center Financial | 202,062.17 | |
| 1305. | | |
| 1306. | | |
| 1307. | | |
| 1308. | | |
| 1309. | | |
| 1310. | | |
| 1311. | | |
| 1312. | | |
| 1313. | | |
| **1400. Total Settlement Charge** *(Enter on line 103, Section J - and - line 502, Section K)* | 19,844,372.63 | |

Form No. 1582          Page 2 of 3

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent: _____    Date: _____

          Beverly A. Miali, Escrow Professionals, Inc.

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment. For details see:  Title 18 U.S. Code Section 1001 and Section 1010.

Exhibit ____1____

Page ____24____

ATTACHMENT TO HUD 1

Settlement Date: 10/23/2006

| | | |
|---|---|---|
| Escrow No.: | 57323 | |
| Title No.: | 09301656-12 | |
| | Page: | 1 |

EXHIBIT A: Tax Payment Breakdown

Breakdown of Tax Payments:

County Taxes

| Year | Amount | Interest | Penalty |
|---|---|---|---|

EXHIBIT B: (HUD Section 100)                                                    Buyer Amount

Gross Amount Due From Borrower - Loan Payoff Breakdown:

Point Center Financial

| | Buyer Amount |
|---|---|
| Principal Balance To: Point Center Financial | 19,000,000.00 |
| Interest Per Diem From 10/01/2006 to 10/19/2006 @ $  6,069.4444 To: Point Center Fi | 113,739.70 |
| Less The Trust Account Balance To: Point Center Financial | -2,434.58 |
| Total: | 19111,305.12 |

EXHIBIT C: (HUD Section 800 )                                                   Buyer Amount

Items Payable In Connection With Loan:

| | Buyer Amount |
|---|---|
| Processing Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Benefici | 500.00 |
| Documntation Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Bene | 300.00 |
| Total: | 800.00 |

EXHIBIT D: (HUD Section 1100)                                                  Buyer Amount

Title Charges:

| | Buyer Amount |
|---|---|
| UCC Financing Statement to Land America Lawyers Title | 20.00 |
| Inspection fee to Land America Lawyers Title | 50.00 |
| Total: | 70.00 |

Exhibit        1
Page        25

# Los Angeles Times

# BUSINESS

**WEDNESDAY, FEBRUARY 18, 2009 :: LATIMES.COM/BUSINESS**

| DOW 7552.60 ▼ 297.81 | S&P 500 789.17 ▼ 37.67 | NASDAQ 1,470.66 ▼ 63.70 | GOLD $967.00 ▲ 25.50 | OIL $34.93 ▼ 2.58 | EURO $1.262 ▼ 0.028 | U.S. T-BILL (6-mo.) 0.47% ▲ 0.02 | U.S. T-NOTE (10-yr.) 2.66% |



IRFAN KHAN *Los Angeles Times*

**FAILED PROJECT:** The lawsuit cites a $19.3-million loan made in 2006 to a developer who planned to build homes at the Palm Springs Country Club. The developer defaulted on the loan and the country club has fallen into disrepair.

**COURTS:**

## MARKETS

# Fear drags Wall St. to a near low

The Dow briefly falls below its November low as worries about banks, the economy shake investors.

WALTER HAMILTON
REPORTING FROM NEW YORK

TOM PETRUNO
REPORTING FROM
LOS ANGELES

After the stock market tumbled Tuesday, some investors

### Holding the low

Dow Jones industrial average daily closes

Exhibit ___2___
Page ___26___



**FAILED PROJECT:** The lawsuit cites a $19.3-million loan made in 2006 to a developer who planned to build homes at the Palm Springs Country Club. The developer defaulted on the loan and the country club has fallen into disrepair.

## COURTS

# Investors cry foul after real estate deals go bust

## Funds bankrolled assemblywoman's campaign, lawsuit says

STUART PFEIFER

Was it the real estate downturn, or were people misled into a risky investment scheme?

That's the question at the center of a lawsuit filed Tuesday that accuses Orange County real estate lender Dan J. Harkey of bilking dozens of investors out of more than $15 million.

In an added twist, the investors claim that their money helped fund the election of Harkey's wife, state Assemblywoman Diane L. Harkey (R-Dana Point).

The lawsuit accuses Dan Harkey of using slick marketing techniques — including mass mailings and DVDs of sales meetings — to attract investors in short-term, high-interest loans to real estate developers. It contends that Harkey exaggerated the value of the properties used as collateral by borrowers, making the individual investments appear much safer than they were.

Dan Harkey denied wrongdoing, saying any losses were related directly to the downturn in the real estate and financial markets.

Assemblywoman Harkey declined to be interviewed. A spokesman disputed the lawsuit's claim that she used investor money to bankroll her campaign.

"She had a 30-year career in business and banking in which she acquired substantial financial resources of her own," said Dave Gilliard, the assemblywoman's political consultant. "She used her personal resources to help fund her political campaigns."

Campaign finance records show that Diane Harkey contributed $1.1 million of her own money to two recent campaigns — an unsuccessful    [See Lawsuit, Page C6]



**PLAINTIFFS:** Sharon and Terry Holdt are among those who allege their investment was mismanaged.

Exhibit ___2___

Page ___27___

ARY 18, 2009

*Los Angeles Times*

LATIMES.CO

# Investors sue real estate lende

[Lawsuit, from Page C1]
bid for the state Senate in 2006 and last year's winning run for the Assembly.

Gilliard added that Diane Harkey had no ownership interest in her husband's company, Point Center Financial Inc. of Aliso Viejo.

The allegations center on a little-known and lightly regulated segment of the real estate industry known as "hard-money" lenders. These lenders often provide financing for high-risk projects that banks won't touch, such as speculative housing developments.

Wealthy individuals looking for outsized returns often provide the investment capital. The lawsuit alleges that many investors were retired people who entrusted Dan Harkey and Point Center with their life savings.

The lawsuit, filed in Orange County Superior Court in Santa Ana, claims that Point Center made millions of dollars by charging broker fees upfront to borrowers, allowing the company to profit regardless of whether the loans were repaid.

When the borrowers defaulted, the lawsuit alleges, the investors were often left with foreclosed properties worth a fraction of the money they had invested.

The suit cites a $19.3-million loan in 2006 to Burnett Development Corp., which planned to build 451 homes surrounding a golf course at the Palm Springs Country Club. The loan was made near the peak of the real estate boom, but conditions soon changed. Burnett Development defaulted on the loan in 2007 and Point Center foreclosed, according to court records. Burnett officials could not be reached.

The now-closed country club has fallen into such disrepair that the city of Palm Springs filed a lawsuit last year

— naming individual Point Center investors as defendants — seeking immediate repairs to a property filled with weeds, polluted ponds and graffiti.

"I was shocked. I thought this was being properly handled by Point Center Financial," said Terry Holdt, an investor and one of the plaintiffs in Tuesday's lawsuit. "I knew the intention was to develop the property. I didn't realize it hadn't gone very far."

Harkey declined to address specific cases cited in the suit but said the plaintiffs represented a small group of unhappy investors. He said investors would make money once the market rebounded.

"We will manage and chart our way through this," said Harkey, 62. "I can't control it if there's a very tiny renegade group that tries to create all these illusions. We're probably the best-suited company in California to manage the portfolio back to health."

The lawsuit also cited Point Center's $10-million loan in 2005 to a company that planned to build luxury oceanfront homes in Carpinteria.

In a summary of the project distributed to prospective investors, Point Center said the property owner had "spent the past seven years securing California Coastal Commission approval" and needed only final approval from the city of Carpinteria.

The developers, brothers Paul and Richard Ehline, personally guaranteed the loan, according to the Point Center summary. The summary advertised an "estimated minimum" return of 23.5%.

It sounded like a good opportunity to Carlsbad Realtor Jim Haiduck, who said he invested $200,000 in the project based on assurances by Harkey's staff that nearly all approvals had been secured.



*DON KELSEN Los Angeles Times*
State Assemblywoman Diane Harkey (R-Dana Point) is Dan Harkey's wife.

But the Coastal Commission had not approved the project, the lawsuit alleges. In 2007, Ehline Development Corp. defaulted on the loan, Point Center foreclosed and the Ehlines filed for bankruptcy protection.

The brothers listed $120 million in bad debt in their bankruptcy filings, including $43.6 million of debt on four separate Point Center loans.

"This was just a clear case of misrepresentation," Haiduck said. "We just don't know where the money went. Now it's in foreclosure."

Richard Ehline, in an interview with The Times, said the project stalled when city planning officials said they would prefer a luxury hotel instead of a purely residential development. He said the $10 million went to acquire the land and for pre-construction expenses.

Ehline said the company spent all its money, was unable to acquire additional financing and was forced to give up the project.

"We were getting ready to submit the formal application into the city for approval. That's about the point in time that real estate started to take a

downhill turn," he said.

The lawsuit, filed by Irvine attorney David C. Grant, seeks to have investors reimbursed for their losses. Grant said he hoped a third party could be appointed to manage the properties that investors now own through foreclosure.

Investors say they also filed complaints with the Securities and Exchange Commission, the California Department of Real Estate and the FBI. Officials with those agencies declined to comment.

The lawsuit also alleges that Harkey operated a "classic Ponzi scheme" by renewing short-term loans and using new investors' money to pay off investors who chose not to renew. One example cited by the plaintiffs was a loan for construction of a proposed shopping center in Riverside County called Murietta Commons.

Point Center funded the original $3.9-million loan in 2005 and then allowed the developer to renew the loan in 2007 for $6.8 million without improving the property, using new investors' money to repay investors who chose not to renew, the lawsuit alleges.

Investors in both loans were victimized by inflated appraisals, the lawsuit contends.

The proposed shopping center was part of a flood-control channel and no tenant could be found, according to the lawsuit. The Murietta project was never built and the property went into foreclosure, the suit says.

Harkey called the Ponzi scheme allegation "nonsense," noting that no agency had filed any allegations against him. Point Center has no record of discipline with the state Department of Real Estate, records show.

Harkey said he had been involved in real estate financing for more than 30 years. The Harkeys own a multimillion-

dollar home [*cut off*]
Point neighbo[*cut off*]
collection inclu[*cut off*]
Porsche and [*cut off*]
Benzes, accor[*cut off*]
ment of Motor[*cut off*]

The lead pl[*cut off*]
suit is retired[*cut off*]
attorney Lloy[*cut off*]
said he was [*cut off*]
$1 million, son[*cut off*]
to the Muriett[*cut off*]

"He scamm[*cut off*]
said. "The rep[*cut off*]
Dan Harkey [*cut off*]
safety of the l[*cut off*]
He was bringi[*cut off*]
to pay off inve[*cut off*]
loan," and [*cut off*]
scheme." [*cut off*]

Charton 1[*cut off*]
away from Ha[*cut off*]
neighbor m[*cut off*]
ments seem f[*cut off*]

In a vide[*cut off*]
pitch to poten[*cut off*]
DVDs of the [*cut off*]
tributed to p[*cut off*]
— Harkey vov[*cut off*]
money would[*cut off*]
the borrower[*cut off*]
ceeded the lo[*cut off*]

"A default [*cut off*]
lose money. [*cut off*]
there's a se[*cut off*]
solve," Harke[*cut off*]

Hard-mor[*cut off*]
have recent[*cut off*]
complaints i[*cut off*]
accuracy of t[*cut off*]
to solicit inve[*cut off*]
cial, one exp[*cut off*]
the loans ar[*cut off*]
on the prope[*cut off*]
borrowers' al[*cut off*]

"That's t[*cut off*]
lending is all[*cut off*]
ty-based. Th[*cut off*]
the borrower[*cut off*]
rowers' cred[*cut off*]
Guttentag, p[*cut off*]
emeritus a[*cut off*]
School of [*cut off*]
Pennsylvani[*cut off*]
loans that go[*cut off*]
to lose mone[*cut off*]

stuart.pfeife[*cut off*]

Exhibit **2**

28



Blac

# l estate lender



LBN Los Angeles Times

bly woman
y (R-Dana
n Harkey's wife.

Coastal Commis-
approved the proj-
it alleges. In 2007,
opment Corp. de-
e loan, Point Cen-
1 and the Ehlines
ruptcy protection.
ers listed $120 mil-
lebt in their bank-
ings,      including
of debt on four
nt Center loans.
: just a clear case of
tation,".    Haiduck
t don't know where
went. Now it's in

Ehline, in an inter-
he Times, said the
ied when city plans
ls said they would
ury hotel instead of
esidential develop-
aid the $10 million
uire the land and for
iction expenses.
said the company
money, was unable
additional financing
rced to give up the

re getting ready to
: formal application
7 for approval. That's
point in time that
: started to take a

downhill turn," he said.

The lawsuit, filed by Irvine attorney David C. Grant, seeks to have investors reimbursed for their losses. Grant said he hoped a third party could be appointed to manage the properties that investors now own through foreclosure.

Investors say they also filed complaints with the Securities and Exchange Commission, the California Department of Real Estate and the FBI. Officials with those agencies declined to comment.

The lawsuit also alleges that Harkey operated a "classic Ponzi scheme" by renewing short-term loans and using new investors' money to pay off investors who chose not to renew. One example cited by the plaintiffs was a loan for construction of a proposed shopping center in Riverside County called Murietta Commons.

Point Center funded the original $3.9-million loan in 2005 and then allowed the developer to renew the loan in 2007 for $6.8 million without improving the property, using new investors' money to repay investors who chose not to renew, the lawsuit alleges.

Investors in both loans were victimized by inflated appraisals, the lawsuit contends.

The proposed shopping center was part of a flood-control channel and no tenant could be found, according to the lawsuit. The Murietta project was never built and the property went into foreclosure, the suit says.

Harkey called the Ponzi scheme allegation "nonsense," noting that no agency had filed any allegations against him. Point Center has no record of discipline with the state Department of Real Estate, records show.

Harkey said he had been involved in real estate financing for more than 30 years. The Harkeys own a multimillion-

dollar home in a gated Dana Point neighborhood. Their car collection includes a Bentley, a Porsche and two Mercedes Benzes, according to Department of Motor Vehicles records.

The lead plaintiff in the lawsuit is retired Orange County attorney Lloyd Charton, who said he was owed more than $1 million, some of which went to the Murietta refinancing.

"He scammed us," Charton said. "The representations that Dan Harkey made about the safety of the loans were untrue. He was bringing in new money to pay off investors on the same loan, and that's a Ponzi scheme."

Charton lives two houses away from Harkey, and said his neighbor made the investments seem foolproof.

In a video-recorded sales pitch to potential customers — DVDs of the meeting were distributed to potential investors — Harkey vowed that investors' money would be safe because the borrowers' collateral far exceeded the loan amounts.

"A default doesn't mean you lose money. It merely means there's a set of problems to solve," Harkey said in the video.

Hard-money loans gone bad have recently spurred other complaints in California. The accuracy of the appraisals used to solicit investor money is crucial, one expert noted, because the loans are approved based on the property value, not the borrowers' ability to repay.

"That's what hard-money lending is all about. It's property-based. They simply ignore the borrowers' income, the borrowers' credit," said Jack M. Guttentag, professor of finance emeritus at the Wharton School of the University of Pennsylvania. "If they make loans that go bad, they're going to lose money."

stuart.pfeifer@latimes.com

Exhibit  2
Page  29



**Los Angeles Times**

**BUSINESS**

WEDNESDAY, FEBRUARY 25, 2009 :: LATIMES.COM/BUSINESS

Exhibit ___3___
Page ___30___

## REAL ESTATE

# LENDER IN O.C. IS FOCUS OF SEC

### Point Center Financial is subpoenaed by the agency after investors alleged fraud.

**STUART PFEIFER**

The Securities and Exchange Commission has opened an investigation into an Orange County real estate lending company that is owned by the husband of a California state assemblywoman.

In an e-mail to his firm's roughly 3,000 investors, Point Center Financial Inc. President Dan J. Harkey disclosed that the SEC had subpoenaed records from the firm last week.

In an interview, Harkey said the SEC was seeking thousands of pages of documents in connection with a $25-million investment pool that funded construction loans. He predicted the SEC would find no irregularities in his company's loan pool, noting that the California Department of Real Estate took no action after a similar review.

Harkey said it would take weeks to compile the records the SEC requested.

Officials with the Securities and Exchange Commission in Los Angeles would neither confirm nor deny any inquiry into Point Center.

More than 50 Point Center investors filed a lawsuit against Harkey last week, accusing him of placing their money in risky construction loans and funneling profits to his wife's political campaigns.

In the interview, Harkey acknowledged that many of his investors had lost money but blamed it on the real estate

[See Probe, Page C6]

Exhibit ___3___

Page ___31___

ss

.8%

s Times

LATIMES.COM/BUSINESS

# SEC is probing O.C. loan firm

**[Probe,** from Page C1]
downturn, which has caused widespread losses. About 60% of the company's loans are in default and interest payments to many investors have been reduced or suspended as a result, Harkey said.

Through a spokesman, Assemblywoman Diane Harkey (R-Dana Point) said she had no affiliation with Point Center and contributed her own money — about $1.1 million — to her campaigns. Before her career in politics, she worked as an executive at Security Pacific National Bank and Bank of America Corp., her husband said.

Aliso Viejo-based Point Center specializes in hard-money loans, which are short-term, high-interest offerings to developers who often can't obtain funding from banks. Hard-money lenders require a large equity stake in the property for loans they issue, using first trust deeds to recover investments if borrowers default.

Harkey said he amassed $500 million in capital from current investors, although he acknowledged that failed loans and the real estate slump had significantly diminished the value of those investments.

The lawsuit said that Harkey charged millions of dollars in loan fees to borrowers and management fees to investors, and claimed he used inflated appraisals that made the loans appear safer than they were. Harkey said he was careful to disclose the risky nature of real estate to investors, advising them that it was possible to lose some or all of their money. He called the SEC investigation routine and said he and his company would be cleared.

"They're compliance people. I have no problem with it," Harkey said. "My disclosure packages are so big I called them 'the phone book.' If the allegation is failure to disclose, they picked the wrong guy."

An SEC subpoena is not undertaken lightly, said Cliff Hyatt, a former SEC enforcement attorney now at law firm Pillsbury Winthrop Shaw Pittman in Los Angeles.

"It's not routine. It's part of a formal investigation by the SEC," Hyatt said.

Investigations involving complicated investments and thousands of pages of records can take months, if not years, Hyatt said.

"The first thing they want to look at in these things is what's going on with the money? Is the money being used in accordance with representations by Point Center?" Hyatt said. "One of the things the SEC is particularly attuned to right now is the possibility of a Ponzi scheme. The second thing is whether the disclosures are adequate."

Lloyd Charton, lead plaintiff in the lawsuit, said a number of appraisals were inflated, giving him and other investors false confidence that their money was safe. He said he welcomed new scrutiny from SEC regulators.

"We are thankful that someone will come in and shine sunlight into Mr. Harkey's activities," Charton said.

stuart.pfeifer@latimes.com

## Analyst erred, GE Capital says

BLOOMBERG NEWS

General Electric Co. said an announced injection of $9.5 billion into its finance arm, GE Capital, means it won't have to make more contributions if the unit's ratio of earnings to fixed charges falls below a certain level.

A report Sunday from Nigel Coe, a New York analyst with Deutsche Bank, "failed to take into account" that contribution, GE said on its website.

Coe issued a clarification Tuesday in a note to investors.

GE shares rose for the first time since last Wednesday, gaining 23 cents to $9.08.

"The injection of cash means no additional funding from GE is needed even under the analyst's earnings forecast," GE said on its site.

Exhibit _3_

Page _32_

**BUSINESS**                           Thursday, Feb. 26, 2009 | Business 3B

# O.C. real estate lender under federal probe

### SEC has subpoenaed documents, says owner.

THE ASSOCIATED PRESS

ALISO VIEJO • Orange County real estate lender **Point Center Financial Inc.** is under investigation by the Securities and Exchange Commission, company President Dan J. Harkey said.

In an e-mail to about 3,000 investors, Harkey, husband of Assemblywoman Diane Harkey, R-Dana Point, said the SEC had subpoenaed thousands of pages of documents from the firm last week.

Harkey told the Los Angeles Times on Tuesday that the documents were tied to a $25 million investment pool to fund construction loans and said federal investigators would find nothing irregular in them. He said the California Department of Real Estate conducted a similar review and took no action.

SEC officials in Los Angeles would neither confirm nor deny the investigation.

Harkey is being sued by investors who said in a lawsuit filed last week that he cheated them out of $15 million and used their money to help fund the election of his wife.

Dan Harkey said his investors lost money because of the real estate downturn, not wrongdoing on his part.

Diane Harkey has said she had no connection to the Aliso Viejo-based Point Center and used $1.1 million of her own money to fund her campaign.

Exhibit 4
Page 33

| In re:<br>THE PRESERVE, LLC<br><br>                                     Debtor(s). | CHAPTER 11<br><br>CASE NUMBER 6:08-bk-23006-BB |
| --- | --- |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 18191 Von Karman Avenue, Suite 470, Irvine, CA 92612

The foregoing document described **REPLY BY DEBTOR AND DEBTOR-IN-POSSESSION TO OPPOSITION BY POINT CENTER FINANCIAL TO MOTION OF DEBTOR AND DEBTOR-IN-POSSESSION FOR ORDER (1) AUTHORIZING EXTENSION OF DEADLINE TO FILE A PLAN AND DISCLOSURE STATEMENT AND (2) EXCLUSIVITY PERIOD REGARDING SOLICITATION OF ACCEPTANCES AND REJECTIONS TO PLAN; MEMORANDUM OF POINTS AND AUTHORITIES AND SUPPLEMENTAL DECLARATIONS OF SCOTT KRENTEL AND JEFFREY W. BROKER IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On March 4, 2009 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

dfisher@ptwww.com (Palmieri Tyler et al.)
kmurphy@goeforlaw.com (Goe & Forsythe, LLP) [counsel for Point Center Financial, Inc.]
ustregion16.rs.ecf@usdoj.gov (United States Trustee)
elizabeth.lossing@usdoj.gov   (United States Trustee)
mcschnitzer@rhlaw.com (Reid & Hellyer) [counsel for Deep Canyon Holdings
dzaro@allenmatkins.com (courtesy NEF)
jdelcastillo@allenmatkins.com (courtesy NEF)

☐ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On February 10, 2009 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or **with an overnight mail service** addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

The Hon. Sheri Bluebond, 255 East Temple Street, Suite 1482, Los Angeles, CA 90012

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| March 4, 2009 | Jeffrey W. Broker | |
| --- | --- | --- |
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                    **F 9013-3.1**