JEFFREY W. BROKER – State Bar No. 53226
PAMELA J. ZYLSTRA – State Bar No. 147977
BROKER & ASSOCIATES PROFESSIONAL CORPORATION
18191 Von Karman Avenue, Suite 470
Irvine, CA 92612-7114

Telephone:  (949) 222-2000
Facsimile:  (949) 222-2022
email:    *jbroker@brokerlaw.biz*

General Reorganization Counsel
for Debtor and Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## RIVERSIDE DIVISION

| | |
|---|---|
| In re<br><br>THE PRESERVE, LLC, a California Limited Liability Company,<br><br><br><br>Debtor and<br>Debtor-in-Possession | Case No.  6:08-bk-23006-BB<br><br>Chapter 11 Proceeding<br><br>**DEBTOR'S NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING SECOND EXTENSION OF (1) DEADLINE TO FILE A PLAN AND DISCLOSURE STATEMENT; AND (2) EXCLUSIVITY PERIOD REGARDING SOLICITATION OF ACCEPTANCES AND REJECTIONS TO PLAN; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF SCOTT KRENTEL AND RICHARD HARVEY IN SUPPORT THEREOF**<br><br><br>[No Hearing Required]<br>[11 U.S.C. §1121(d); Local Bankruptcy Rule 9013-1(o)(1)] |

**TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY JUDGE;**

**THE OFFICE OF THE UNITED STATES TRUSTEE; CREDITORS AND PARTIES IN**

**INTEREST:**

# TABLE OF CONTENTS

**Page**

NOTICE ……………………………………………………………………… 2

MEMORANDUM OF POINTS AND AUTHORITIES ………………………………… 4

    I.      CASE OVERVIEW…………………………………………………… 4

          A.     Administrative Matters That Have Taken Place in This Case…………… 4

          B.     The Legacy Highlands and the Point Center Litigation………………… 5

                 (i)     The Legacy Highlands…………………………………………… 5

                 (ii)    The Point Center Litigation……………………………………… 6

                        (a)    The Loan Arranged by Point Center………………………… 6

                        (b)    The Loan was Not Fully Funded…………………………… 7

                        (c)    Status of the Point Center Litigation………………………… 8

          (C)    The CEQA Challenge……………………………………………… 9

          (D)    Other Properties……………………………………………………… 10

          (E)    Challenges in Plan Formulation…………………………………… 10

          (F)    Summary…………………………………………………………… 12

    II.     THIS COURT HAS AUTHORITY TO EXTEND THE EXCLUSIVE
          PERIODS FOR FILING A PLAN AND SOLICITING ACCEPTANCES
          THERETO……………………………………………………………… 12

    III.    THE DEBTOR'S MOTION IS TIMELY……………………………………… 19

    IV.    PURSUANT TO LOCAL BANKRUPTCY RULE 9013-1(o)(1), AN
          ORDER GRANTING THE RELIEF SOUGHT BY THIS MOTION MAY
          BE OBTAINED WITHOUT A HEARING……………………………………… 19

    V.     CONCLUSION……………………………………………………………… 20

DECLARATION OF SCOTT KRENTEL………………………………………… 21

DECLARATION OF RICHARD HARVEY………………………………………… 28

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

In re Eagle-Picher Industries, Inc.
    176 B.R. 143 (Bankr. S.D. Ohio 1994)……………………………………………..14

In re Gibson & Cushman
    101 B.R. 405, 409 (E.D.N.Y. 1989)……………………………………….……..13, 16

In re Grossinger's Associates
    116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990)…………………………………………..14

In re Henry Mayo Newhall Memorial Hospital
    282 B.R. 444, 452 (9th Cir. BAP 2002)…………………………………………….15

In re Landmark Park Plaza Ltd. Partnership
    167 B.R. 752, 756 (Bankr. D. Conn. 1994)……………………………………….13

In re Manville Forest Products Corp.
    31 B.R. 991,995 (S.D.N.Y. 1983)……………………………………………...…..16

In re Montgomery Court Apartments of Ingham County, Ltd
    126 B.R. 537, 539 (Bankr. S.D. Ohio 1991)……………………………………...13

In re Matter of Newark Airport/Hotel Ltd. Partnership
    156 B.R. 444, 451 (Bankr. D.N.J. 1993) *affirmed* 155 B.R. 93 (D.N.J. 1993)………..13

In re Pine Run Trust, Inc.
    67 B.R. 432 (Bankr. E.D.Pa. 1986)………………………………………………...18

In re Public Service Company of New Hampshire
    88 B.R. 534 (Bankr. D.N.H. 1988)………………………………………………... 14

In re Slettleland
    260 B.R. 657, 670 (S.D.N.Y. 2001)……………………………………….………..15

In re Southwest Oil of Jourdanton, Inc.
    84 B.R. 448, 452 (Bankr. W.D. Tex. 1987)……………………………...…………16

In re Texaco Inc., 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987)……………………...14, 15

In re Trainer's, Inc.
    17 B.R. 246, 247 (Bankr. E.D. Pa. 1982) …………………………………………17

| Cases | Page(s) |
|---|---|

In re United Press International
    60 B.R. 265 (Bankr. D.D.C. 1986)………………………………………..…15, 16, 17

In re Washington-St. Tammany Elec. Co-op., Inc.
    97 B.R. 852, 854 (E. D. La. 1989)……………………………………………..…14


Statutes

11 U.S.C. §341(a)……………………………………………………………………………  4
11 U.S.C. §1121(b)……………………………………………………………………………  12
11 U.S.C. §1121(c)……………………………………………………………………………  13
11 U.S.C. §1121(d)(1)………………………………………………………………………  13,
                                                                                                                          19

THE PRESERVE, LLC, a California Limited Liability Company, the Debtor and Debtor-in-Possession in the within Chapter 11 case (the "Debtor"), hereby moves this Court for its Order, pursuant to 11 U.S.C. §1121(d) and Local Bankruptcy Rule 9013-1(o)(1), extending until September 23, 2009, the exclusivity period within which the Debtor has the exclusive right to file a Plan, and extending to November 23, 2009, the exclusivity period within which the Debtor has the exclusive right to solicit acceptances thereto. In addition, the Debtor moves that such extension be without prejudice to the Debtor's right to seek further extension of the exclusivity periods.

This Motion is based upon the annexed Memorandum of Points and Authorities and the annexed declarations of Scott Krentel (the "Krentel Declaration") and Richard Harvey (the "Harvey Declaration"), and upon such other additional evidence, oral or documentary, that the Court may consider prior to or at the time of the hearing on the Motion, should such hearing be timely requested.

**IF YOU DO NOT OPPOSE THE MOTION AND THE COURT APPROVAL OF THE MOTION REQUESTED HEREBY, YOU NEED TAKE NO ACTION. HOWEVER, IF YOU OBJECT TO THE COURT APPROVING THE MOTION, PURSUANT TO THE PROVISIONS OF LOCAL BANKRUPTCY RULE 9013-1(o), SUCH OBJECTION MUST BE FILED WITH THE BANKRUPTCY COURT *NO LATER THAN FIFTEEN (15) DAYS AFTER THE DATE OF SERVICE OF THIS NOTICE* IN THE MANNER REQUIRED BY LOCAL BANKRUPTCY RULE 9013-1(o)(1).**

**YOU MUST FILE YOUR OBJECTION AND REQUEST FOR A HEARING WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT, LOCATED AT 3420 TWELFTH STREET, RIVERSIDE, CALIFORNIA 92501. YOU MUST SERVE A COPY OF YOUR OBJECTION TO THE MOTION AND REQUEST FOR A HEARING UPON THE DEBTORS' GENERAL REORGANIZATION COUNSEL AT THE ADDRESS INDICATED ON THE UPPER LEFT HAND CORNER OF THE FIRST PAGE OF THIS**

1  MOTION, AND UPON THE OFFICE OF THE UNITED STATES TRUSTEE, LOCATED

2  AT 3685 MAIN STREET, SUITE 300, CALIFORNIA 92501.

3

4        UPON RECEIPT OF A TIMELY OBJECTION AND REQUEST FOR A HEARING,

5  GENERAL REORGANIZATION COUNSEL WILL OBTAIN A HEARING DATE AND

6  GIVE APPROPRIATE NOTICE THEREOF. ANY FAILURE TO TIMELY FILE AND

7  SERVE OBJECTIONS MAY RESULT IN ANY SUCH OBJECTION BEING WAIVED,

8  AND THE COURT MAY ENTER AN ORDER APPROVING THE MOTION UPON THE

9  DEBTORS' SUBMISSION THEREOF TO THE COURT WITHOUT FURTHER NOTICE

10  OR HEARING.

11

12  DATED: May 20, 2009                    BROKER & ASSOCIATES
                                          PROFESSIONAL CORPORATION
13

14

15                              By: _____
                                    Jeffrey W. Broker
16                                  General Reorganization Counsel
                                    for Debtor and Debtor in Possession
17

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.

3

### CASE OVERVIEW

4    This case was commenced by the filing of a voluntary Chapter 11 petition by the Debtor on

5  September 25, 2008 (the "Petition Date").  The Debtor is in the business of acquiring and making

6  real estate investments, and by and through the efforts of its consultants, both political and

7  technical, designs, plans and offers for sale to developers their projects consisting of single family

8  residential lots, commercial and industrial projects to then sell to the public and private builder-

9  developers throughout the United States at a profit. See, Krentel Declaration at ¶2.

10    A.    **Administrative Matters That Have Taken Place in This Case**

11    The Debtor has obtained timely Court authorization to employ General Reorganization

12  Counsel and two law firms to handle litigation matters as its Special Litigation Counsel involving

13  the "Point Center Litigation" and the "CEQA Challenge" described below.  The examination of the

14  Debtor pursuant to 11 U.S.C. §341(a) was held and concluded on November 12, 2008.  The Debtor

15  is current in its reporting requirements with the Office of the United States Trustee, is current in

16  the payment of its quarterly fees, and has no unpaid administrative expenses.  The bar date has now

17  passed and the Debtor is in the process of examining claims, some of which the Debtor believes

18  will be resolved consensually and amended by the creditors.  The proof of claim filed by Point

19  Center Financial ("Point Center") as the alleged "designated agent" for scores of purported

20  individual investors and three Point Center 'affiliates' is under intense scrutiny by the Debtor as it

21  is intertwined with the Point Center Litigation described below. See, Krentel Declaration at ¶3.

22    On January 21, 2009 the Debtor filed a motion to extend the exclusivity periods in this

23  case.  The only objection to that motion came from Point Center.  This Court overruled the

24  objection and granted the motion after a hearing that took place on March 11, 2009, extending until

25  May 22, 2009, the exclusivity period within which the Debtor has the exclusive right to file a Plan,

26  and extending to July 22, 2009, the exclusivity period within which the Debtor has the exclusive

27  right to solicit acceptances thereto.  The Debtor requires additional time within which to formulate

28

-4-

1   its reorganization plan due in substantial part to the delaying tactics on the part of Point Center in

2   the Point Center Litigation in its non cooperation in the Debtor's discovery efforts, and the as yet

3   unresolved matter of the CEQA Challenge.  See, Krentel Declaration at ¶4.

### B.   The Legacy Highlands and the Point Center Litigation

#### (i)   The Legacy Highlands

6        To put the dynamics of this case in context, there is a dispute with Point Center as to the

7   nature, extent and validity of the interest it claims as the purported "agent" for other investors in the

8   approximately 700 acres of real property within the "Legacy Highlands" project which is the

9   Debtor's most valuable asset.[1]  Point Center is NOT the lender to the Debtor.  The Legacy

10  Highlands is a unique, multi-generational master planned community set within the rolling hills of

11  West Beaumont, located in Riverside County, California.  Land uses include conventional

12  residential single family homes on lots ranging in size from 7,000 to 20,000 square feet, PUD

13  residential single family homes, a gated "active Adult" community which consists of residential

14  single family homes with lots ranging from 4,000 to 7,000 square feet, parks, school sites and trails.

15  A total of 2,868 residential lots have been approved as described below.  See, Krentel Declaration

16  at ¶5.

17       The Specific Plan that sets the zoning standards was approved in January of 2008 after six

18  years of work on this project.  The Environmental Impact Report was certified, the Tentative Parcel

19  Map, and a 25 year Development Agreement with two five year extensions of time were also

20  approved by the City Council of the City of Beaumont in January of 2008. The Final Parcel Maps

21  are in the process of being recorded.  All the "back bone" infra-structure improvement plans for

22  Portero Parkway, 4th Street, and South Loop Road have been prepared.  All the in-tract infra-

23  structure including water, sewer, storm drain, grading, and final maps for planning areas 1.1

24  through 1.9, 3.1 through 3.3, and 4.1 through 4.4 are completed and are in "plan check" at the City

---

[1]  The Point Center Claim is scheduled as Disputed, Unliquidated and Contingent in Schedule D (Exhibit 5
to the Motion).  In addition, the Debtor disputes that 46 acres of land *possibly within the legal description*
of the deed of trust securing the Point Center Claim was intended to be security for the loan arranged by
Point Center.

1  of Beaumont. The Tentative Tract maps are also prepared and have been approved *for financing*

2  *purposes* by the City of Beaumont. All Tract Maps, and all Improvement Plans are, with the

3  exception of storm drain, are continued to be processed through the City of Beaumont. The City of

4  Beaumont supports and has approved the Legacy Highlands project. The Debtor has been

5  proceeding forward with work necessary for the completion of the entitlement process for the

6  Legacy Highlands project as described above.   The Debtor's actions post-petition have been for

7  the purpose of enhancing the value of the Legacy Highlands project. See, Krentel Declaration at

8  ¶6.

9              **(ii)     The Point Center Litigation**

10             **(a)     The Loan Arranged by Point Center**

11             Prior to the Petition Date, in or about September 2006 the Debtor entered into a loan

12  transaction arranged by Point Center for a $39,000,000.00 fully funded development loan (the

13  "Loan") with 24 months of draws, and was promised two (2) one-year extensions (to extend the

14  loan to September 2010) wherein the Debtor was the borrower, secured by a Deed of Trust on real

15  property in the County of Riverside, State of California consisting of approximately 1,300 acres

16  known as the "Legacy Highlands" project. *Point Center was not the lender to the Debtor, only the*

17  *arranger of the Loan the funding of which was to come from third party investors, for which it was*

18  *to be paid a fee of $2,340,000.00.* Among other aspects of the Loan was that $9,650,000.00 would

19  be retained by Point Center as a 24-month interest reserve and there was a further soft cost

20  holdback of $7,251,736.00 placed in a trust account on behalf of the Debtor. Interest reserves in

21  commercial loans are typically set aside on "day one" and are untouchable for any other purpose.

22  Point Center was paid a loan broker fee of $2,340,000.00 which was calculated based upon a fully

23  funded $39 million loan.  See, Krentel Declaration at ¶7, which attaches collectively as Exhibit

24  "1" the Escrow Closing Statement and "HUD-1"[2] received by the Debtor from the Escrow that

25

26  [2] The HUD-1 states the following prominent warning at page 3 thereof: "WARNING: It is a crime to
knowingly make false statements to the United States on this or any other similar form. Penalties upon

27  conviction can include a fine or imprisonment. For details see: Title 18 U.S. Code Sections 1001 and
1010." See, Exhibit 1.

28

1   confirm the foregoing details, including (i) a $39,000,000.00 fully funded loan, (ii) a 24 month

2   interest reserve of $9,650,000.00, (iii) a holdback of $7,251,736.00 and (iv) a loan broker fee of

3   $2,340,000.00 for the arranging of the $39,000,000.00 loan.

4                    (b)      **The Loan was Not Fully Funded**

5          In or about October 2007 the Debtor was advised by Point Center that the Loan was <u>not</u>

6   <u>fully funded</u> as previously represented and that there was a *shortfall* of approximately

7   $7,675,980.00.  As a direct result of the missing funds of approximately $7,675,980.00 described

8   above, there were no funds available from the Loan after the tenth draw to pay for "soft costs" or

9   related interest reserves relating to the ongoing development of the Legacy Highlands which

10  include but are not limited to consulting fees, 'contingency', legal and insurance, management fees,

11  property maintenance and property tax reserves, as well as there being no remaining interest

12  reserve for the Loan all as indicated on closing statements and other transactional documents as of

13  the date of the original funding.  <u>See</u>, Krentel Declaration at ¶8.

14         After the *existence of the shortfall* was disclosed to the Debtor by Point Center, the Debtor

15  immediately made arrangements to raise money through Deep Canyon Holdings, Inc. ("DCH") in

16  order to assist in the replacement of the missing proceeds.  After DCH provided over $1.3 million

17  to Point Center and was granted a definitive fractionalized interest in the Loan in its own name,

18  further funding by DCH was refused by Point Center in violation of the terms of its loan

19  modification with The Preserve, and Point Center indicated that no further investment would be

20  allowed by DCH in connection with the Loan.  <u>See</u>, Krentel Declaration at ¶9.

21         The disclosure by Point Center in approximately October 2007 that <u>$7,675,980.00 of the</u>

22  <u>funds attributable to the $39 million loan arranged by Point Center in 2006</u> **were not existent** left

23  the Debtor 'in the lurch' without the full use of the anticipated proceeds from the loan for its use in

24  the ongoing development process involving the "Legacy Highlands" project which is the Debtor's

25  most valuable asset.  In order to keep the development processes moving forward and as a direct

26  consequence of no funds being available from the Loan after the tenth draw as described above,

27  commencing in or about October 2007, Scott Krentel arranged for loans to the Debtor, at a great

28

1  personal hardship to Mr. Krentel.  As of the Petition Date the loans arranged by Mr. Krentel to the

2  Debtor were in the total principal amount of $1,117,497.00.  Notwithstanding objection by Point

3  Center, this Court approved the proposed post-petition borrowing from Mr. Krentel (in an amount

4  up to $2 million for the purpose of funding the Debtor's post-petition cash needs) pursuant to its

5  order entered on November 26, 2008 and the debtor has been proceeding forward in its

6  reorganization efforts with *replacement funding* from Mr. Krentel.  The Debtor is current with its

7  post-petition administrative obligations.  See, Krentel Declaration at ¶10.

8  **(c)**      **Status of the Point Center Litigation**

9          A lawsuit was filed by the Debtor against Point Center and others in the Riverside Superior

10  Court prior to the Petition Date relating to the transaction which is the subject matter of that

11  claimed interest prior to the Petition Date (the "Point Center Litigation").  As described above,

12  Point Center diverted for its own purposes **$7.675 million of the Debtor's funds** out of the

13  purported $39 million loan it arranged.  In addition, at the time of the origination of the $39 million

14  loan, Point Center was paid a loan broker fee of **$2.34 million** which was calculated based upon a

15  fully funded $39 million loan (which was obviously never fully funded).  *There is a minimum of*

16  *over $10 million in damages just attributable to those two items alone.*   The relief sought in the

17  Point Center Litigation is based upon claims set forth in the Complaint for Civil Rico, Fraud,

18  Conversion, Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing,

19  Rescission, Reformation, Injunctive Relief and the Appointment of a Receiver.  Significant

20  monetary damages in an amount in excess of $60 million and other relief is sought in the Point

21  Center Litigation on behalf of the Debtor.  See, Krentel Declaration at ¶11.

22          The Point Center Litigation is presently before this Court as a result of a Notice of Removal

23  filed by the defendants on October 30, 2008.  The matter was referred to this Court by the United

24  States District Court.  A second status conference is presently set for May 27, 2009 at 2:00 p.m. in

25  this Court.  It is anticipated that the discovery problems described below will be addressed at that

26  time in a preliminary fashion.  See, Harvey Declaration at ¶2.

27

28

1        Point Center has not produced documents that have been repeatedly requested on behalf of

2    the Debtor in the Point Center Litigation.  No contact information regarding the *investors*

3    purportedly represented by Point Center or monies actually received from *investors* in connection

4    with the Loan have been produced to date.  No documents concerning any commissions received

5    by Point Center, and any information that relates to the transaction forming the basis of the proof

6    of Claim filed by Point Center regarding Point Center's methodology in doing business, the actual

7    location of funds purportedly invested in the Loan but misdirected to other loans in an alleged "bait

8    and switch" of documents which were not to be a part of the Debtor's Loan have been produced to

9    date.  Special Litigation Counsel for Debtor was not supplied the information either in the Rule 26

10   (Bankruptcy Rule 7026) "disclosure" process or in response to formal document discovery

11   demands propounded under Rule 34 (Bankruptcy Rule 7034) that were responded to on May 8,

12   2009 without the concurrent production of a single document.  Steps are in process to compel

13   discovery.  The Demand for production of documents is attached as Exhibit 2 to the Harvey

14   Declaration and the Response thereto is attached as Exhibit 3 to the Harvey Declaration.  See,

15   Harvey Declaration at ¶3.

16       **C.**    **The CEQA Challenge**

17       The CEQA Challenge was tried and a judgment was obtained specifying corrective matters

18   regarding those portions of CEQA's requirements that were found wanting.  The Debtor has, even

19   before trial, conducted its own further water analysis and believes that it can with relative ease

20   supply the City of Beaumont (the "City") with additional factual data about water as well as more

21   information regarding the unacceptability of the suggested alternatives and furnish more support for

22   the overriding benefits of the project.  The Debtor has been advised by its professionals and

23   consultants that it is likely that the correction activities can be completed within the next 4 to 6

24   months and then submitted to the same superior court for confirmation and the matter of the CEQA

25   Challenge concluded favorably to the Debtor and the City.  The Debtor is prepared to pursue this

26   option for the resolution of the CEQA Challenge.  The other option is a settlement with the CEQA

27   Challenge plaintiffs.  The Debtor is in the process of settlement discussions, through its

28

1  consultants, with the CEQA Challenge plaintiffs which, if consummated, would accelerate the

2  process for the favorable resolution of the CEQA Challenge. Either way, the Debtor believes that

3  the CEQA Challenge will be resolved within the next 4 to 6 months either through corrective

4  actions with the City and the superior court or through a settlement with the CEQA Challenge

5  plaintiffs. See, Krentel Declaration at ¶12.

6      **D.**    **Other Properties**

7      The Debtor continues to explore the possible purchase of an additional 57 lots that are

8  contiguous to the Adelanto Finished Lot upon very favorable terms to the Debtor. The Debtor is

9  also continuing to explore what to do with the 112 Acres. See, Krentel Declaration at ¶13.

10      **E.**    **Challenges in Plan Formulation**

11      The Debtor has other secured creditors whose scheduled *undisputed* claims are secured by

12  real property assets *other than the Legacy Highlands project*. The Debtor also has general

13  unsecured creditors having claims in excess of $6 million. The Debtor fully intends to propose a

14  Chapter 11 Plan that fairly treats the claim asserted by Point Center as the alleged agent for third

15  party investors when its true nature, extent and validity is finally determined as well as fairly treats

16  the claims of its other secured and unsecured creditors. See, Krentel Declaration at ¶14.

17      The Debtor faces the following challenges, among others, in attempting to address the

18  proof of claim filed by Point Center (*as an alleged agent*) in its formulation of a plan pertaining

19  thereto:

20      •    Point Center is <u>not</u> the lender;

21      •    Point Center has <u>not</u> produced, although formally requested by the Debtor, any

22      document allowing it to represent any purported *investor(s)* in this case;

23      •    Point Center has <u>not</u> produced, although formally requested by the Debtor, any

24      document to verify that any alleged *investor* it purports to represent actually

25      provided one dollar attributable to the Loan;

26      •    Point Center has <u>not</u> produced, although formally requested by the Debtor, any

27      document in the form of contact information relating to any alleged *investor* in

28

1    order for the Debtor to verify that such person is truly an *investor* in the Loan and as

2    a result entitled to treatment in connection with the Loan in a plan and entitled to

3    receive notice of a bar date in connection with its claim; and

4    • The Debtor is in the process of reviewing the public record regarding the Loan

5    when compared to what it has reviewed to date in the form of what was produced

6    previously by Point Center and what is in the Debtor's files.

7  See, Krentel Declaration at ¶15.

8    The Debtor believes that Point Center has what appears to be a clear <u>conflict of interest</u> in

9  this matter since it has not to date, nor will it in its anticipated objection to this Motion, represent

10  to this Court **under oath** that it has **disclosed to all of the alleged investors in the Loan** that,

11  notwithstanding it was paid a fee of $2,340,000 based upon a fully funded $39 million loan, <u>in fact</u>

12  (i) the Loan was not fully funded, (ii) when the Debtor obtained an additional funding source

13  (DCH) to replace the missing Loan proceeds, further funding from DCH was refused by Point

14  Center in violation of the terms of its Loan modification with the Debtor and (iii) the Debtor had

15  initiated litigation against Point Center in September 2008 for Civil Rico, Fraud, Conversion,

16  Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Rescission,

17  Reformation, Injunctive Relief and the Appointment of a Receiver in connection with the Loan.

18  The Debtor believes that Point Center does not want its *investors* in this Loan (to the extent they

19  can be disclosed and verified) as well as the other plaintiffs in other litigation pending against

20  Point Center as well as regulatory authorities already examining Point Center to know about the

21  problems with the Loan and is, for that reason, *stonewalling* the Debtor in its discovery efforts and

22  the assertion of its rights in the Point Center Litigation.

23    <u>The Debtor wants to negotiate with the legitimate investors/creditors involved with the</u>

24  <u>Loan</u>. There is an inherent problem dealing directly with a party (Point Center) whom the Debtor

25  believes is not only dishonest but is also 'hiding the ball' from the Debtor and the true investors.

26  The Debtor has been stymied in its efforts to ascertain the contact information and back-up

27  regarding any investor in the Loan. The Debtor is fully prepared to discuss plan issues such as a

28

payoff and payment options and/or profit participation in the Legacy Highlands in the future, and

participation in the Point Center Litigation with the true legitimate creditors (investors) in the Loan

in this case once their contact information is disclosed in order for the Debtor to confirm their *bona*

*fides* in connection therewith.  See, Krentel Declaration at ¶16.

**F.    Summary**

As reflected in the case overview above, the Debtor has been successful in prosecuting this

case within the context of Chapter 11 over the past eight months, and is in complete compliance

with the requirements of the Office of the United States Trustee.  The Debtor has been totally

frustrated in its discovery efforts in the Point Center Litigation to obtain information about the Loan

and the identities and contact information of the true *investors* because of the stonewalling and

delaying tactics of Point Center in its "hiding the ball" from the Debtor as to its *bona fides* in the

case.  The Debtor has demonstrated that it will have "probable success" in formulating a Chapter 11

plan in this case because of the ongoing financial support by Mr. Krentel, the ongoing development

efforts, and the continued pursuit by the Debtor of the Point Center Litigation.  Accordingly, the

Debtor believes that good cause exists in this case for the Court to grant an extension of the plan

exclusivity periods by 120 days each, as requested in this Motion.

**II.**

**THIS COURT HAS AUTHORITY TO EXTEND THE EXCLUSIVE PERIODS**

**FOR FILING A PLAN AND SOLICITING ACCEPTANCES THERETO**

Pursuant to 11 U.S.C. 1121(b), a Chapter 11 debtor has the exclusive right to file a plan of

reorganization during the first 120 days following the filing date of a Chapter 11 bankruptcy

petition and to thereafter solicit acceptances to any plan so filed for a period of an additional 60

days.  11 U.S.C. § 1121(b):

> Except as otherwise provided in this section, only a debtor may file a plan
> until after 120 days after the date of the order for relief under this Chapter.

11 U.S.C. § 1121(b).

1    No other party in interest may file a plan of reorganization unless: (i) a trustee has been

2    appointed, (ii) the debtor has not filed a plan within 120 days after the date of the order of relief, or

3    (iii) the debtor has not filed a plan that has been accepted before 180 days after the date of the order

4    for relief by each class of claims or interests that is impaired by the plan.  See, 11 U.S.C. § 1121(c).

5    However, 11 U.S.C. §1121(d)(1) empowers the Court to reduce or extend the 120-day and 180-day

6    periods for "cause" when it provides, in pertinent part:

7        (1) Subject to subparagraph (2), on request of a party in interest made within
         the respective periods specified in subsection (c) of this section and after
8        notice and a hearing, the court may for cause reduce or increase the 120-day
         period or the 180-day period referred to in this section.
9

10   11 U.S.C. § 1121(d)(1).

11       The Bankruptcy Code does not define "cause" as used in 11 U.S.C. § 1121(d).  The decision

12   regarding whether to grant a request to extend the exclusivity periods lies within the sound

13   discretion of the bankruptcy judge.  In re Gibson & Cushman, 101 B.R. 405, 409 (E.D.N.Y. 1989).

14   The accepted standard to extend the exclusivity periods, which is supported by the legislative

15   history of Section 1121, requires merely that the debtor make a "showing of some promise of

16   success for reorganization."  In the case, In re Matter of Newark Airport/Hotel Ltd. Partnership,

17   156 B.R. 444, 451 (Bankr. D.N.J. 1993) affirmed 155 B.R. 93 (D.N.J. 1993), the court stated:

18       . . . **As the legislative history to § 1121(d) indicates, the legislature
         intended that the granting of an extension would be based "on a showing
19       of some promise of probable success [for reorganization]."**  11 U.S.C.A.
         § 1121(d) (Historical and Revision Notes, S. Rept. No. 95-989).
20            . . .
         The purpose of the debtor's exclusivity period is to make a chapter 11 filing
21   attractive enough to encourage ailing businesses to seek reorganization without
     unduly delaying creditors.  See In re Pine Run, 67 B.R. at 434.  If the chapter
22   11 provisions did not enable the debtor to remain in control for at least some
     period of time, debtors would likely avoid the provisions of chapter 11
23   reorganization until it would no longer be an effective remedy.  Id. at 435,
     relying on, H.R.Rep. No. 595, 95th Cong., 2d Sess. 231-232 (1978), reprinted
24   in U.S.C.C.A.N.1978, pp. 5787, 6191.

25   Id. at 451 (emphasis added).  See also  In re Landmark Park Plaza Ltd. Partnership, 167 B.R. 752,

26   756 (Bankr. D. Conn. 1994)("exclusivity extension based upon a showing of some promise of

27   probable success"); In re Montgomery Court Apartments of Ingham County, Ltd, 126 B.R. 537,

28
                                              -13-

1    539 (Bankr. S.D. Ohio 1991) ("a debtor seeking an extension should make a showing 'of some

2    probable success' in formulating a plan."); In re Grossinger's Associates, 116 B.R. 34, 36 (Bankr.

3    S.D.N.Y. 1990) ("probable success in formulating a plan of reorganization"); In re Washington-St.

4    Tammany Elec. Co-op., Inc., 97 B.R. 852, 854 (E. D. La. 1989) ("the granted extension should be

5    based on a showing of some promise of probable success"); In re Texaco Inc., 76 B.R. 322, 326

6    (Bankr. S.D.N.Y. 1987) ("probable success in formulating a plan of reorganization").

7         Further, the very notion of the exclusivity period is to favor and promote the Debtor's

8    efforts to reorganize.  See, Legislative History 140 Cong. Rec. H 10714, October 4, 1994.  In the

9    case, In re Eagle-Picher Industries, Inc., 176 B.R. 143 (Bankr. S.D. Ohio 1994), the official

10    unsecured creditors' committee filed a motion to terminate the debtor's exclusivity period so that it

11    could file a competing plan.  The official unsecured creditors' committee believed that the

12    presentation of competing plans would serve to expedite a prompt resolution of the case and,

13    therefore, that the debtor's exclusivity period should be terminated.  The court found that this did

14    not constitute cause for the termination of the debtor's exclusivity period, specifically stating:

15         The view of the UCC [Committee] that it should in fairness be allowed to
           file an alternative plan because it is entitled to a level playing field does not lead

16         us to alter our view that the UCC has failed to show cause for termination of the
           exclusivity period.  **The UCC argued that a level playing field was what was**

17         **contemplated by the Bankruptcy Code.  That is simply not so.  The concept**
           **of an exclusivity period in favor of the debtor, a consideration at the heart**

18         **of the Bankruptcy Code, on its face contradicts the notion that parties in a**
           **chapter 11 bankruptcy case be given an equal opportunity to seek**

19         **confirmation of a plan.**  What will happen now in these consolidated cases is
           that they will proceed in the manner contemplated by the Bankruptcy Code.

20         That is debtors under the shield of exclusivity will present their plan.  Other
           constituencies, all in these case, represented by knowledgeable and competent

21         counsel, can then take such steps in pursuit of the interest of their constituencies
           as are appropriate.  If the debtor's plan fails at confirmation, then it may be

22         appropriate for these constituencies to present their own plan or plans.

23    Id. at 148 (emphasis added).

24         The "cause" standard referred to in Section 1121 has been referred to as a general standard

25    that allows the bankruptcy court "maximum flexibility to suit various types of reorganization

26    proceedings."  In re Public Service Company of New Hampshire, 88 B.R. 534 (Bankr. D.N.H.

27    1988).  Courts have recognized that the diligence of management and the proper administration of

28

-14-

-

1   the case are factors supporting an extension of the exclusivity periods.  *See* In re United Press

2   International, supra.

3          The cases cited above amalgamate the following relevant factors in determining "cause" for

4   the requested extension (*see also*, In re Henry Mayo Newhall Memorial Hospital, 282 B.R. 444,

5   452 (9th Cir. BAP 2002)):

6          •    **Was this the first extension requested**

7          This is the second extension requested by the Debtor in this case.  The request by the

8   Debtor was made timely.  The Debtor contends that it has been delayed in its reorganization efforts

9   by the stonewalling tactics of Point Center in the Point Center Litigation among other factors set

10  forth in this Motion.

11         •    **Was the case complicated**

12         The Debtor submits that this case is complex for three reasons.  The first is the magnitude

13  and inherent complexity of the Legacy Highlands project in and of itself that has been worked on

14  for well over six years.  The entitlements process is substantially completed which the Debtor

15  contends has enhanced the value of the Legacy Highlands project.  Second, the Debtor has

16  proactively pursued the resolution of the CEQA Challenge and believes it will be favorably

17  resolved within the next 4 to 6 months after either identified corrections are submitted to the trial

18  court or the matter settled.

19         The third reason is the pending litigation against Point Center, which will be tried before a

20  jury in the United States District Court next year.  **Stated simply, Point Center took money that**

21  **belonged to the Debtor, paid itself a fee that it did not earn, and through its improper actions**

22  **precipitated the filing of this case.**  The Court should properly consider the pendency of the Point

23  Center Litigation in deciding whether to extend the exclusivity periods provided by Section

24  1121(d) of the Bankruptcy Code.  See, e.g., In re Slettleland, 260 B.R. 657, 670 (S.D.N.Y. 2001)

25  ("litigation may be one factor, among others, that supports an extension"); In re Texaco, Inc.,

26  supra, at 325 (Bankruptcy court extended exclusivity twice to give the debtors "a reasonable

27  opportunity to pursue their appeal of the Pennzoil judgment" and "to negotiate with the creditors in

28

-15-

1    order to formulate a plan of reorganization"); In re United Press International, supra, at 270 ("a

2    pending appeal, along with the consideration of other factors, may lead to a finding of cause for

3    extending the exclusivity period.").

4            The existence of litigation can constitute cause for an extension where the mass, weight,

5    volume and complication of the litigation justify a "shakedown period". In re Southwest Oil of

6    Jourdanton, Inc., 84 B.R. 448, 452 (Bankr. W.D. Tex. 1987); In re Manville Forest Products Corp.,

7    31 B.R. 991,995 (S.D.N.Y. 1983). In Manville Forest Products Corp., supra, the District Court

8    affirmed the Bankruptcy Court's granting of the **fifth extension of the exclusivity period** based on

9    a significant amount of litigation involving the Debtor's parent company, even though there was no

10   substantial showing of any lawful claims of the parent's creditors against the Debtor's assets.

11           In In re Gibson & Cushman, supra, the Bankruptcy Court granted successive motions that

12   had the effect of extending the period in which the Debtor may file a plan to **over one and one half**

13   **years after the filing of the petition**. The filing of the petition was prompted by Debtor's desire

14   to maintain its business while challenging the validity of a $2.5 million dollar state tort judgment

15   rendered against the Debtor. According to the Debtor, the judgment was "likely to be reversed by

16   the state appellate court because, inter alia, it was fraudulently obtained." Id. at 406-407. In

17   addition to the judgment, two major claims were noticed against the Debtor's estate, one claim

18   alleged breach of contract seeking approximately $600,000, and the other claim sought to hold the

19   debtor liable in the amount of two million dollars for personal injuries allegedly suffered by a

20   plaintiff. After reviewing the relevant case law, the District Court affirmed the Bankruptcy Court's

21   order extending the exclusivity period.

22           The disclosure of information in the discovery process, stonewalled to date by Point Center,

23   and the prosecution to a conclusion of the Point Center Litigation is inextricably intertwined with

24   the Debtor's ability to propose a meaningful plan with the true creditors involved in the process.

25   However, the Debtor is asserting claims for significant monetary damages which necessarily will

26   impact the claim filed by Point Center and its treatment under a plan once a dialog with the true

27   investors is opened.

28

                                                    -16-

- **Was the case pending for a long time relative to its size and complexity**

This case has not been pending for a "long time" since it was filed on September 25, 2008, just eight months ago relative to its size and complexity described above.  The Debtor has made progress in both the entitlement processes and in its prosecution of the pending litigation against Point Center.

- **Was the debtor proceeding in good faith**

The Debtor asserts that it filed its Chapter 11 case in good faith and is proceeding in good faith in its efforts to reorganize.  The Debtor is current in its administrative operating expenses through Court-approved borrowing (over the objection of Point Center) and is in complete compliance with the requirements of the Office of the United States Trustee.

- **Was the debtor paying current operating expenses**

The Debtor is current in its administrative operating expenses through Court-approved borrowing (over the objection of Point Center) and is in complete compliance with the requirements of the Office of the United States Trustee.  Courts have recognized that the diligence of management and the proper administration of the case are yet additional factors in supporting an extension of the exclusivity periods.  See, In re United Press International, 60 B.R. 265, 269-270 (Bankr. D.C. 1986); In re Trainer's, Inc., 17 B.R. 246, 247 (Bankr. E.D. Pa. 1982).  In the present case, the Debtor has properly administered its Chapter 11 case.  The Debtor has complied with the requirements of the Bankruptcy Code and the Bankruptcy Rules, is in full compliance with the requirements of the Office of the United States Trustee, and is current on its administrative expenses.

- **Was there a reasonable prospect for filing a viable plan and prepare adequate information**

The Debtor has invested and continues to invest significant time and monies toward a reorganization of its financial affairs.  It has significant assets and simply wants the opportunity to negotiate with its true legitimate creditors, not an agent that through its dishonesty has caused significant damage to the Debtor and is on the other side of litigation with the Debtor.

1

- **Was there satisfactory progress negotiating with key creditors**

2    Debtor believes that Point Center does not represent the interests of 'investors' relevant to

3    the Loan and the Debtor is evaluating how to proceed with a diversity of constituents apparently

4    present here regarding the Loan:  (i) DCH, which has appeared several times in this case and has

5    indicated that Point Center does not speak for it in connection with the Loan, and has filed its own

6    secured claim with reference to its fractional interest in the Loan; (ii) alleged *investors* in the Loan

7    who are true, legitimate creditors; (iii) alleged *investors* in the Loan who have no paper trail

8    relating them to the Loan; (iv) investors in Pools managed/arranged by Point Center who are

9    plaintiffs in pending litigation in Orange County Superior Court against Point Center who *may* be

10    interested in connection with the Loan; and (v) perhaps the SEC, FBI, Riverside County District

11    Attorney, a Grand Jury, the California Department of Real Estate, a receiver or other fiduciary.

12

- **Was the extension sought to pressure creditors**

13    The Debtor has not pressured any of its creditors with regard to a particular payment

14    proposal, although there have been discussions with parties *other than* Point Center post-petition in

15    that regard with regard to the Loan.  The Debtor does not anticipate that any creditor or party in

16    interest other than Point Center will object to the granting of the Motion.  Point Center has

17    presented no written evidence that it has standing to represent *anyone* in this case.

18    Courts have found that cause exists to extend the plan exclusivity periods where there is no

19    evidence that an extension is being sought for the purpose of pressuring creditors into acceding to a

20    debtor's reorganization demands. *See* In re Pine Run Trust, Inc., 67 B.R. 432 (Bankr. E.D. Pa.

21    1986).  In this case, the Debtor's requested plan exclusivity extension is not intended to hold the

22    parties in interest in this case "hostage" to the Debtor's restructuring efforts.  The Debtor is not

23    attempting to force its approach to financial reorganization upon its creditors.  The extension is

24    necessary in light of the substantial and material unresolved issues outlined above (i.e., the

25    prosecution of the Point Center Litigation, disclosure of the identities and contact information of

26    true investors, the ongoing development efforts, and the resolution of the CEQA Challenge).  The

27

28

-18-

1    extension of time sought by the Debtor will afford an opportunity to continue to deal with the issues

2    outlined above, and to negotiate with creditors and parties in interest concerning a Chapter 11 plan.

3         •    **Was there an unresolved contingency**

4    There are the unresolved contingencies of what the Debtor actually owes with regard to the

5    Loan, *if anything*, at the end of the day, and whether it is validly secured in the first instance, the

6    completion of the entitlement process, as well as the final resolution of the CEQA Challenge by

7    settlement or corrective matters.

8         As set forth above, the Debtor's request for an extension of the exclusivity periods for the

9    filing of a plan and the solicitation of acceptances to such a plan satisfies the general principles

10   established by the courts as guidelines for a Debtor demonstrating "cause" within the meaning of

11   11 U.S.C. §1121(d).  The Debtor has not yet been able to formulate a Chapter 11 plan in this case

12   for the reasons set forth above.  The reasons are compelling, not subject to serious dispute, and

13   constitute "cause" for the granting of the Motion.

14                                    **III.**

15                    **THE DEBTOR'S MOTION IS TIMELY**

16        Pursuant to 11 U.S.C. §1121(d), on request of a party-in-interest, and after notice and a

17   hearing, the Court may extend the exclusivity periods specified by 11 U.S.C. §1121 if such request

18   for the extension of the exclusivity periods *is made prior to the expiration of the statutory period.*

19   Since the expiration of the statutory period is currently May 22, 2009, the filing of this Motion is

20   timely.

21                                    **IV.**

22       **PURSUANT TO LOCAL BANKRUPTCY RULE 9013-1(o)(1), AN ORDER**

23       **GRANTING THE RELIEF SOUGHT BY THIS MOTION MAY BE OBTAINED**

24                          **WITHOUT A HEARING**

25        Local Bankruptcy Rule 9013-1(o)(1) provides that matters can be determined "Upon Notice

26   of Opportunity to Request Hearing" except as to matters specifically noted in Local Bankruptcy

27   Rule 9013-1(o)(2).  Relief of the type requested in this Motion is not specifically noted in Local

28
                                    -19-

1  Bankruptcy Rule 9013-1(o)(2) and therefore may be determined upon *notice of opportunity to*

2  *request a hearing* basis.  Thus, an order on this Motion may be obtained without a hearing in the

3  absence of a timely objection.

### V.

### CONCLUSION

5  The Debtor respectfully requests that this Court grant the relief requested herein without

7  the need for a hearing, if no objection by a party in interest is timely filed, and if an objection and

8  a request for hearing is timely filed, that the Court grant the relief requested herein after hearing.

10  DATED:  May 20, 2009                **BROKER & ASSOCIATES**
                                        **PROFESSIONAL CORPORATION**

12  By:  _____

13                                       Jeffrey W. Broker
                                         General Reorganization Counsel for
14                                       Debtor and Debtor-in-Possession

-20-

## DECLARATION OF SCOTT KRENTEL

I, Scott Krentel, declare and state as follows:

1.    The matters stated herein are true and correct and are within my personal knowledge, and if called upon to testify as a witness, I could and would testify competently thereto. I am the manager of Beaumont 1600, a California Limited Liability Company, which is the manager of the Debtor.

2.    This case was commenced by the filing of a voluntary Chapter 11 petition by the Debtor on September 25, 2008 (the "Petition Date"). The Debtor is in the business of acquiring and making real estate investments, and by and through the efforts of its consultants, both political and technical, designs, plans and offers for sale to developers their projects consisting of single family residential lots, commercial and industrial projects to then sell to the public and private builder-developers throughout the United States at a profit.

3.    The Debtor has obtained timely Court authorization to employ General Reorganization Counsel and two law firms to handle litigation matters as its Special Litigation Counsel involving the "Point Center Litigation" and the "CEQA Challenge" described below. The examination of the Debtor pursuant to 11 U.S.C. §341(a) was held and concluded on November 12, 2008. The Debtor is current in its reporting requirements with the Office of the United States Trustee, is current in the payment of its quarterly fees, and has no unpaid administrative expenses. The bar date has now passed and the Debtor is in the process of examining claims, some of which the Debtor believes will be resolved consensually and amended by the creditors. The proof of claim filed by Point Center Financial ("Point Center") as the alleged "designated agent" for scores of purported individual investors and three Point Center 'affiliates' is under intense scrutiny by the Debtor as it is intertwined with the Point Center Litigation described below.

4.    On January 21, 2009 the Debtor filed a motion to extend the exclusivity periods in this case. The only objection to that motion came from Point Center. This Court overruled the objection and granted the motion after a hearing that took place on March 11, 2009, extending until May 22, 2009, the exclusivity period within which the Debtor has the exclusive right to file a Plan,

and extending to July 22, 2009, the exclusivity period within which the Debtor has the exclusive

right to solicit acceptances thereto.  The Debtor requires additional time within which to formulate

its reorganization plan due in substantial part to the delaying tactics on the part of Point Center in

the Point Center Litigation in its non cooperation in the Debtor's discovery efforts, and the as yet

unresolved matter of the CEQA Challenge. .

      5.      To put the dynamics of this case in context, there is a dispute with Point Center as

to the nature, extent and validity of the interest it claims as the purported "agent" <u>for other</u>

<u>investors</u> in the approximately 700 acres of real property within the "Legacy Highlands" project

which is the Debtor's most valuable asset.[3]  Point Center is NOT the lender to the Debtor.  The

Legacy Highlands is a unique, multi-generational master planned community set within the rolling

hills of West Beaumont, located in Riverside County, California.  Land uses include conventional

residential single family homes on lots ranging in size from 7,000 to 20,000 square feet, PUD

residential single family homes, a gated "active Adult" community which consists of residential

single family homes with lots ranging from 4,000 to 7,000 square feet, parks, school sites and

trails.  A total of 2,868 residential lots have been approved as described below.

      7.      The Specific Plan that sets the zoning standards was approved in January of 2008

after six years of work on this project.  The Environmental Impact Report was certified, the

Tentative Parcel Map, and a 25 year Development Agreement with two five year extensions of time

were also approved by the City Council of the City of Beaumont in January of 2008.  The Final

Parcel Maps are in the process of being recorded.  All the "back bone" infra-structure improvement

plans for Portero Parkway, 4th Street, and South Loop Road have been prepared.  All the in-tract

infra-structure including water, sewer, storm drain, grading, and final maps for planning areas 1.1

through 1.9, 3.1 through 3.3, and 4.1 through 4.4 are completed and are in "plan check" at the City

of Beaumont.  The Tentative Tract maps are also prepared and have been approved *for financing*

---

[3] The Point Center Claim is scheduled as Disputed, Unliquidated and Contingent in Schedule D (Exhibit 5 to the Motion).  In addition, the Debtor disputes that 46 acres of land *possibly within the legal description* of the deed of trust securing the Point Center Claim was intended to be security for the loan arranged by Point Center.

1  *purposes* by the City of Beaumont.  All Tract Maps, and all Improvement Plans are, with the

2  exception of storm drain, are continued to be processed through the City of Beaumont.  The City of

3  Beaumont supports and has approved the Legacy Highlands project.  The Debtor has been

4  proceeding forward with work necessary for the completion of the entitlement process for the

5  Legacy Highlands project as described above.    The Debtor's actions post-petition have been for

6  the purpose of enhancing the value of the Legacy Highlands project.

7            7.        Prior to the Petition Date, in or about September 2006 the Debtor entered into a loan

8  transaction <u>arranged by</u> Point Center for a $39,000,000.00 fully funded development loan (the

9  "Loan") with 24 months of draws, and was promised two (2) one-year extensions (to extend the

10  loan to September 2010) wherein the Debtor was the borrower, secured by a Deed of Trust on real

11  property in the County of Riverside, State of California consisting of approximately 1,300 acres

12  known as the "Legacy Highlands" project.  *Point Center was <u>not</u> the lender to the Debtor, only the*

13  *<u>arranger</u> of the Loan the funding of which was to come from third party investors, for which it was*

14  *to be paid a fee of $2,340,000.00*.  Among other aspects of the Loan was that $9,650,000.00 would

15  be retained by Point Center as a 24-month interest reserve and there was a further soft cost

16  holdback of $7,251,736.00 placed in a trust account on behalf of the Debtor.  Interest reserves in

17  commercial loans are typically set aside on "day one" and are untouchable for any other purpose.

18  Point Center was paid a loan broker fee of $2,340,000.00 which was calculated based upon a fully

19  funded $39 million loan.    Attached hereto collectively as Exhibit "1" are the Escrow Closing

20  Statement and "HUD-1"[4] received by the Debtor from the Escrow that confirm the foregoing

21  details, including (i) a $39,000,000.00 fully funded loan, (ii) a 24 month interest reserve of

22  $9,650,000.00, (iii) a holdback of $7,251,736.00 and (iv) a loan broker fee of $2,340,000.00 for the

23  arranging of the $39,000,000.00 loan.

24

25

26  [4] The HUD-1 states the following prominent warning at page 3 thereof:  "WARNING:  It is a crime to
    knowingly make false statements to the United States on this or any other similar form.  Penalties upon

27  conviction can include a fine or imprisonment.  For details see:  Title 18 U.S. Code Sections 1001 and
    1010."  <u>See</u>, Exhibit 1.

28                                                    -23-

8.      In or about October 2007 the Debtor was advised by Point Center that the Loan was not fully funded as previously represented and that there was a *shortfall* of approximately $7,675,980.00. As a direct result of the missing funds of approximately $7,675,980.00 described above, there were no funds available from the Loan after the tenth draw to pay for "soft costs" or related interest reserves relating to the ongoing development of the Legacy Highlands which include but are not limited to consulting fees, 'contingency', legal and insurance, management fees, property maintenance and property tax reserves, as well as there being no remaining interest reserve for the Loan all as indicated on closing statements and other transactional documents as of the date of the original funding.

9.      After the *existence of the shortfall* was disclosed to the Debtor by Point Center, the Debtor immediately made arrangements to raise money through Deep Canyon Holdings, Inc. ("DCH") in order to assist in the replacement of the missing proceeds. After DCH provided over $1.3 million to Point Center and was granted a definitive fractionalized interest in the Loan in its own name, further funding by DCH was refused by Point Center in violation of the terms of its loan modification with The Preserve, and Point Center indicated that no further investment would be allowed by DCH in connection with the Loan.

10.      The disclosure by Point Center in approximately October 2007 that $7,675,980.00 of the funds attributable to the $39 million loan arranged by Point Center in 2006 **were not existent** left the Debtor 'in the lurch' without the full use of the anticipated proceeds from the loan for its use in the ongoing development process involving the "Legacy Highlands" project which is the Debtor's most valuable asset. In order to keep the development processes moving forward and as a direct consequence of no funds being available from the Loan after the tenth draw as described above, commencing in or about October 2007, I arranged for loans to the Debtor, at a great personal hardship to me. As of the Petition Date the loans arranged by me to the Debtor were in the total principal amount of $1,117,497.00. Notwithstanding objection by Point Center, this Court approved the proposed post-petition borrowing from me (in an amount up to $2 million for the purpose of funding the Debtor's post-petition cash needs) pursuant to its order entered on

-24-

1    November 26, 2008 and the debtor has been proceeding forward in its reorganization efforts with

2    *replacement funding* from me.  The Debtor is current with its post-petition administrative

3    obligations.

4            11.    A lawsuit was filed by the Debtor against Point Center and others in the Riverside

5    Superior Court prior to the Petition Date relating to the transaction which is the subject matter of

6    that claimed interest prior to the Petition Date (the "Point Center Litigation").  As described above,

7    Point Center diverted for its own purposes **$7.675 million of the Debtor's funds** out of the

8    purported $39 million loan it arranged.  In addition, at the time of the origination of the $39 million

9    loan, Point Center was paid a loan broker fee of **$2.34 million** which was calculated based upon a

10   fully funded $39 million loan (which was obviously never fully funded).  *There is a minimum of*

11   *over $10 million in damages just attributable to those two items alone.*   The relief sought in the

12   Point Center Litigation is based upon claims set forth in the Complaint for Civil Rico, Fraud,

13   Conversion, Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing,

14   Rescission, Reformation, Injunctive Relief and the Appointment of a Receiver.  Significant

15   monetary damages in an amount in excess of $60 million and other relief is sought in the Point

16   Center Litigation on behalf of the Debtor.

17           12.    The CEQA Challenge was tried and a judgment was obtained specifying corrective

18   matters regarding those portions of CEQA's requirements that were found wanting.  The Debtor

19   has, even before trial, conducted its own further water analysis and believes that it can with relative

20   ease supply the City of Beaumont (the "City")  with additional factual data about water as well as

21   more information regarding the unacceptability of the suggested alternatives and furnish more

22   support for the overriding benefits of the project.  The Debtor has been advised by its professionals

23   and consultants that it is likely that the correction activities can be completed within the next 4 to 6

24   months and then submitted to the same superior court for confirmation and the matter of the CEQA

25   Challenge concluded favorably to the Debtor and the City.  The Debtor is prepared to pursue this

26   option for the resolution of the CEQA Challenge.  The other option is a settlement with the CEQA

27   Challenge plaintiffs.  The Debtor is in the process of settlement discussions, through its

28

1   consultants, with the CEQA Challenge plaintiffs which, if consummated, would accelerate the

2   process for the favorable resolution of the CEQA Challenge.  Either way, the Debtor believes that

3   the CEQA Challenge will be resolved within the next 4 to 6 months either through corrective

4   actions with the City and the superior court or through a settlement with the CEQA Challenge

5   plaintiffs.

6       13.     The Debtor continues to explore the possible purchase of an additional 57 lots that

7   are contiguous to the Adelanto Finished Lot upon very favorable terms to the Debtor.  The Debtor

8   is also continuing to explore what to do with the 112 Acres.

9       14.     The Debtor has other secured creditors whose scheduled *undisputed* claims are

10  secured by real property assets *other than the Legacy Highlands project*.  The Debtor also has

11  general unsecured creditors having claims in excess of $6 million.  The Debtor fully intends to

12  propose a Chapter 11 Plan that fairly treats the claim asserted by Point Center as the alleged agent

13  for third party investors when its true nature, extent and validity is finally determined as well as

14  fairly treats the claims of its other secured and unsecured creditors.

15      15.     The Debtor faces the following challenges, among others, in attempting to address

16  the proof of claim filed by Point Center (*as an alleged agent*) in its formulation of a plan pertaining

17  thereto:

18      •   Point Center is not the lender;

19      •   Point Center has not produced, although formally requested by the Debtor, any

20          document allowing it to represent any purported *investor(s)* in this case;

21      •   Point Center has not produced, although formally requested by the Debtor, any

22          document to verify that any alleged *investor* it purports to represent actually

23          provided one dollar attributable to the Loan;

24      •   Point Center has not produced, although formally requested by the Debtor, any

25          document in the form of contact information relating to any alleged *investor* in

26          order for the Debtor to verify that such person is truly an *investor* in the Loan and as

27

28

as a result entitled to treatment in connection with the Loan in a plan and entitled to receive notice of a bar date in connection with its claim; and

- The Debtor is in the process of reviewing the public record regarding the Loan when compared to what it has reviewed to date in the form of what was produced previously by Point Center and what is in the Debtor's files.

16. <u>The Debtor wants to negotiate with the legitimate investors/creditors involved with the Loan</u>. There is an inherent problem dealing directly with a party (Point Center) whom the Debtor believes is not only dishonest but is also 'hiding the ball' from the Debtor and the true investors. The Debtor has been stymied in its efforts to ascertain the contact information and back-up regarding any investor in the Loan. The Debtor is fully prepared to discuss plan issues such as a payoff and payment options and/or profit participation in the Legacy Highlands in the future, and participation in the Point Center Litigation with the true legitimate creditors (investors) in the Loan in this case once their contact information is disclosed in order for the Debtor to confirm their *bona fides* in connection therewith.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct and that this declaration was executed this 20th day of May, 2009 at Riverside, California.

_____
Scott Krentel

-27-

# **DECLARATION OF RICHARD A. HARVEY**

I, Richard A. Harvey, declare and state as follows:

1.       The matters stated herein are true and correct and are within my personal knowledge, and if called upon to testify as a witness, I could and would testify competently thereto. I am an attorney at law, duly licensed to practice in the State of California and before the bar of this Court. I practice law under the name LAW OFFICE OF RICHARD A. HARVEY (the "Firm"), and as such am authorized to make this Declaration on behalf of the Firm.

2.       The Firm is special litigation counsel for the Debtor in the Point Center Litigation that is presently before this Court as a result of a Notice of Removal filed by the defendants on October 30, 2008.  The matter was referred to this Court by the United States District Court.  A second status conference is presently set for May 27, 2009 at 2:00 p.m. in this Court.  It is anticipated that the discovery problems described below will be addressed at that time in a preliminary fashion.

3.       Point Center has not produced documents that have been repeatedly requested on behalf of the Debtor in the Point Center Litigation.  No contact information regarding the *investors* purportedly represented by Point Center or monies actually received from *investors* in connection with the Loan have been produced to date.  No documents concerning any commissions received by Point Center, and any information that relates to the transaction forming the basis of the proof of Claim filed by Point Center regarding Point Center's methodology in doing business, the actual location of funds purportedly invested in the Loan but misdirected to other loans in an alleged "bait and switch" of documents which were not to be a part of the Debtor's Loan have been produced to date.  My Firm as the Debtor's Special Litigation Counsel was not supplied the information either in the Rule 26 (Bankruptcy Rule 7026) "disclosure" process or in response to formal document discovery demands propounded under Rule 34 (Bankruptcy Rule 7034) that were responded to on May 8, 2009 <u>without the concurrent production of a single document</u>.  Steps are in process to compel discovery.  A true and correct copy of the Demand for production of documents is attached

-28-

1  hereto as Exhibit 2 and incorporated by reference and a true and correct copy of Response is

2  attached hereto as Exhibit 3 and incorporated by reference.

3          I declare under penalty of perjury under the laws of the State of California and the United

4  States of America that the foregoing is true and correct and that this declaration was executed this

5  18 day of May, 2009 at Lake Forest, California.

6

7

8                                                    Richard Harvey

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              -29-