JEFFREY W. BROKER – State Bar No. 53226
PAMELA J. ZYLSTRA – State Bar No. 147977
BROKER & ASSOCIATES PROFESSIONAL CORPORATION
18191 Von Karman Avenue, Suite 470
Irvine, CA 92612-7114

Telephone: (949) 222-2000
Facsimile: (949) 222-2022
email: *jbroker@brokerlaw.biz*

General Reorganization Counsel
for Debtor and Debtor-in-Possession

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

| | |
|---|---|
| In re | Case No. 6:08-bk-23006-BB |
| | Chapter 11 Proceeding |
| THE PRESERVE, LLC, a California Limited Liability Company, | **DEBTOR'S NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING FOURTH EXTENSION OF (1) DEADLINE TO FILE A PLAN AND DISCLOSURE STATEMENT; AND (2) EXCLUSIVITY PERIOD REGARDING SOLICITATION OF ACCEPTANCES AND REJECTIONS TO PLAN; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF SCOTT KRENTEL AND RICHARD HARVEY IN SUPPORT THEREOF** |
| Debtor and Debtor-in-Possession | |
| | [No Hearing Required] [11 U.S.C. §1121(d); Local Bankruptcy Rule 9013-1(o)(1)] |

**TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY JUDGE;**

**THE OFFICE OF THE UNITED STATES TRUSTEE; CREDITORS AND PARTIES IN**

**INTEREST:**

1   THE PRESERVE, LLC, a California Limited Liability Company, the Debtor and Debtor-

2   in-Possession in the within Chapter 11 case (the "Debtor"), hereby moves this Court for its Order,

3   pursuant to 11 U.S.C. §1121(d) and Local Bankruptcy Rule 9013-1(o)(1), extending until March

4   25, 2010, the exclusivity period within which the Debtor has the exclusive right to file a Plan, and

5   extending to May 25, 2010, the exclusivity period within which the Debtor has the exclusive right

6   to solicit acceptances thereto.

7      This Motion is based upon the annexed Memorandum of Points and Authorities and the

8   annexed declarations of Scott Krentel (the "Krentel Declaration") and Richard Harvey (the "Harvey

9   Declaration"), and upon such other additional evidence, oral or documentary, that the Court may

10  consider prior to or at the time of the hearing on the Motion, should such hearing be timely

11  requested.

12

13  **IF YOU DO NOT OPPOSE THE MOTION AND THE COURT APPROVAL OF**

14  **THE MOTION REQUESTED HEREBY, YOU NEED TAKE NO ACTION.  HOWEVER,**

15  **IF YOU OBJECT TO THE COURT APPROVING THE MOTION, PURSUANT TO THE**

16  **PROVISIONS OF LOCAL BANKRUPTCY RULE 9013-1(o), SUCH OBJECTION MUST**

17  **BE FILED WITH THE BANKRUPTCY COURT *NO LATER THAN FIFTEEN (15) DAYS***

18  ***AFTER THE DATE OF SERVICE OF THIS NOTICE* IN THE MANNER REQUIRED BY**

19  **LOCAL BANKRUPTCY RULE 9013-1(o)(1).**

20

21  **YOU MUST FILE YOUR OBJECTION AND REQUEST FOR A HEARING WITH**

22  **THE CLERK OF THE UNITED STATES BANKRUPTCY COURT, LOCATED AT 3420**

23  **TWELFTH STREET, RIVERSIDE, CALIFORNIA 92501.  YOU MUST SERVE A COPY**

24  **OF YOUR OBJECTION TO THE MOTION AND REQUEST FOR A HEARING UPON**

25  **THE DEBTOR'S GENERAL REORGANIZATION COUNSEL AT THE ADDRESS**

26  **INDICATED ON THE UPPER LEFT HAND CORNER OF THE FIRST PAGE OF THIS**

27

28

1  MOTION, AND UPON THE OFFICE OF THE UNITED STATES TRUSTEE, LOCATED

2  AT 3685 MAIN STREET, SUITE 300, CALIFORNIA 92501.

3

4  **UPON RECEIPT OF A TIMELY OBJECTION AND REQUEST FOR A HEARING,**

5  **DEBTOR'S GENERAL REORGANIZATION COUNSEL WILL OBTAIN A HEARING**

6  **DATE AND GIVE APPROPRIATE NOTICE THEREOF.**  ANY FAILURE TO TIMELY

7  FILE AND SERVE OBJECTIONS MAY RESULT IN ANY SUCH OBJECTION BEING

8  WAIVED, AND THE COURT MAY ENTER AN ORDER APPROVING THE MOTION

9  UPON THE DEBTOR'S SUBMISSION THEREOF TO THE COURT WITHOUT

10  FURTHER NOTICE OR HEARING.

11

12  DATED: January 25, 2010                    BROKER & ASSOCIATES

13                                             PROFESSIONAL CORPORATION

14

15                                             By:

16                                             Jeffrey W. Broker
                                               General Reorganization Counsel
17                                             for Debtor and Debtor in Possession

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### CASE OVERVIEW

This case was commenced by the filing of a voluntary Chapter 11 petition by the Debtor on September 25, 2008 (the "Petition Date").  The Debtor is in the business of acquiring and making real estate investments, and by and through the efforts of its consultants, both political and technical, designs, plans and offers for sale to developers their projects consisting of single family residential lots, commercial and industrial projects to then sell to the public and private builder-developers throughout the United States at a profit.  See, Krentel Declaration at ¶2.

**A.      Administrative Matters That Have Taken Place in This Case**

The Debtor has obtained timely Court authorization to employ General Reorganization Counsel and two law firms to handle litigation matters as its Special Litigation Counsel involving the "Point Center Litigation" and the "CEQA Challenge" described below.  The examination of the Debtor pursuant to 11 U.S.C. §341(a) was held and concluded on November 12, 2008.  The Debtor is current in its reporting requirements with the Office of the United States Trustee, is current in the payment of its quarterly fees, and has no unpaid administrative expenses.  All real property taxes are current.  The bar date has passed and the Debtor is in the process of examining claims, some of which the Debtor believes will be resolved consensually and amended by the creditors. The proof of claim filed by Point Center Financial ("Point Center") as the alleged "agent" for scores of purported individual investors and three Point Center 'affiliates' is disputed by the Debtor as it is intertwined with the Point Center Litigation described below.  The Debtor intends to bring on for hearing in the immediate future a motion for the *estimation* of the Claim filed by Point Center in this case in order to move the reorganization process forward.  See, Krentel Declaration at ¶3.

On January 21, 2009 the Debtor filed a motion to extend the exclusivity periods in this case.  The only objection to that motion came from Point Center.  This Court overruled the objection and granted the motion after a hearing that took place on March 11, 2009, extending until

1  May 22, 2009, the exclusivity period within which the Debtor has the exclusive right to file a Plan,

2  and extending to July 22, 2009, the exclusivity period within which the Debtor has the exclusive

3  right to solicit acceptances thereto.  On May 20, 2009 the Debtor filed a second motion to extend

4  the exclusivity periods in this case.  The only objection to that motion came from Point Center.

5  This Court overruled the objection and granted the motion after a hearing that took place on July

6  29, 2009, extending until September 23, 2009, the exclusivity period within which the Debtor has

7  the exclusive right to file a Plan, and extending to November 23, 2009, the exclusivity period

8  within which the Debtor has the exclusive right to solicit acceptances thereto.  On September 21,

9  2009 the Debtor filed a third motion to extend the exclusivity periods in this case.  The only

10  objection to that motion came from Point Center.  This Court overruled the objection and granted

11  the motion after a hearing that took place on November 10, 2009, extending until January 27,

12  2010, the exclusivity period within which the Debtor has the exclusive right to file a Plan, and

13  extending to March 26, 2010, the exclusivity period within which the Debtor has the exclusive

14  right to solicit acceptances thereto.  This Motion seeks an additional 60-day extension of the

15  exclusivity periods.  The Debtor requires additional time for the formulation of its reorganization

16  plan for the reasons described with particularity hereinbelow.  See, Krentel Declaration at ¶4.

17  **B.**    **The Legacy Highlands and the Point Center Litigation**

18  **(i)**    **The Legacy Highlands**

19  To put the dynamics of this case in context, there is a dispute with Point Center as to the

20  nature, extent and validity of the interest it asserts in its proof of claim as the purported "agent" for

21  other investors in the approximately 700 acres of real property within the "Legacy Highlands"

22  project which is the Debtor's most valuable asset.[1]  As noted by this Court in prior proceedings,

23  Point Center is NOT the lender to the Debtor.  The Legacy Highlands is a unique, multi-

24  generational master planned community set within the rolling hills of West Beaumont, located in

25  _____

26  [1]  The Point Center Claim is scheduled by the Debtor as Disputed, Unliquidated and Contingent in its
Schedule D.  In addition, the Debtor disputes that 46 acres of land *possibly within the legal description* of

27  the deed of trust securing the Point Center Claim was intended to be security for the loan arranged by Point
Center.

28

1   Riverside County, California.  Land uses include conventional residential single family homes on

2   lots ranging in size from 7,000 to 20,000 square feet, PUD residential single family homes, a gated

3   "active Adult" community which consists of residential single family homes with lots ranging from

4   4,000 to 7,000 square feet, parks, school sites and trails.  A total of 2,868 residential lots have been

5   approved as described below.  See, Krentel Declaration at ¶5.

6           The Specific Plan that sets the zoning standards was approved in January of 2008 after six

7   years of work on this project.  The Environmental Impact Report was certified, the Tentative Parcel

8   Map, and a 25 year Development Agreement with two five year extensions of time were also

9   approved by the City Council of the City of Beaumont in January of 2008.  The Final Parcel Maps

10  are in the process of being recorded.  All the "back bone" infra-structure improvement plans for

11  Portero Parkway, 4th Street, and South Loop Road have been prepared.  All the in-tract infra-

12  structure including water, sewer, storm drain, grading, and final maps for planning areas 1.1

13  through 1.9, 3.1 through 3.3, and 4.1 through 4.4 are completed and are in "plan check" at the City

14  of Beaumont.  The Tentative Tract maps are also prepared and have been approved *for financing*

15  *purposes* by the City of Beaumont.  All Tract Maps, and all Improvement Plans are, with the

16  exception of storm drain, are continuing to be processed through the City of Beaumont.  The City

17  of Beaumont supports and has approved the Legacy Highlands project.  The Debtor has been

18  proceeding forward with work necessary for the completion of the entitlement process for the

19  Legacy Highlands project as described above.  As previously indicated, all real property taxes are

20  current.  The Debtor's actions post-petition have been for the purpose of enhancing the value of the

21  Legacy Highlands project.  See, Krentel Declaration at ¶6.

22              **(ii)**        **The Point Center Litigation**

23                  **(a)**        **The Loan Arranged by Point Center**

24          Prior to the Petition Date, in or about September 2006 the Debtor entered into a loan

25  transaction arranged by Point Center for a $39,000,000.00 fully funded development loan (the

26  "Loan") with 24 months of draws, and was promised two (2) one-year extensions (to extend the

27  loan to September 2010) wherein the Debtor was the borrower, secured by a Deed of Trust on real

28

1    property in the County of Riverside, State of California consisting of approximately 1,300 acres

2    known as the "Legacy Highlands" project. *Point Center was not the lender to the Debtor, only the*

3    *arranger of the Loan the funding of which was to come from third party investors, for which it was*

4    *to be paid a fee of $2,340,000.00.* Among other aspects of the Loan was that $9,650,000.00 would

5    be retained by Point Center as a 24-month interest reserve and there was a further soft cost

6    holdback of $7,251,736.00 placed in a trust account on behalf of the Debtor. Interest reserves in

7    commercial loans are typically set aside on "day one" and are untouchable for any other purpose.

8    Point Center was paid a loan broker fee of $2,340,000.00 which was calculated based upon a fully

9    funded $39 million loan.  See, Krentel Declaration at ¶7, which attaches collectively as Exhibit

10    "1" the Escrow Closing Statement and "HUD-1"[2] received by the Debtor from the Escrow that

11    confirm the foregoing details, including (i) a $39,000,000.00 fully funded loan, (ii) a 24 month

12    interest reserve of $9,650,000.00, (iii) a holdback of $7,251,736.00 and (iv) a loan broker fee of

13    $2,340,000.00 for the arranging of the $39,000,000.00 loan. This is but a small portion of the

14    evidence in support of the Debtor's claims against Point Center and others that will be reviewed by

15    the Court in connection with the *claim estimation* motion that will be brought by the Debtor.

16                         **(b)**        **The Loan was Not Fully Funded**

17             In or about October 2007 the Debtor was advised by Point Center that the Loan was not

18    fully funded as previously represented and that there was a *shortfall* of approximately

19    $7,675,980.00. As a direct result of the missing funds of approximately $7,675,980.00 described

20    above, there were no funds available from the Loan after the tenth draw to pay for "soft costs" or

21    related interest reserves relating to the ongoing development of the Legacy Highlands which

22    include but are not limited to consulting fees, 'contingency', legal and insurance, management fees,

23    property maintenance and property tax reserves, as well as there being no remaining interest

24

25    _____

26    [2] The HUD-1 states the following prominent warning at page 3 thereof: "WARNING: It is a crime to
knowingly make false statements to the United States on this or any other similar form. Penalties upon

27    conviction can include a fine or imprisonment. For details see: Title 18 U.S. Code Sections 1001 and
1010." See, Exhibit 1.

28                                                    -7-

1   reserve for the Loan, all as indicated on closing statements and other transactional documents as of

2   the date of the original funding.  See, Krentel Declaration at ¶8.

3        After the *existence of the shortfall* was disclosed to the Debtor by Point Center, the Debtor

4   immediately made arrangements to raise money through Deep Canyon Holdings, Inc. ("DCH") in

5   order to assist in the replacement of the missing loan proceeds.  After DCH provided over $1.3

6   million to Point Center and was granted a definitive fractionalized interest in the Loan in its own

7   name, further funding by DCH was refused by Point Center in violation of the terms of its loan

8   modification with the Debtor and its contractual agreement with DCH, and Point Center also

9   indicated that no further investment would be allowed by DCH in connection with the Loan.  DCH

10  has terminated Point Center as servicer on its behalf in connection with the Loan.  See, Krentel

11  Declaration at ¶9.

12       The disclosure by Point Center in approximately October 2007 that <u>$7,675,980.00 of the</u>

13  <u>funds attributable to the $39 million loan arranged by Point Center in 2006</u> **were not existent** left

14  the Debtor 'in the lurch' without the full use of the anticipated proceeds from the loan for its use in

15  the ongoing development process involving the "Legacy Highlands" project which is the Debtor's

16  most valuable asset.  In order to keep the development processes moving forward and as a direct

17  consequence of no funds being available from the Loan after the tenth draw as described above,

18  commencing in or about October 2007, Scott Krentel arranged for loans to the Debtor, at a great

19  personal hardship to Mr. Krentel.  As of the Petition Date the loans arranged by Mr. Krentel to the

20  Debtor were in the total principal amount of $1,117,497.00.  Notwithstanding objection by Point

21  Center, this Court approved the proposed post-petition borrowing from Mr. Krentel (in an amount

22  up to $2 million for the purpose of funding the Debtor's post-petition cash needs) pursuant to its

23  order entered on November 26, 2008 and the debtor has been proceeding forward in its

24  reorganization efforts with *replacement funding* from Mr. Krentel.  The Debtor is current with its

25  post-petition administrative obligations, including the real property tax payments.  See, Krentel

26  Declaration at ¶10.

27

28

1

(c)    **Status of the Point Center Litigation**

2        A lawsuit was filed by the Debtor against Point Center and others in the Riverside Superior

3   Court prior to the Petition Date relating to the transaction which is the subject matter of that

4   claimed interest prior to the Petition Date (the "Point Center Litigation").  As described above,

5   Point Center diverted for its own purposes approximately **$7,675,980.00 of the Debtor's funds**

6   out of the purported $39 million loan it arranged.  In addition, at the time of the origination of the

7   $39 million loan, Point Center was paid a loan broker fee of **$2,340,000.00** which was calculated

8   based upon a fully funded $39 million loan (which was obviously never fully funded).  *There is a*

9   *minimum of over $10 million in damages just attributable to those two items alone.*  The relief

10  sought in the Point Center Litigation is based upon claims set forth in the Complaint for Civil

11  Rico, Fraud, Conversion, Breach of Contract, Breach of the Implied Covenant of Good Faith and

12  Fair Dealing, Rescission, Reformation, Injunctive Relief and the Appointment of a Receiver.

13  Significant monetary damages in an amount in excess of $60 million and other relief is sought in

14  the Point Center Litigation on behalf of the Debtor.  The Debtor's affirmative damage claims will

15  be the subject matter of its forthcoming *claim estimation* motion.  See, Krentel Declaration at ¶11.

16       The Point Center Litigation is presently before this Court as a result of a Notice of Removal

17  filed by the defendants on October 30, 2008.  The matter was referred to this Court by the United

18  States District Court.  A third status conference is presently set for February 11, 2010 at 10:00 a.m.

19  in this Court.  The Debtor intends to amend its complaint to name the individual investors as

20  additional defendants.  The existing defendants filed a motion for summary judgment ("MSJ") that

21  is also set for hearing on February 11, 2010.  The Debtor has opposed the MSJ and has developed

22  its case in chief insofar as the specification of damages is concerned to a sufficient extent to be

23  utilized in connection with its forthcoming *claim estimation* motion.  See, Harvey Declaration at

24  ¶2.

25  **C.    The CEQA Challenge**

26       The CEQA Challenge was tried and a judgment was obtained specifying corrective matters

27  regarding those portions of CEQA's requirements that were found wanting.  The Debtor has, even

28

before trial, conducted its own further water analysis and believes that it can with relative ease supply the City of Beaumont (the "City") with additional factual data about water as well as more information regarding the unacceptability of the suggested alternatives and furnish more support for the overriding benefits of the project.  See, Krentel Declaration at ¶12.

The Debtor has continued to work on drafting a water rights transfer agreement with the City which will provide the Legacy Highlands project with primary water rights to meet the project's water demand.  The creation of this primary water right would provide the project not only with a guaranteed water supply, but would also make the water supply portion of the environmental impact report unassailable in court based upon a recent ruling on a neighboring project.  The City and the Debtor have continued to revise and negotiate the draft water agreement, with most issues now resolved.  The City and the Debtor have also concluded that exploring methods to reduce the project's projected water demand is a step which is best taken concurrent with the drafting of this agreement and the revisions to the environmental impact report.  The Debtor has begun this work, exploring the use of drought tolerant vegetation, reducing the landscaped area of the project and utilizing more efficient landscape watering systems amongst other items.  Concurrent with this work, the Debtor has met with the City to delineate the parameters of the revised water supply section of the environmental impact report.  As noted above, in addition to addressing the specific deficiencies found in the prior consultant's report that were involved with the CEQA Challenge, the addition of this primary water right and the water demand reduction methods will serve to protect the new report against further challenge.  The Debtor is actively pursuing this course of action which would result in the complete restoration of all entitlements for the Legacy Highlands.  See, Krentel Declaration at ¶13.

### D.    **Other Properties**

The Debtor continues to explore the possible purchase of an additional 57 lots that are contiguous to the Adelanto Finished Lot upon very favorable terms to the Debtor.  The Debtor is also continuing to explore what to do with the 112 Acres that it owns that is near the Legacy Highlands project.  See, Krentel Declaration at ¶14.

E.    **Challenges in Plan Formulation**

The Debtor has other secured creditors whose scheduled *undisputed* claims are secured by real property assets *other than the Legacy Highlands project*. The Debtor also has general unsecured creditors having claims in excess of $6 million. The Debtor fully intends to propose a Chapter 11 Plan that fairly treats the proof of claim asserted by Point Center as the alleged agent for third party investors (or perhaps with the many fractionalized investors directly, which the Debtor would prefer) when its true nature, extent and validity is finally determined (through the claim estimation process) as well as fairly treats the claims of its other secured and unsecured creditors. It is anticipated that through the *claim estimation* process the Debtor will thereafter be in a position to effectively deal with the subject claim through a Plan. See, Krentel Declaration at ¶15.

The Debtor faces the following challenges, among others, in attempting to address the proof of claim filed by Point Center (*as an alleged agent*) in its formulation of a plan pertaining thereto:

- Point Center is <u>not</u> the lender and has limited authority;
- Point Center has <u>not</u> produced, although formally requested by the Debtor, any document to verify that any alleged *investor* it purports to represent actually provided one dollar attributable to the Loan;
- The Debtor is in the process of reviewing the public record regarding the Loan when compared to what it has reviewed to date in the form of what was produced previously by Point Center and what is in the Debtor's files. The Proof of Claim filed by Point Center on April 8, 2009 lists 112 fractional interest holders; the Reply filed by Point Center on July 7, 2009 in connection with its unsuccessful Motion for Relief from Stay (ECF Docket No. 112) at page 3, line 7 <u>and</u> footnote 1 references "approximately 182" investors; the Declaration of Rene Esparza filed on August 10, 2009 in support of Point Center's Trial Brief (ECF Docket No. 146) at page 3, paragraph 6 references 175 'reaffirmations' sent to investors (what happened to the

other '7' investors?); the investor list produced in discovery by Point Center has 191 names and addresses; and the analysis by Allen Parrin annexed to his declaration in opposition to the motion for relief from stay filed on August 27, 2009 (ECF Docket No. 152) indicates that there are *more than* 191 fractional interests of record. It would be safe to say that there is over $50,000,000 in irreconcilable interests reflected in the public record; and

- Point Center has <u>recently</u> produced contact information relating to the alleged *investors*. The Debtor sees no alternative to amending its complaint in the Point Center Litigation to name the investors as additional defendants in order for their interests to be bound by the anticipated recovery by the Debtor by way of damages, offset, or otherwise.

<u>See</u>, Krentel Declaration at ¶16.

The Debtor believes that Point Center has what appears to be a clear <u>conflict of interest</u> in this matter since it has not to date, nor will it in its anticipated objection to this Motion, represent to this Court **under oath** that it has **disclosed to all of the alleged investors in the Loan** that, notwithstanding it was paid a fee of $2,340,000 based upon a fully funded $39 million loan, <u>in fact</u> (i) the Loan was not fully funded, (ii) when the Debtor obtained an additional funding source (DCH) to replace the missing Loan proceeds, further funding from DCH was refused by Point Center in violation of the terms of its Loan modification with the Debtor and (iii) the Debtor had initiated litigation against Point Center in September 2008 for Civil Rico, Fraud, Conversion, Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Rescission, Reformation, Injunctive Relief and the Appointment of a Receiver in connection with the Loan. The Debtor believes that Point Center does not want the *investors* in this Loan (to the extent they can be disclosed and verified) as well as the other plaintiffs in other litigation pending against Point Center as well as regulatory authorities already examining Point Center to know about the problems with the Loan, including but not limited to short funding.

1    The Debtor believes that it has been significantly damaged through the actions of Point

2    Center and others. <u>The Debtor wants to negotiate with the legitimate investors/creditors involved</u>

3    <u>with the Loan</u>. There is an inherent problem dealing directly with a party (Point Center) whom the

4    Debtor believes is not only dishonest but is also 'hiding the ball' from the Debtor and the true

5    investors. The Debtor is fully prepared to discuss plan issues such as a payoff and payment options

6    and/or profit participation in the Legacy Highlands in the future, and participation in the Point

7    Center Litigation with the true legitimate creditors (investors) in the Loan in this case once the

8    Point Center claim is *estimated* and the resolution of investor claims is moved to a litigation

9    context. <u>See</u>, Krentel Declaration at ¶17.

10    **F.**    **<u>Summary</u>**

11    As reflected in the case overview above, the Debtor has been successful in prosecuting this

12    case within the context of Chapter 11 over the past sixteen months, and is in complete compliance

13    with the requirements of the Office of the United States Trustee. The Debtor has demonstrated that

14    it will have "probable success" in formulating a Chapter 11 plan in this case because of the ongoing

15    financial support by Mr. Krentel, the ongoing development efforts, the continued pursuit by the

16    Debtor of the Point Center Litigation (including the forthcoming amendment of the complaint to

17    name the individual investors) and the *claim estimation* motion that is anticipated to be brought

18    shortly. Accordingly, the Debtor believes that good cause exists in this case for the Court to grant

19    an extension of the plan exclusivity periods by 60 days each, as requested in this Motion.

20    **II.**

21    **<u>THIS COURT HAS AUTHORITY TO EXTEND THE EXCLUSIVE PERIODS</u>**

22    **<u>FOR FILING A PLAN AND SOLICITING ACCEPTANCES THERETO</u>**

23    Pursuant to 11 U.S.C. 1121(b), a Chapter 11 debtor has the exclusive right to file a plan of

24    reorganization during the first 120 days following the filing date of a Chapter 11 bankruptcy

25    petition and to thereafter solicit acceptances to any plan so filed for a period of an additional 60

26    days. 11 U.S.C. § 1121(b):

27

28

1

    Except as otherwise provided in this section, only a debtor may file a plan
    until after 120 days after the date of the order for relief under this Chapter.

2    11 U.S.C. § 1121(b).

3    No other party in interest may file a plan of reorganization unless: (i) a trustee has been

4    appointed, (ii) the debtor has not filed a plan within 120 days after the date of the order of relief, or

5    (iii) the debtor has not filed a plan that has been accepted before 180 days after the date of the order

6    for relief by each class of claims or interests that is impaired by the plan. See, 11 U.S.C. § 1121(c).

7    However, 11 U.S.C. §1121(d)(1) empowers the Court to reduce or extend the 120-day and 180-day

8    periods for "cause" when it provides, in pertinent part:

9
    (1) Subject to subparagraph (2), on request of a party in interest made within
10    the respective periods specified in subsection (c) of this section and after
    notice and a hearing, the court may for cause reduce or increase the 120-day
11    period or the 180-day period referred to in this section.

12    (2) (A) The 120-day period specified in paragraph (1) may not be extended
    beyond a date that is 18 months after the date of the order for relief under this
13    chapter.

14    (B) The 120-day period specified in paragraph (1) may not be extended
    beyond a date that is 20 months after the date of the order for relief under this
15    chapter.

16    11 U.S.C. § 1121(d)(1) and (2).  This Motion seeks extension of the exclusivity periods to the

17    maximum extent permitted under these sections of the Bankruptcy Code:  18 and 20 months,

18    respectively.

19    The Bankruptcy Code does not define "cause" as used in 11 U.S.C. § 1121(d).  The decision

20    regarding whether to grant a request to extend the exclusivity periods lies within the sound

21    discretion of the bankruptcy judge.  In re Gibson & Cushman, 101 B.R. 405, 409 (E.D.N.Y. 1989).

22    The accepted standard to extend the exclusivity periods, which is supported by the legislative

23    history of Section 1121, requires merely that the debtor make a "showing of some promise of

24    success for reorganization."  In the case, In re Matter of Newark Airport/Hotel Ltd. Partnership,

25    156 B.R. 444, 451 (Bankr. D.N.J. 1993) affirmed 155 B.R. 93 (D.N.J. 1993), the court stated:

26
    . . . As the legislative history to § 1121(d) indicates, the legislature
27    intended that the granting of an extension would be based "on a showing

28

**of some promise of probable success [for reorganization]."** 11 U.S.C.A.
§ 1121(d) (Historical and Revision Notes, S. Rept. No. 95-989).
. . .
   The purpose of the debtor's exclusivity period is to make a chapter 11 filing
attractive enough to encourage ailing businesses to seek reorganization without
unduly delaying creditors.  *See* In re Pine Run, 67 B.R. at 434.  If the chapter
11 provisions did not enable the debtor to remain in control for at least some
period of time, debtors would likely avoid the provisions of chapter 11
reorganization until it would no longer be an effective remedy.  Id. at 435,
relying on, H.R.Rep. No. 595, 95th Cong., 2d Sess. 231-232 (1978), reprinted
in U.S.C.C.A.N.1978, pp. 5787, 6191.

Id. at 451 (emphasis added).  *See also*  In re Landmark Park Plaza Ltd. Partnership, 167 B.R. 752,

756 (Bankr. D. Conn. 1994)("exclusivity extension based upon a showing of some promise of

probable success"); In re Montgomery Court Apartments of Ingham County, Ltd., 126 B.R. 537,

539 (Bankr. S.D. Ohio 1991) ("a debtor seeking an extension should make a showing 'of some

probable success' in formulating a plan."); In re Grossinger's Associates, 116 B.R. 34, 36 (Bankr.

S.D.N.Y. 1990) ("probable success in formulating a plan of reorganization"); In re Washington-St.

Tammany Elec. Co-op., Inc., 97 B.R. 852, 854 (E. D. La. 1989) ("the granted extension should be

based on a showing of some promise of probable success"); In re Texaco Inc., 76 B.R. 322, 326

(Bankr. S.D.N.Y. 1987) ("probable success in formulating a plan of reorganization").

   Further, the very notion of the exclusivity period is to favor and promote the Debtor's

efforts to reorganize.  See, Legislative History 140 Cong. Rec. H 10714, October 4, 1994.  In the

case, In re Eagle-Picher Industries, Inc., 176 B.R. 143 (Bankr. S.D. Ohio 1994), the official

unsecured creditors' committee filed a motion to terminate the debtor's exclusivity period so that it

could file a competing plan.  The official unsecured creditors' committee believed that the

presentation of competing plans would serve to expedite a prompt resolution of the case and,

therefore, that the debtor's exclusivity period should be terminated.  The court found that this did

not constitute cause for the termination of the debtor's exclusivity period, specifically stating:

   The view of the UCC [Committee] that it should in fairness be allowed to
file an alternative plan because it is entitled to a level playing field does not lead
us to alter our view that the UCC has failed to show cause for termination of the
exclusivity period.  **The UCC argued that a level playing field was what was
contemplated by the Bankruptcy Code.  That is simply not so.  The concept
of an exclusivity period in favor of the debtor, a consideration at the heart
of the Bankruptcy Code, on its face contradicts the notion that parties in a
chapter 11 bankruptcy case be given an equal opportunity to seek**

**confirmation of a plan.** What will happen now in these consolidated cases is that they will proceed in the manner contemplated by the Bankruptcy Code. That is debtors under the shield of exclusivity will present their plan. Other constituencies, all in these case, represented by knowledgeable and competent counsel, can then take such steps in pursuit of the interest of their constituencies as are appropriate. If the debtor's plan fails at confirmation, then it may be appropriate for these constituencies to present their own plan or plans.

Id. at 148 (emphasis added).

The "cause" standard referred to in Section 1121 has been referred to as a general standard that allows the bankruptcy court "maximum flexibility to suit various types of reorganization proceedings." In re Public Service Company of New Hampshire, 88 B.R. 534 (Bankr. D.N.H. 1988). Courts have recognized that the diligence of management and the proper administration of the case are factors supporting an extension of the exclusivity periods. See In re United Press International, supra.

The cases cited above amalgamate the following relevant factors in determining "cause" for the requested extension (see also, In re Henry Mayo Newhall Memorial Hospital, 282 B.R. 444, 452 (9th Cir. BAP 2002)):

- **Was this the first extension requested**

This is the fourth extension requested by the Debtor in this case. The request by the Debtor was made timely. The Debtor contends that it has been delayed in its reorganization efforts by the difficulties encountered in the Point Center Litigation, and the lengthy development process, among other factors set forth in this Motion hereinabove.

- **Was the case complicated**

The Debtor submits that this case is complex for three reasons. The first is the magnitude and inherent complexity of the Legacy Highlands project in and of itself that has been worked on for well over *seven* years. The entitlements process is substantially completed which the Debtor contends has enhanced the value of the Legacy Highlands project. Second, the Debtor has proactively pursued the resolution of the CEQA Challenge in the fashion described above.

The third reason is the pending litigation against Point Center, which will be tried before a jury in the United States District Court next year. **Stated simply, Point Center took money that**

1     **belonged to the Debtor in the amount of approximately $7.675 million, paid itself a $2.34**

2     **million fee that it did not earn, and through its improper actions precipitated the filing of**

3     **this case.** This is the starting point in the Debtor's damages calculations in the Point Center

4     Litigation that will be fully briefed in connection with its forthcoming *claim estimation* motion.

5     The Court should properly consider the pendency of the Point Center Litigation in deciding

6     whether to extend the exclusivity periods provided by Section 1121(d) of the Bankruptcy Code.

7     See, e.g., In re Slettleland, 260 B.R. 657, 670 (S.D.N.Y. 2001) ("litigation may be one factor,

8     among others, that supports an extension"); In re Texaco, Inc., supra, at 325 (Bankruptcy court

9     extended exclusivity twice to give the debtors "a reasonable opportunity to pursue their appeal of

10     the Pennzoil judgment" and "to negotiate with the creditors in order to formulate a plan of

11     reorganization"); In re United Press International, supra, at 270 ("a pending appeal, along with the

12     consideration of other factors, may lead to a finding of cause for extending the exclusivity

13     period.").

14        The existence of litigation can constitute cause for an extension where the mass, weight,

15     volume and complication of the litigation justify a "shakedown period". In re Southwest Oil of

16     Jourdanton, Inc., 84 B.R. 448, 452 (Bankr. W.D. Tex. 1987); In re Manville Forest Products Corp.,

17     31 B.R. 991, 995 (S.D.N.Y. 1983). In Manville Forest Products Corp., *supra*, the District Court

18     affirmed the Bankruptcy Court's granting of the **fifth extension of the exclusivity period** based on

19     a significant amount of litigation involving the Debtor's parent company, even though there was no

20     substantial showing of any lawful claims of the parent's creditors against the Debtor's assets.

21        In In re Gibson & Cushman, supra, the Bankruptcy Court granted successive motions that

22     had the effect of extending the period in which the Debtor may file a plan to **over one and one half**

23     **years after the filing of the petition**. The filing of the petition was prompted by Debtor's desire

24     to maintain its business while challenging the validity of a $2.5 million dollar state tort judgment

25     rendered against the Debtor. According to the Debtor, the judgment was "likely to be reversed by

26     the state appellate court because, inter alia, it was fraudulently obtained." Id. at 406-407. In

27     addition to the judgment, two major claims were noticed against the Debtor's estate, one claim

28

1   alleged breach of contract seeking approximately $600,000, and the other claim sought to hold the

2   debtor liable in the amount of two million dollars for personal injuries allegedly suffered by a

3   plaintiff.  After reviewing the relevant case law, the District Court affirmed the Bankruptcy Court's

4   order extending the exclusivity period.

5         The Debtor is asserting claims for significant monetary damages which necessarily will

6   impact the claim filed by Point Center and the treatment of that claim.  To bring the issue to the

7   table the Debtor will be filing shortly a *claim estimation* motion in order for the subject claim to be

8   effectively dealt with under a plan.

9         •   **Was the case pending for a long time relative to its size and complexity**

10        This case has not been pending for a "long time" since it was filed on September 25, 2008,

11   just sixteen months ago relative to its size and complexity described above.  The Debtor has made

12   progress in both the entitlement processes and in its prosecution of the pending litigation against

13   Point Center.  The *claim estimation* procedure should result in the streamlining of the

14   reorganization process.

15         •   **Was the debtor proceeding in good faith**

16        The Debtor asserts that it filed its Chapter 11 case in good faith and is proceeding in good

17   faith in its efforts to reorganize.  The Debtor is current in its administrative operating expenses,

18   including real property taxes, through Court-approved borrowing (over the objection of Point

19   Center) and is in complete compliance with the requirements of the Office of the United States

20   Trustee.

21         •   **Was the debtor paying current operating expenses**

22        The Debtor is current in its administrative operating expenses through Court-approved

23   borrowing (over the objection of Point Center) and is in complete compliance with the

24   requirements of the Office of the United States Trustee.  Courts have recognized that the diligence

25   of management and the proper administration of the case are yet additional factors in supporting

26   an extension of the exclusivity periods.  See, In re United Press International, 60 B.R. 265, 269-

27   270 (Bankr. D.C. 1986); In re Trainer's, Inc., 17 B.R. 246, 247 (Bankr. E.D. Pa. 1982).  In the

28

1   present case, the Debtor has properly administered its Chapter 11 case.  The Debtor has complied

2   with the requirements of the Bankruptcy Code and the Bankruptcy Rules, is in full compliance

3   with the requirements of the Office of the United States Trustee, and is current on its

4   administrative expenses, including real property taxes.

5       • **Was there a reasonable prospect for filing a viable plan and prepare adequate**

6           **information**

7   The Debtor has invested and continues to invest significant time and significant monies

8   toward a reorganization of its financial affairs.  It has significant assets and simply wants the

9   opportunity to negotiate with its true legitimate creditors, not a purported agent that through its

10  dishonesty has caused significant damage to the Debtor and is on the other side of litigation with

11  the Debtor.  The *claim estimation* procedure will enhance the Debtor's reorganization efforts.

12      • **Was there satisfactory progress negotiating with key creditors**

13  Debtor believes that Point Center does not represent the interests of 'investors' relevant to

14  the Loan and the Debtor is evaluating how to proceed with a diversity of constituents apparently

15  present here regarding the Loan:  (i) DCH, which has appeared several times in this case and has

16  indicated that Point Center does not speak for it in connection with the Loan, and has filed its own

17  secured claim with reference to its fractional interest in the Loan; (ii) alleged *investors* in the Loan

18  who are true, legitimate creditors, although they will be named as defendants in the Point Center

19  Litigation and subject to damage and/or offset claims; (iii) alleged *investors* in the Loan who have

20  no paper trail relating them to the Loan; (iv) investors in Pools managed/arranged by Point Center

21  who are plaintiffs in pending litigation in Orange County Superior Court against Point Center who

22  *may* be interested in connection with the Loan; and (v) perhaps the SEC, FBI, Riverside County

23  District Attorney, a Grand Jury, the California Department of Real Estate, a receiver or other

24  fiduciary.

25      • **Was the extension sought to pressure creditors**

26  The Debtor has not pressured any of its creditors with regard to a particular payment

27  proposal, although there have been discussions with parties *other than* Point Center post-petition in

28

1   that regard with regard to the Loan.  The Debtor does not anticipate that any creditor or party in

2   interest *other than Point Center* (who the Debtor contends has no standing to do so) will object to

3   the granting of the Motion.

4          Courts have found that cause exists to extend the plan exclusivity periods where there is no

5   evidence that an extension is being sought for the purpose of pressuring creditors into acceding to a

6   debtor's reorganization demands.  *See* In re Pine Run Trust, Inc., 67 B.R. 432 (Bankr. E.D. Pa.

7   1986).  In this case, the Debtor's requested plan exclusivity extension is not intended to hold the

8   parties in interest in this case "hostage" to the Debtor's restructuring efforts.  The Debtor is not

9   attempting to force its approach to financial reorganization upon its creditors.  The extension is

10  necessary in light of the substantial and material unresolved issues outlined above (i.e., the

11  prosecution of the Point Center Litigation, verification of investment and other information relating

12  to the true investors, the ongoing development efforts, and the resolution of the water issue that

13  arose under the CEQA Challenge, and the anticipated *claim estimation* procedure.).   The extension

14  of time sought by the Debtor will afford an opportunity to continue to deal with the issues outlined

15  above, and to negotiate with creditors and parties in interest concerning a Chapter 11 plan.

16         •      **Was there an unresolved contingency**

17         There are the unresolved contingencies of what the Debtor actually owes with regard to the

18  Loan, *if anything*, at the end of the day, and whether it is validly secured in the first instance (to be

19  the subject of a *claim estimation* motion), the completion of the entitlement process, as well as the

20  final resolution of the CEQA Challenge by corrective action in process in cooperation with the

21  City of Beaumont as described above.

22         As set forth above, the Debtor's request for an extension of the exclusivity periods for the

23  filing of a plan and the solicitation of acceptances to such a plan satisfies the general principles

24  established by the courts as guidelines for a Debtor demonstrating "cause" within the meaning of

25  11 U.S.C. §1121(d).  The Debtor has not yet been able to formulate a Chapter 11 plan in this case

26  for the reasons set forth above.  The reasons are compelling, not subject to serious dispute, and

27  constitute "cause" for the granting of the Motion.

28

### III.

### **THE DEBTOR'S MOTION IS TIMELY**

Pursuant to 11 U.S.C. §1121(d), on request of a party-in-interest, and after notice and a hearing, the Court may extend the exclusivity periods specified by 11 U.S.C. §1121 if such request for the extension of the exclusivity periods *is made prior to the expiration of the statutory period*. Since the expiration of the statutory period is currently January 27, 2010, the filing of this Motion is timely.

### IV.

### **PURSUANT TO LOCAL BANKRUPTCY RULE 9013-1(o)(1), AN ORDER GRANTING THE RELIEF SOUGHT BY THIS MOTION MAY BE OBTAINED WITHOUT A HEARING**

Local Bankruptcy Rule 9013-1(o)(1) provides that matters can be determined "Upon Notice of Opportunity to Request Hearing" except as to matters specifically noted in Local Bankruptcy Rule 9013-1(o)(2). Relief of the type requested in this Motion is not specifically noted in Local Bankruptcy Rule 9013-1(o)(2) and therefore may be determined upon *notice of opportunity to request a hearing* basis. Thus, an order on this Motion may be obtained without a hearing in the absence of a timely objection.

### V.

### **CONCLUSION**

The Debtor respectfully requests that this Court grant the relief requested herein without the need for a hearing, if no objection by a party in interest is timely filed, and if an objection and a request for hearing is timely filed, that the Court grant the relief requested herein after hearing.

DATED: January 25, 2010

BROKER & ASSOCIATES
PROFESSIONAL CORPORATION

By: _____
Jeffrey W. Broker
General Reorganization Counsel for
Debtor and Debtor-in-Possession

-21-

### DECLARATION OF SCOTT KRENTEL

I, Scott Krentel, declare and state as follows:

1.      The matters stated herein are true and correct and are within my personal knowledge, and if called upon to testify as a witness, I could and would testify competently thereto. I am the manager of Beaumont 1600, a California Limited Liability Company, which is the manager of the Debtor.

2.      This case was commenced by the filing of a voluntary Chapter 11 petition by the Debtor on September 25, 2008 (the "Petition Date"). The Debtor is in the business of acquiring and making real estate investments, and by and through the efforts of its consultants, both political and technical, designs, plans and offers for sale to developers their projects consisting of single family residential lots, commercial and industrial projects to then sell to the public and private builder-developers throughout the United States at a profit.

3.      The Debtor has obtained timely Court authorization to employ General Reorganization Counsel and two law firms to handle litigation matters as its Special Litigation Counsel involving the "Point Center Litigation" and the "CEQA Challenge" described below. The examination of the Debtor pursuant to 11 U.S.C. §341(a) was held and concluded on November 12, 2008. The Debtor is current in its reporting requirements with the Office of the United States Trustee, is current in the payment of its quarterly fees, and has no unpaid administrative expenses. All real property taxes are current. The bar date has passed and the Debtor is in the process of examining claims, some of which the Debtor believes will be resolved consensually and amended by the creditors. The proof of claim filed by Point Center Financial ("Point Center") as the alleged "agent" for scores of purported individual investors and three Point Center 'affiliates' is disputed by the Debtor as it is intertwined with the Point Center Litigation described below. The Debtor intends to bring on for hearing in the immediate future a motion for the *estimation* of the Claim filed by Point Center in this case in order to move the reorganization process forward.

4.      On January 21, 2009 the Debtor filed a motion to extend the exclusivity periods in this case. The only objection to that motion came from Point Center. This Court overruled the

1    objection and granted the motion after a hearing that took place on March 11, 2009, extending until

2    May 22, 2009, the exclusivity period within which the Debtor has the exclusive right to file a Plan,

3    and extending to July 22, 2009, the exclusivity period within which the Debtor has the exclusive

4    right to solicit acceptances thereto.  On May 20, 2009 the Debtor filed a second motion to extend

5    the exclusivity periods in this case.  The only objection to that motion came from Point Center.

6    This Court overruled the objection and granted the motion after a hearing that took place on July

7    29, 2009, extending until September 23, 2009, the exclusivity period within which the Debtor has

8    the exclusive right to file a Plan, and extending to November 23, 2009, the exclusivity period

9    within which the Debtor has the exclusive right to solicit acceptances thereto.  On September 21,

10   2009 the Debtor filed a third motion to extend the exclusivity periods in this case.  The only

11   objection to that motion came from Point Center.  This Court overruled the objection and granted

12   the motion after a hearing that took place on November 10, 2009, extending until January 27,

13   2010, the exclusivity period within which the Debtor has the exclusive right to file a Plan, and

14   extending to March 26, 2010, the exclusivity period within which the Debtor has the exclusive

15   right to solicit acceptances thereto.  This Motion seeks an additional 60-day extension of the

16   exclusivity periods.

17        5.        To put the dynamics of this case in context, there is a dispute with Point Center as

18   to the nature, extent and validity of the interest it asserts in its proof of claim as the purported

19   "agent" for other investors in the approximately 700 acres of real property within the "Legacy

20   Highlands" project which is the Debtor's most valuable asset.[3]  As noted by this Court in prior

21   proceedings, Point Center is NOT the lender to the Debtor.  The Legacy Highlands is a unique,

22   multi-generational master planned community set within the rolling hills of West Beaumont,

23   located in Riverside County, California.  Land uses include conventional residential single family

24   homes on lots ranging in size from 7,000 to 20,000 square feet, PUD residential single family

25

26   [3] The Point Center Claim is scheduled by the Debtor as Disputed, Unliquidated and Contingent in its
     Schedule D.  In addition, the Debtor disputes that 46 acres of land *possibly within the legal description* of
27   the deed of trust securing the Point Center Claim was intended to be security for the loan arranged by Point
     Center.

28

1    homes, a gated "active Adult" community which consists of residential single family homes with

2    lots ranging from 4,000 to 7,000 square feet, parks, school sites and trails.  A total of 2,868

3    residential lots have been approved as described below.

4          6.      The Specific Plan that sets the zoning standards was approved in January of 2008

5    after six years of work on this project.  The Environmental Impact Report was certified, the

6    Tentative Parcel Map, and a 25 year Development Agreement with two five year extensions of time

7    were also approved by the City Council of the City of Beaumont in January of 2008.  The Final

8    Parcel Maps are in the process of being recorded.  All the "back bone" infra-structure improvement

9    plans for Portero Parkway, 4th Street, and South Loop Road have been prepared.  All the in-tract

10   infra-structure including water, sewer, storm drain, grading, and final maps for planning areas 1.1

11   through 1.9, 3.1 through 3.3, and 4.1 through 4.4 are completed and are in "plan check" at the City

12   of Beaumont.  The Tentative Tract maps are also prepared and have been approved *for financing*

13   *purposes* by the City of Beaumont.  All Tract Maps, and all Improvement Plans are, with the

14   exception of storm drain, are continuing to be processed through the City of Beaumont.  The City

15   of Beaumont supports and has approved the Legacy Highlands project.  The Debtor has been

16   proceeding forward with work necessary for the completion of the entitlement process for the

17   Legacy Highlands project as described above.  As previously indicated, all real property taxes are

18   current.  The Debtor's actions post-petition have been for the purpose of enhancing the value of the

19   Legacy Highlands project.

20         7.      Prior to the Petition Date, in or about September 2006 the Debtor entered into a loan

21   transaction <u>arranged by</u> Point Center for a $39,000,000.00 fully funded development loan (the

22   "Loan") with 24 months of draws, and was promised two (2) one-year extensions (to extend the

23   loan to September 2010) wherein the Debtor was the borrower, secured by a Deed of Trust on real

24   property in the County of Riverside, State of California consisting of approximately 1,300 acres

25   known as the "Legacy Highlands" project.  *Point Center was <u>not</u> the lender to the Debtor, only the*

26   *<u>arranger</u> of the Loan the funding of which was to come from third party investors, for which it was*

27   *to be paid a fee of $2,340,000.00.*  Among other aspects of the Loan was that $9,650,000.00 would

28

1  be retained by Point Center as a 24-month interest reserve and there was a further soft cost

2  holdback of $7,251,736.00 placed in a trust account on behalf of the Debtor.  Interest reserves in

3  commercial loans are typically set aside on "day one" and are untouchable for any other purpose.

4  Point Center was paid a loan broker fee of $2,340,000.00 which was calculated based upon a fully

5  funded $39 million loan.    Attached hereto collectively as Exhibit "1" are the Escrow Closing

6  Statement and "HUD-1"[4] received by the Debtor from the Escrow that confirm the foregoing

7  details, including (i) a $39,000,000.00 fully funded loan, (ii) a 24 month interest reserve of

8  $9,650,000.00, (iii) a holdback of $7,251,736.00 and (iv) a loan broker fee of $2,340,000.00 for the

9  arranging of the $39,000,000.00 loan.

10        8.        In or about October 2007 the Debtor was advised by Point Center that the Loan was

11  not fully funded as previously represented and that there was a *shortfall* of approximately

12  $7,675,980.00.  As a direct result of the missing funds of approximately $7,675,980.00 described

13  above, there were no funds available from the Loan after the tenth draw to pay for "soft costs" or

14  related interest reserves relating to the ongoing development of the Legacy Highlands which

15  include but are not limited to consulting fees, 'contingency', legal and insurance, management fees,

16  property maintenance and property tax reserves, as well as there being no remaining interest

17  reserve for the Loan all as indicated on closing statements and other transactional documents as of

18  the date of the original funding.

19        9.        After the *existence of the shortfall* was disclosed to the Debtor by Point Center, the

20  Debtor immediately made arrangements to raise money through Deep Canyon Holdings, Inc.

21  ("DCH") in order to assist in the replacement of the missing loan proceeds.  After DCH provided

22  over $1.3 million to Point Center and was granted a definitive fractionalized interest in the Loan in

23  its own name, further funding by DCH was refused by Point Center in violation of the terms of its

24  loan modification with the Debtor and its contractual agreement with DCH, and Point Center also

25

---

26  [4] The HUD-1 states the following prominent warning at page 3 thereof: "WARNING:  It is a crime to
knowingly make false statements to the United States on this or any other similar form.  Penalties upon

27  conviction can include a fine or imprisonment.  For details see:  Title 18 U.S. Code Sections 1001 and
1010."  See, Exhibit 1.

28

1  indicated that no further investment would be allowed by DCH in connection with the Loan.  DCH

2  has terminated Point Center as servicer on its behalf in connection with the Loan.

3      10.    The disclosure by Point Center in approximately October 2007 that <u>$7,675,980.00</u>

4  <u>of the funds attributable to the $39 million loan arranged by Point Center in 2006</u> **were not**

5  **existent** left the Debtor 'in the lurch' without the full use of the anticipated proceeds from the loan

6  for its use in the ongoing development process involving the "Legacy Highlands" project which is

7  the Debtor's most valuable asset.  In order to keep the development processes moving forward and

8  as a direct consequence of no funds being available from the Loan after the tenth draw as described

9  above, commencing in or about October 2007, Scott Krentel arranged for loans to the Debtor, at a

10  great personal hardship to Mr. Krentel.  As of the Petition Date the loans arranged by Mr. Krentel

11  to the Debtor were in the total principal amount of $1,117,497.00.  Notwithstanding objection by

12  Point Center, this Court approved the proposed post-petition borrowing from Mr. Krentel (in an

13  amount up to $2 million for the purpose of funding the Debtor's post-petition cash needs) pursuant

14  to its order entered on November 26, 2008 and the debtor has been proceeding forward in its

15  reorganization efforts with *replacement funding* from Mr. Krentel.  The Debtor is current with its

16  post-petition administrative obligations, including the real property tax payments.

17      11.    A lawsuit was filed by the Debtor against Point Center and others in the Riverside

18  Superior Court prior to the Petition Date relating to the transaction which is the subject matter of

19  that claimed interest prior to the Petition Date (the "Point Center Litigation").  As described above,

20  <u>Point Center diverted for its own purposes</u> approximately **$7,675,980.00 of the Debtor's funds**

21  out of the purported $39 million loan it arranged.  In addition, at the time of the origination of the

22  $39 million loan, Point Center was paid a loan broker fee of **$2,340,000.00** which was calculated

23  based upon a fully funded $39 million loan (which was obviously never fully funded).  *There is a*

24  *minimum of over $10 million in damages just attributable to those two items alone.*  The relief

25  sought in the Point Center Litigation is based upon claims set forth in the Complaint for Civil

26  Rico, Fraud, Conversion, Breach of Contract, Breach of the Implied Covenant of Good Faith and

27  Fair Dealing, Rescission, Reformation, Injunctive Relief and the Appointment of a Receiver.

28

1   Significant monetary damages in an amount <u>in excess of $60 million</u> and other relief is sought in

2   the Point Center Litigation on behalf of the Debtor.  The Debtor's affirmative damage claims will

3   be the subject matter of its forthcoming *claim estimation* motion.

4        12.    The CEQA Challenge was tried and a judgment was obtained specifying corrective

5   matters regarding those portions of CEQA's requirements that were found wanting.  The Debtor

6   has, even before trial, conducted its own further water analysis and believes that it can with relative

7   ease supply the City of Beaumont (the "City") with additional factual data about water as well as

8   more information regarding the unacceptability of the suggested alternatives and furnish more

9   support for the overriding benefits of the project.

10        13.    The Debtor has continued to work on drafting a water rights transfer agreement with

11   the City which will provide the Legacy Highlands project with primary water rights to meet the

12   project's water demand.  The creation of this primary water right would provide the project not

13   only with a guaranteed water supply, but would also make the water supply portion of the

14   environmental impact report unassailable in court based upon a recent ruling on a neighboring

15   project.  The City and the Debtor have continued to revise and negotiate the draft water agreement,

16   with most issues now resolved.  The City and the Debtor have also concluded that exploring

17   methods to reduce the project's projected water demand is a step which is best taken concurrent

18   with the drafting of this agreement and the revisions to the environmental impact report.  The

19   Debtor has begun this work, exploring the use of drought tolerant vegetation, reducing the

20   landscaped area of the project and utilizing more efficient landscape watering systems amongst

21   other items.  Concurrent with this work, the Debtor has met with the City to delineate the

22   parameters of the revised water supply section of the environmental impact report.  As noted

23   above, in addition to addressing the specific deficiencies found in the prior consultant's report that

24   were involved with the CEQA Challenge, the addition of this primary water right and the water

25   demand reduction methods will serve to protect the new report against further challenge.  The

26   Debtor is actively pursuing this course of action which would result in the complete restoration of

27   all entitlements for the Legacy Highlands.

28

14.    The Debtor continues to explore the possible purchase of an additional 57 lots that are contiguous to the Adelanto Finished Lot upon very favorable terms to the Debtor.  The Debtor is also continuing to explore what to do with the 112 Acres that it owns that is near the Legacy Highlands project.

15.    The Debtor has other secured creditors whose scheduled *undisputed* claims are secured by real property assets *other than the Legacy Highlands project*.  The Debtor also has general unsecured creditors having claims in excess of $6 million.  The Debtor fully intends to propose a Chapter 11 Plan that fairly treats the proof of claim asserted by Point Center as the alleged agent for third party investors (or perhaps with the many fractionalized investors directly, which the Debtor would prefer) when its true nature, extent and validity is finally determined (through the claim estimation process) as well as fairly treats the claims of its other secured and unsecured creditors.  It is anticipated that through the *claim estimation* process the Debtor will thereafter be in a position to effectively deal with the subject claim through a Plan

16.    The Debtor faces the following challenges, among others, in attempting to address the proof of claim filed by Point Center (*as an alleged agent*) in its formulation of a plan pertaining thereto:

- Point Center is <u>not</u> the lender and has limited authority;

- Point Center has <u>not</u> produced, although formally requested by the Debtor, any document to verify that any alleged *investor* it purports to represent actually provided one dollar attributable to the Loan;

- The Debtor is in the process of reviewing the public record regarding the Loan when compared to what it has reviewed to date in the form of what was produced previously by Point Center and what is in the Debtor's files.  The Proof of Claim filed by Point Center on April 8, 2009 lists 112 fractional interest holders; the Reply filed by Point Center on July 7, 2009 in connection with its unsuccessful Motion for Relief from Stay (ECF Docket No. 112) at page 3, line 7 <u>and</u> footnote 1 references "approximately 182" investors; the Declaration of Rene Esparza filed on August 10,

1    2009 in support of Point Center's Trial Brief (ECF Docket No. 146) at page 3,

2    paragraph 6 references 175 'reaffirmations' sent to investors (what happened to the

3    other '7' investors?); the investor list produced in discovery by Point Center has 191

4    names and addresses; and the analysis by Allen Parrin annexed to his declaration in

5    opposition to the motion for relief from stay filed on August 27, 2009 (ECF Docket

6    No. 152) indicates that there are *more than* 191 fractional interests of record.  It

7    would be safe to say that there is over $50,000,000 in irreconcilable interests

8    reflected in the public record; and; and

9    •    Point Center has <u>recently</u> produced contact information relating to the alleged

10    *investors*.  The Debtor sees no alternative to amending its complaint in the Point

11    Center Litigation to name the investors as additional defendants in order for their

12    interests to be bound by the anticipated recovery by the Debtor by way of damages,

13    offset, or otherwise.

14    17.    The Debtor believes that it has been significantly damaged through the actions of

15    Point Center and others.  <u>The Debtor wants to negotiate with the legitimate investors/creditors</u>

16    <u>involved with the Loan.</u>  There is an inherent problem dealing directly with a party (Point Center)

17    whom the Debtor believes is not only dishonest but is also 'hiding the ball' from the Debtor and

18    the true investors.  The Debtor is fully prepared to discuss plan issues such as a payoff and

19    payment options and/or profit participation in the Legacy Highlands in the future, and participation

20    in the Point Center Litigation with the true legitimate creditors (investors) in the Loan in this case

21    once the Point Center claim is *estimated* and the resolution of investor claims is moved to a

22    litigation context.

23    I declare under penalty of perjury under the laws of the State of California and the United

24    States of America that the foregoing is true and correct and that this declaration was executed this

25    ᒷᒷ day of January, 2010 at Riverside, California.

26

27    Scott Krentel

28    -29-

## DECLARATION OF RICHARD A. HARVEY

I, Richard A. Harvey, declare and state as follows:

1.     The matters stated herein are true and correct and are within my personal knowledge, and if called upon to testify as a witness, I could and would testify competently thereto. I am an attorney at law, duly licensed to practice in the State of California and before the bar of this Court. I practice law under the name LAW OFFICE OF RICHARD A. HARVEY (the "Firm"), and as such am authorized to make this Declaration on behalf of the Firm.

2.     The Point Center Litigation is presently before this Court as a result of a Notice of Removal filed by the defendants on October 30, 2008. The matter was referred to this Court by the United States District Court. A third status conference is presently set for February 11, 2010 at 10:00 a.m. in this Court. The Debtor intends to amend its complaint to name the individual investors as additional defendants. The existing defendants filed a motion for summary judgment ("MSJ") that is also set for hearing on February 11, 2010. The Debtor has opposed the MSJ and has developed its case in chief insofar as the specification of damages is concerned to a sufficient extent to be utilized in connection with its forthcoming *claim estimation* motion.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct and that this declaration was executed this 22 day of January, 2010 at Irvine, California.

Richard Harvey

-30-

# EXHIBIT 1

# Escrow Professionals, Inc.

33161 Camino Capistrano Unit H
San Juan Capistrano, CA 92675
P: (949) 661-8066 • F: (949) 661-9727

The Preserve LLC

Date: October 25, 2006
Escrow No.: 57323

7006 Magnolia Avenue #909
**Riverside, Ca. 92506**

RE: Property Address:  **1.300+ Acres Located Beamont, Ca, , CA**

We are please to inform you that the above referenced escrow was closed on October 23, 2006 and we enclose the following for your records:

      Our Check in the amount of **$218,062.17** representing your refund.  WIRED
      Final HUD-I and Closing Statement.

**Loan Information:**

      First Deed of Trust in favor of: **Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries.** (Lender will notify you regarding payments.)

Any documents to which you are entitled will be forwarded to you directly from the appropriate governing party.

We hope this transaction has been handled to your satisfaction, and that we may serve you again in the future.

Escrow Professionals, Inc.

Beverly A. Miali
Escrow Officer / Manager

Exhibit \_\_\_\_1\_\_\_\_    Exhibit _____    Exhibit \_\_\_C\_\_\_
Page \_\_\_31\_\_\_    Page \_\_\_30\_\_\_    Page \_\_\_7\_\_\_

POINT CENTER FINANCIAL, INC.
30900 RANCHO VIEJO ROAD, #100
SAN JUAN CAPISTRANO CA 92675

**Escrow Number:** 206070
**Escrow Officer:** Beverly A. Miali
**Date Recorded:**

**Borrower:** THE PRESERVE LLC, a California limited liability company

**Property:** SW of I-10 and SR60
Beaumont CA

Page: 1

# ESCROW CLOSING STATEMENT

| DESCRIPTION | DEBIT | CREDIT |
|---|---|---|
| **Funds Deposited To Escrow:** | | |
| RICHARD T. BREENE  ( 0.13%) | | 49,920.00 |
| STEVEN C. COLBURN  ( 0.13%) | | 49,920.00 |
| PAUL P. KRASNER, M.D., TRUSTEE  ( 0.13%) | | 49,920.00 |
| Point Center Mortgage Fund I, LLC   (Jul-12-2006 99.49%) | | 38,800,320.00 |
| DONOVAN H. RITTENBACH, TRUSTEE  ( 0.13%) | | 49,920.00 |
| | | |
| **Demands Paid Through Escrow:** | | |
| Point Center Financial, Inc. | | |
| Principal | 19,000,000.00 | |
| Interest From 10/01/06 To 10/30/06 | 173,602.70 | |
| Less the Trust Account Balance | -4,890.13 | |
| | 19,168,712.57 | |
| | | 19,168,712.57 |
| | | |
| **Payments Made on Authorization of Borrower:** | | |
| Beneficiary Statement Fees | 45.00 | |
| Credit for Partialy Funded Loan | | 6,456.02 |
| Re-imbursemnt of Appraisal to THE PRESERVE, LLC | 16,000.00 | |
| | | |
| **Costs and Expenses:** | | |
| Escrow Fee | 10,250.00 | |
| Title Insurance Policy | 28,000.00 | |
| Notary Fee | 40.00 | |
| Recording Fees | 200.00 | |
| Credit Investigation Fees | 81.00 | |
| Processing Fee | 500.00 | |
| Underwriting Fee | 5,000.00 | |
| Documentation Fee | 300.00 | |
| Securitization Fee | 1,000.00 | |
| County Property Tax Reserves (24 months) | 250,000.00 | |
| Interest Reserves (24 months) | 9,650,000.00 | |
| PCF Inspection Site Fee | 250.00 | |
| Construction Hold Back | 7,251,736.00 | |
| | | |
| **Other Items Paid Through Escrow:** | | |
| Broker's Commission | 2,340,000.00 | |
| Prepaid Interest From 10/30/06 To 11/01/06 @ $13,356.16/day | 26,712.32 | |
| | | |
| **Check To Borrower** | 257,629.13 | |
| **Totals** | 39,006,456.02 | 39,006,456.02 |

Exhibit \_\_\_\_ 1
Page \_\_\_\_ 33

Exhibit \_\_\_\_ 1
Page \_\_\_\_ 31

Exhibit \_\_\_\_ C
Page \_\_\_\_ 8

**Escrow Professionals, Inc.**
33161 Camino Capistrano, Unit. H
San Juan Capistrano, CA 92675
Phone: (949) 661-8066 • Fax: (949) 661-9727

### BORROWER STATEMENT
Final

| | |
|---|---|
| Escrow Number: | 57323 |
| Escrow Officer: | Beverly A. Miali |
| Borrower: | The Preserve LLC |

| | |
|---|---|
| Title Order Number: | 09301656-12 |
| Date: | 10/25/2006 -10:30:29AM |
| Closing Date: | 10/23/2006 |

**Property:** 1.300+ Acres Located Beamont, Ca, CA

| DESCRIPTION | DEBITS | CREDITS |
|---|---|---|
| **TOTAL CONSIDERATION** | | |
| **TITLE CHARGES** | | |
| Lender/Mortgagee Premium for 39,000,000.00: Land America Lawyers Title | 26,520.00 | |
| Mortgage Recording Fee: Land America Lawyers Title | 223.00 | |
| Agreement fee: Land America Lawyers Title | 82.00 | |
| UCC Financing Statement: Land America Lawyers Title | 20.00 | |
| Inspection fee: Land America Lawyers Title | 50.00 | |
| **ESCROW CHARGES TO: Escrow Professionals, Inc.** | | |
| Escrow Fee | 10,250.00 | |
| Wire Fee | 45.00 | |
| Audit & Assessment Fee | 9.50 | |
| **LENDER CHARGES** | | |
| New to Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries: | | 39,000,000.00 |
| Loan Fee @ 0.00 %: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 2,340,000.00 | |
| Interest Adjustment From 10/20/2006 To 11/01/2006, 11 Days, @ 7,520.3300/per day: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 90,243.96 | |
| Underwriting Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 5,000.00 | |
| Credit Investigation Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 81.00 | |
| Processing Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 500.00 | |
| Documntation Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 300.00 | |
| Securitization Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 1,000.00 | |
| County Property Tax Resrves (24 Months): Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 250,000.00 | |
| Interest Reserves (24 Months): Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 9,650,000.00 | |
| Pcf Inspeciton Site Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 250.00 | |
| Construction Hold Back: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 7,251,736.00 | |
| **LOAN PAYOFF: Point Center Financial** | | |
| Principal Balance | 19,000,000.00 | |
| Interest Per Diem From 10/01/2006 To 10/19/2006, 18 Days, @ 6,069.4444 | 113,739.70 | |
| Less The Trust Account Balance | -2,434.58 | |
| Total Loan Payoff | 19,113,739.70 | 2,434.58 |
| **TAXES:** | | |
| Property Tax to: Riverside County Tax Collector | 44,322.25 | |
| **ADDITIONAL DISBURSEMENTS:** | | |
| Reimbursement Of Appraisal: The Preserve LLC | 16,000.00 | |
| Funds Returned To PCF For Reserves: Point Center Financial | 202,062.17 | |
| **TOTALS** | 39,002,434.58 | 39,002,434.58 |

Exhibit ___1___
Page ___33___
THIS IS A FINAL CLOSING STATEMENT

Exhibit ___1___
Page ___32___

Exhibit ___C___
Page ___9___

OMB No. 2502-0265

SETTLEMENT STATEMENT

| | | |
|---|---|---|
| 1. ☐ FHA | 2. ☐ FHMA | 3. ☒ CONV. UNINS. |
| 4. ☐ VA | 5. ☐ CONV. INS. | |

6. FILE NUMBER: 57323   7. LOAN NUMBER:

8. MORTGAGE INS. CASE NO.:

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME & ADDRESS OF BORROWER:   The Preserve LLC

E. NAME & ADDRESS OF SELLER:

F. NAME & ADDRESS OF LENDER:   Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries
30900 Rancho Viejo Road #110, San Juan Capistrano, CA 92675

G. PROPERTY LOCATION:   1,300+ Acres Located Beamont, Ca, , CA

H. SETTLEMENT AGENT:   Escrow Professionals, Inc.
PLACE OF SETTLEMENT: 33161 Camino Capistrano Unit H, San Juan Capistrano, CA  92675 (949) 661-8066

I. SETTLEMENT DATE:   10/23/2006  Final

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower:** | | **400. Gross Amount Due To Seller:** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower: (line 1400) | 19,844,372.63 | 403. | |
| 104. Property Tax | 44,322.25 | 404. | |
| 105. Payoff To Point Center Financial | 19,111,305.12 | 405. | |
| | | | |
| | | | |
| | | | |
| **Adjustments For Items Paid By Seller In Advance:** | | **Adjustments For Items Paid By Seller In Advance:** | |
| 106. City/town taxes          to | | 406. City/town taxes          to | |
| 107. County taxes          to | | 407. County taxes          to | |
| 108. Assessments          to | | 408. Assessments          to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 116. | | 416. | |
| **120. Gross Amount Due From Borrower** | 39,000,000.00 | **420. Gross Amount Due To Seller:** | |
| **200. Amounts Paid By Or In Behalf Of Borrower:** | | **500. Reductions In Amount Due To Seller:** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 39,000,000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff 1st Mtg. Ln. | |
| 205. | | 505. Payoff 2nd Mtg. Ln. | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| | | | |
| **Adjustments For Items Unpaid By Seller:** | | **Adjustments For Items Unpaid By Seller:** | |
| 210. City/town taxes          to | | 510. City/town taxes          to | |
| 211. County taxes          to | | 511. County taxes          to | |
| 212. Assessments          to | | 512. Assessments          to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower:** | 39,000,000.00 | **520. Total Reductions In Amount Due Seller:** | |
| **300. Cash At Settlement From/To Borrower:** | | **600. Cash At Settlement From/To Seller:** | |
| 301. Gross amount due from borrower (line 120) | 39,000,000.00 | 601. Gross amount due to seller (line 420) | |
| 302. Less amount paid by/for borrower (line 220) | 39,000,000.00 | 602. Less reductions in amount due seller (line 520) | |
| 303. Cash (☐FROM) (☐TO) Borrower: | 0.00 | 603. Cash (☐TO) (☐FROM) Seller: | 0.00 |

Previous Edition is Obsolete
Form No. 1581
3/86

SB-4-3538-000-1
HUD-1 (3-86)
RESPA, HB 4305.2

Exhibit  1    Exhibit  1    Page 1 of 3    Exhibit  C

Page  34    Page  33    Page  10

| L. SETTLEMENT CHARGES | Escrow: 57323 | Paid From Borrower's Funds At Settlement | Paid From Seller's Funds At Settlement |
|---|---|---|---|
| **700. Total Sales/Broker's Commission Based On Price $** | | | |
| Division of Commission (line 700) as Follows: | | | |
| 701. $ to | | | |
| 702. $ to | | | |
| 703. Commission paid at settlement | | | |
| 704. | | | |
| **800. Items Payable In Connection With Loan:** | | | |
| 801. Loan Origination fee % | | | |
| 802. Loan Discount % | | | |
| 803. Appraisal fee to: | | | |
| 804. Credit report to: | | | |
| 805. Lender's inspection fee | | | |
| 806. Mortgage insurance application fee to | | | |
| 807. Assumption fee | | | |
| 808. Loan Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | | 2,340,000.00 | |
| 809. Securitization Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | | 1,000.00 | |
| 810. County Property Tax Reserves (24 Months) To: Point Center Financial, Inc., as Designated Lender for M | | 250,000.00 | |
| 811. Interest Reserves (24 Months) To: Point Center Financial, Inc., as Designated Lender for Multi-Benef | | 9,650,000.00 | |
| 812. Pof Inspection Site Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiari | | 250.00 | |
| 813. Construction Hold Back To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiarie | | 7,251,736.00 | |
| 814. Underwriting Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | | 5,000.00 | |
| 815. Credit Investigation Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiar | | 81.00 | |
| 816. Exhibit "C" Attached Hereto | | 800.00 | |
| **900. Items Required By Lender To Be Paid In Advance:** | | | |
| 901. Interest from 10/20/2006 to 11/01/2006 @$ 7,520.3300 /day | | 90,243.96 | |
| 902. Mortgage insurance premium for mo. to | | | |
| 903. Hazard insurance premium for yrs. to | | | |
| 904. Flood insurance premium for yrs. to | | | |
| 905. | | | |
| 906. | | | |
| **1000. Reserves Deposited With Lender:** | | | |
| 1001. Hazard insurance months @ $ per month | | | |
| 1002. Mortgage insurance months @ $ per month | | | |
| 1003. City property taxes months @ $ per month | | | |
| 1004. County property taxes months @ $ per month | | | |
| 1005. Annual assessments months @ $ per month | | | |
| 1006. Flood insurance months @ $ per month | | | |
| 1007. months @ $ per month | | | |
| 1008. Aggregate Adjustment | | | |
| 1009. | | | |
| **1100. Title Charges** | | | |
| 1101. Settlement or closing fee to Escrow Professionals, Inc. | | 10,250.00 | |
| 1102. Abstract or title search to | | | |
| 1103. Title examination to | | | |
| 1104. Title insurance binder to | | | |
| 1105. Document preparation to | | | |
| 1106. Notary fees to | | | |
| 1107. Attorney's fees to | | | |
| (includes above item Numbers: ) | | | |
| 1108. Title insurance to Land America Lawyers Title | | | |
| (includes above item Numbers: ) | | 26,520.00 | |
| 1109. Lender's coverage $ 39000.000.00 Premium: $26520.00 | | | |
| 1110. Owner's coverage $ | | | |
| 1111. Wire Fee to Escrow Professionals, Inc. | | 45.00 | |
| 1112. Audit & Assessment Fee to Escrow Professionals, Inc. | | 9.50 | |
| 1113. Agreement fee to Land America Lawyers Title | | 82.00 | |
| 1114. Exhibit "D" Attached Hereto | | 70.00 | |
| **1200. Government Recording and Transfer Charges:** | | | |
| 1201. Recording fees: Deed $ ;Mortgage $ 223.00 ;Releases $ | | 223.00 | |
| 1202. City/county tax/stamps: Deed $ ;Mortgage $ | | | |
| 1203. State tax/Stamps: Deed $ ;Mortgage $ | | | |
| 1204. | | | |
| 1205. | | | |
| **1300. Additional Settlement Charges:** | | | |
| 1301. Survey to | | | |
| 1302. Pest inspection to | | | |
| 1303. Reimbursement Of Appraisal to The Preserve LLC | | 16,000.00 | |
| 1304. Funds Returned To PCF For Reserves to Point Center Financial | | 202,062.17 | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| 1308. | | | |
| 1309. | | | |
| 1310. | | | |
| 1311. | | | |
| 1312. | | | |
| 1313. | | | |
| **1400. Total Settlement Charge** *(Enter on line 103, Section J - and line 502, Section K)* | | 19,844,372.63 | |

Form No. 1582 Page 2 of 3 SB-4-3538-000-1

Exhibit _____ 1 _____

Page _____ 35 _____

Exhibit _____ 1 _____

Page _____ 34 _____

Exhibit _____ C _____

Page _____ 11 _____

SELLER'S AND/OR BORROWER'S STATEMENT          Escrow:    57323

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent: _____          Date: _____

          Beverly A. Miali, Escrow Professionals, Inc.

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment. For details see:  Title 18 U.S. Code Section 1001 and Section 1010.

Exhibit _____1_____          Exhibit _____1_____          Exhibit _____C_____
Page _____36_____          Page _____35_____    Page 3 of 3          Page _____12_____

| ATTACHMENT | | | | Escrow No.: | 57323 |
| Settlement Date: | 23/2006 | | | Title No.: | 09301656-12 |
| | | | | Page: | 1 |

**EXHIBIT A: Tax Payment Breakdown**

Breakdown of Tax Payments:

County Taxes

| Year | Amount | Interest | Penalty |
|------|--------|----------|---------|

**EXHIBIT B: (HUD Section 100)**                                    Buyer Amount

Gross Amount Due From Borrower - Loan Payoff Breakdown:

**Point Center Financial**

| | |
|---|---|
| Principal Balance To: Point Center Financial | 19,000,000.00 |
| Interest Per Diem From 10/01/2006 to 10/19/2006 @ $ 6,069.4444 To: Point Center Fi | 113,739.70 |
| Less The Trust Account Balance To: Point Center Financial | -2,434.58 |
| Total: | 19111,305.12 |

**EXHIBIT C: (HUD Section 800 )**                                    Buyer Amount

Items Payable In Connection With Loan:

| | |
|---|---|
| Processing Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Benefici | 500.00 |
| Documntation Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Bene | 300.00 |
| Total: | 800.00 |

**EXHIBIT D: (HUD Section 1100)**                                    Buyer Amount

Title Charges:

| | |
|---|---|
| UCC Financing Statement to Land America Lawyers Title | 20.00 |
| Inspection fee to Land America Lawyers Title | 50.00 |
| Total: | 70.00 |

Exhibit ___1___          Exhibit ___1___          Exhibit ___C___
Page ___37___            Page ___36___            Page ___13___

| In re:<br>THE PRESERVE, LLC<br><div align="right">Debtor.</div> | CHAPTER 11<br><br>CASE NUMBER 6:08-bk-23006-BB |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 18191 Von Karman Avenue, Suite 470, Irvine, CA 92612.

A true and correct copy of the foregoing document described as **DEBTOR'S NOTICE OF MOTION AND MOTION FOR ORDER AUTHORIZING FOURTH EXTENSION OF (1) DEADLINE TO FILE A PLAN AND DISCLOSURE STATEMENT; AND (2) EXCLUSIVITY PERIOD REGARDING SOLICITATION OF ACCEPTANCES AND REJECTIONS TO PLAN; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS OF SCOTT KRENTEL AND RICHARD HARVEY IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On January 25, 2010 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

jbroker@brokerlaw.biz (Jeffrey Broker)
dfisher@ptwww.com ( Don Fisher at Palmieri Tyler et al.)
kmurphy@goeforlaw.com (Mark Forsythe at Goe & Forsythe)
kmurphy@goeforlaw.com; rgoe@goeforlaw.com; mforsythe@goeforlaw.com (Robert P. Goe at Goe & Forsythe)
ustregion16.rs.ecf@usdoj.gov (United States Trustee)
elizabeth.lossing@usdoj.gov (Elizabeth Lossing at Office of the United States Trustee)
mcschnitzer@rhlaw.com (Mark Schnitzer at Reid & Hellyer)
dzaro@allenmatkins.com (David R. Zaro at Allen Matkins)
jdelcastillo@allenmatkins.com (Joshua del Castillo at Allen Matkins)
dickatlaw@cox.net (Richard Harvey)

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On January 25, 2010 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

The Hon. Sheri Bluebond, 255 East Temple Street, Suite 1482, Los Angeles, CA 90012
Office of the United States Trustee, 3685 Main Street, Suite 300, Riverside, CA 92501-3837

☒ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served)**:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 25, 2010 | Barbara Jean Little-Raphael | *[signature]* |
| --- | --- | --- |
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                          **F 9013-3.1**

Office of the US Trustee
3685 Main Street, Suite 300
Riverside, CA 92501

The Preserve, LLC
7006 Magnolia Ave., PMB 309
Riverside, CA 92506

Internal Revenue Service
P.O. Box 21126
Philadelphia, PA 19114

Riverside County Tax collector
P.O. Box 12005
Riverside, CA 92502-2205

Scott H. Krentel
7006 Magnolia Ave., PMB 309
Riverside, CA 92506

Franchise Tax Board
Attention: Bankruptcy
PO Box 2952
Sacramento, CA 95812-2952

Deep Canyon Holdings, Inc.
P.O. Box 10723
Palm Desert, CA 92255

San Bernardino County Tax Collector
172 West Third St., First Floor
San Bernardino, CA 91425-0360

Aamir Raza
655 Central Avenue, 17th Floor
Glendale, CA 91203

Gresham Savage Nolan & Tilden
3750 University Avenue,
Suite 250
Riverside, CA 92501-3335

Bandari Freeman Lim & Cleland
861 Parkview Drive North,
Suite 200
El Segundo, CA 90245

Rox Consulting Group, Inc
575 Anton, Suite 880
Costa Mesa, CA 92626

Barry Hildebrandt
20886 Indigo Point
Riverside, CA 92508

Lloyd Charton
14 Monarch Bay Plaza No. 310
Dana Point, CA 92629

National Financial Lending, LLC
7 Argonaut
Aliso Viejo, CA 92656

The William Marano Living Trust
c/o Steve Coldwell
3239 North Verdugo Road
Glendale, CA 91208-1633

Sherry Ikezawa
6349 Riverside Avenue
Riverside, CA 92506

Point Central Financial, Inc.
"PCFU" and "PCF1"
7 Argonaut
Aliso Viejo, Ca 92656

Cherry Valley Pass Acres
c/o Rogers Joseph O'Donnell
311 California Street
San Francisco, CA 94104

Cherry Valley Environmental
c/o Rogers Joseph O'Donnell
311 California Street
San Francisco, CA 94104

Amanda Breneman, Esq.
Grant Genovese & Baratta LLP
2030 Main Street, Suite 1600
Irvine, CA 92614

Office of the US Trustee
3685 Main Street, Suite 300
Riverside, CA 92501
**[via ECF notice]**

David Zaro, Esq.
Allen Matkins et al
515 S. Figueroa Street, 9th Floor
Los Angeles, CA 90071
**[via ECF notice]**

Richard A. Harvey, Esq.
111 Pacifica, Suite 130
Irvine, CA 92618
**[via ECF notice]**

Mark Schnitzer, Esq.
Reid & Hellyer
P.O. Box 1300
Riverside, CA 92502-1300
**[via ECF notice]**

Palmieri Tyler et al
2603 Main Street, East Tower
Suite 1300
Irvine, CA 92614
[Special Notice] **[via ECF notice]**

Robert P. Goe, Esq.
Goe & Forsythe, LLP
18101 Von Karman, Suite 510
Irvine, CA 92612
[Special Notice] **[via ECF notice]**