# EXHIBIT 1

# EXHIBIT 1

Richard A. Harvey, Esq. (SBN 61442)
LAW OFFICE OF RICHARD A. HARVEY
111 Pacifica, Suite 130
Irvine, CA 92618
Tel: (949) 336-6611 Ext. 222
Fax: (949) 336-6616
Email:  dickatlaw@cox.net

Attorney for Plaintiff
THE PRESERVE, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION (SPRING STREET)

| | |
|---|---|
| In re: | District Court Case No.: |
| | 5:12-cv-01023-GW |
| THE PRESERVE, LLC, | |
| | Bankruptcy Case No.: |
| Plaintiff, | 2:10-bk-18429-BB |
| | |
| v. | Adversary Case No.: |
| | 2:10-ap-01296-BB |
| POINT CENTER FINANCIAL, INC., | |
| ESCROW PROFESSIONALS, INC., POINT | Hon. George H. Wu |
| CENTER MORTGAGE FUND, I, LLC, | Ctrm. 10 |
| NATIONAL FINANCIAL LENDING, INC., | |
| NATIONAL FINANCIAL LENDING, LLC, | NOTICE AND MOTION FOR |
| DANIEL J. HARKEY aka DANNY JOE | ISSUANCE OF A PRELIMINARY |
| HARKEY, VERNON ALAN BERGFELD, | INJUNCTION AND/OR TO ADVANCE |
| STEPHAN GEORGE LIVINGSTON, | ACTION FOR TRIAL; MEMORANDUM |
| TD SERVICE COMPANY, RENE E. | OF POINTS AND AUTHORITIES IN |
| ESPARZA, M. GWEN MELANSON, LOIS | SUPPORT THEREOF |
| R. BEJERANO, JOSHUA RETA, et al., | |
| | DATE:  October 11, 2012 |
| Defendants. | TIME:  8:30 a.m. |
| | CTRM:  10 |
| | 312 North Spring St. |
| | Los Angeles, CA 90012 |
| | |
| | [Request for Judicial Notice |
| | and Declarations of Douglas |
| | Beach and Scott Krentel |
| | filed and served |
| | concurrently] |

NOTICE AND MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION AND/OR TO ADVANCE
ACTION FOR TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

EXHIBIT "1"                                                    PAGE 15

# TABLE OF CONTENTS

Page

NOTICE        ........................................        1

MEMORANDUM OF POINTS AND AUTHORITIES.................        3

I.      INTRODUCTION...................................        3

II.     THE COURT HAS THE AUTHORITY TO ISSUE THE
        PRELIMINARY INJUNCTION AND TO ADVANCE THE
        MATTER FOR TRIAL AS REQUESTED BY
        THE PRESERVE...................................        6

III.    CONCLUSION.....................................        9

i

NOTICE AND MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION AND/OR TO ADVANCE
ACTION FOR TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

EXHIBIT "1"                                                    PAGE 16

# TABLE OF AUTHORITIES

                                                                                    Page

**CASES**

Gon v. First State Ins. Co. (9th Cir. 1989)
871 Fed.2d 863, 865................................   7

United States v. Oregon State Med. Soc. (1952)
343 US 326, 333; 72 S. Ct. 690, 695.................   7


**CODE SECTIONS**

Civil Code §3289.....................................   8

Federal Rules of Civil Procedure, Rule 65(a)(1)......   6

Federal Rules of Civil Procedure, 65(a)(2)...........   6


**OTHER**

Business and Professions Code §10026.................   9

Business and Professions Code §10146.................   9

Schwarzer, Tashima & Wagstaffe, CAL. PRAC. GUIDE:
FED. CIV. PRO. BEFORE TRIAL (The Rutter Group 2008)
p. 13-3, §13:2.......................................   7, 8

Schwarzer, Tashima & Wagstaffe, CAL. ORAC. GUIDE:
FED. CIV. PRO. BEFORE TRIAL (The Rutter Group 2008)
p. 13-5, §13:8.......................................   7

NOTICE AND MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION AND/OR TO ADVANCE
ACTION FOR TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

TO POINT CENTER FINANCIAL, INC., AND JEFFREY S. BENICE, ITS ATTORNEY OF RECORD:

PLEASE TAKE NOTICE THAT on October 11, 2012 at 8:30 a.m. or as soon thereafter as the matter may be heard in Department 10 of the above-entitled Court located at 312 North Spring St., Los Angeles, CA 90012, Plaintiff THE PRESERVE, LLC ("THE PRESERVE") will and hereby does move this Court for the issuance of a preliminary injunction to prevent Defendant POINT CENTER FINANCIAL, INC. (sometimes "PCF") from demanding payments from THE PRESERVE under its Chapter 11 plan or taking any action in enforcing the conversion of the plan to a Chapter 7 if payments are not made or attempting to foreclose on the real property utilized as security for its loan ("Real Property") until and when the damages that THE PRESERVE has admittedly suffered as a result of POINT CENTER's action, plus interest and treble damages that the Court finds warranted, have been exhausted, or any other relief or terms the Court deems just and proper and further to advance this action for trial.

This motion is sought in that it is undisputed that THE PRESERVE is owed a minimum liquidated sum of $460,558.80 for the commissions PCF admittedly received and "paid itself" from sums that were never funded ($7,675,980.00) from a loan contracted to be in the sum of $39,000,000.00.

This Motion is be based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently filed and served declarations of Douglas Beach and Scott Krentel, the Court's file in this matter, and whatever

///

1

NOTICE AND MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION AND/OR TO ADVANCE
ACTION FOR TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Case 5:12-cv-01023-GW  Document 5  Filed 09/10/12  Page 9 of 15  Page ID #:19

further argument and evidence the Court entertains at the

hearing on this matter.


DATED:   September 10, 2012     LAW OFFICE OF RICHARD A. HARVEY


                                By:/S/ Richard A. Harvey_____
                                   Richard A. Harvey, Esq.,
                                   Attorney for Plaintiff
                                   THE PRESERVE, LLC

2

NOTICE AND MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION AND/OR TO ADVANCE
ACTION FOR TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

MEMORANDUM OF POINTS AND AUTHORITIES

I.

INTRODUCTION

This adversarial proceeding concerns a $39,000,000.00 development loan (the "Loan") obtained by THE PRESERVE on or about October 23, 2006 which was originated and serviced by Defendant PCF and secured by certain real property located in Beaumont, California. (First Amended Complaint ("FAC"), p. 2, ¶¶20 and 21.) The First Amended Complaint asserts numerous causes of action including tort and breach of contract theories against PCF. The FAC alleges that the Loan was to be fully funded, that PCF received compensation in the form of commissions of 6% (or $2,340,000.00) on a fully funded Loan, and, despite the fact that PCF was paid as if the Loan was fully funded on or about October 12, 2007, PCF advised THE PRESERVE that PCF never raised the sum of $7,675,980.00. (FAC, pp. 29-31, ¶¶26-28.) That is to say, the Loan amount raised is claimed by PCF to only be $31,324,020.00!

The Joint Pretrial Order in this proceeding admits the following facts:

1. POINT CENTER . . . is a corporation organized and existing under the laws of the state of California and operates as a wholesale private mortgage lender soliciting investors and public offerings by which potential third party qualified investors from the general public may invest in fractionalized securities purportedly secured by Deeds of Trust. (Joint Pretrial Order ("JPO"), p. 2, fact no. 4.)

2. POINT CENTER'S ownership interests are totally owned

3

NOTICE AND MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION AND/OR TO ADVANCE
ACTION FOR TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Case 5:12-cv-04023-GW    Document 5    Filed 09/10/12    Page 7 of 15    Page ID #:21

by DANIEL J. HARKEY aka DANNY JOE HARKEY (hereinafter "DANNY JOE HARKEY").  (JPO, p. 2, fact no. 6.)

3.    DANNY JOE HARKEY is an individual and the Chief Executive Officer, President, sole Director, Chairman of the Loan Committee and shareholder of POINT CENTER and is the controlling member and manager of ESCROW PROFESSIONALS, INC., POINT CENTER MORTGAGE FUND, I, LLC, NATIONAL FINANCIAL LENDING, INC. and NATIONAL FINANCIAL LENDING, LLC.  (JPO, p. 3, fact no. 15.)

4.    On October 12, 2007, POINT CENTER informed THE PRESERVE, LLC that POINT CENTER was demanding THE PRESERVE, LLC deposit the sum of $7,675,980.00 with POINT CENTER within 90 days.  (JPO, p. 13, fact no. 36.)

5.    Pursuant to a written agreement between POINT CENTER and THE PRESERVE, LLC, POINT CENTER was to receive 6% of the principal amount of $39,000,000.00 as a broker's commission. (JPO, p. 13, fact no. 37.)

6.    POINT CENTER, as broker of the $39,000,000.00 Loan fund paid itself $2,340,000.00 on or before December 31, 2007. (JPO, pp. 13-14, fact no. 38.)

7.    POINT CENTER never caused to be funded the full amount of $39,000,000.00.  (JPO, p. 14, fact no. 39.)

8.    POINT CENTER admits it is not entitled to commissions on funds not funded to THE PRESERVE, LLC which commissions equal six percent times $7,675,980.00.  (JPO, p. 15, fact no. 53.)

PCF documented its obligations to THE PRESERVE by letter agreement dated November 15, 2007 when DANNY JOE HARKEY acknowledged, "PCF acknowledges that it received compensation in

4

the form of points, fees and interest for raising investor money to fund the Preserve Loan.  PCF further acknowledges that it did not raise the full loan amount called for under the Preserve Loan, but that it received points as if it had raised the full loan amount.  PCF hereby acknowledges that the compensation received on that portion of the loan amount that was not funded as of October 1, 2007 was not earned."  (Declaration of Scott Krentel, p. 2, lines 21-25, Exhibit "B".)

Pursuant to the plan, THE PRESERVE is to make payments to PCF, as agent for the purported investors in the Loan. (Judicially noticed Plan, Exhibit "A", p. 33.)

PCF has received two payments from THE PRESERVE pursuant to the plan.  (Declaration of Scott Krentel, p. 3, lines 1-2.)

PCF has been utilizing payments received to pay its litigation costs and no portion of any payment has been distributed to the investors.  (Declaration of Douglas Beach, p. 3, lines 4-10, Exhibit "C".)

Despite repeated inquiries, Deep Canyon, LLC, an investor with $1,341,600.00 invested into the Loan, has not received any payments or response whatsoever to its requests.  (Declaration of Douglas Beach, p. 2, lines 15-24, Exhibits "A" and "B", and p. 3, lines 11-27, Exhibits "D" and "E".)

The Loan closed on October 23, 2006.  (Declaration of Scott Krentel, p. 2, lines 14-18, Exhibit "A".)

THE PRESERVE'S approved Chapter 11 plan calls for quarterly payments to PCF in the amount of $302,575.00, but which are without prejudice to the rights of THE PRESERVE with respect to this litigation.  (Plan, p. 21, lines 21-26.)  Pursuant to the

5

concurrently filed declaration of Douglas Beach, the payments made THE PRESERVE are being applied to reimburse PCF for its attorney's fees and costs in connection with this litigation and THE PRESERVE'S bankruptcy.

THE PRESERVE seeks an order to prohibit or enjoin PCF from demanding payments from THE PRESERVE under its bankruptcy plan until the damages THE PRESERVE has admittedly suffered, plus interest and other multipliers the Court deems just and proper, are exhausted, or whatever further relief this Court deems appropriate.

II.

THE COURT HAS THE AUTHORITY TO ISSUE THE PRELIMINARY INJUNCTION AND TO ADVANCE THE MATTER FOR TRIAL AS REQUESTED BY THE PRESERVE

A preliminary injunction may be issued upon notice to the adverse party.  (Federal Rules of Civil Procedure ("FRCP"), Rule 65(a)(1).)  FRCP 65(a)(2) provides that,

> "[b]efore or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing.  Even when consolidation is not ordered, evidence that is received on the motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial.  But the court must preserve any party's right to a jury trial."

///

///

///

6

NOTICE AND MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION AND/OR TO ADVANCE ACTION FOR TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

"A preliminary injunction is a provisional remedy issued prior to final disposition of the litigation. Its function is to preserve the status quo and prevent irreparable loss of rights prior to judgment." (Schwarzer, Tashima & Wagstaffe, CAL. ORAC. GUIDE: FED. CIV. PRO. BEFORE TRIAL (The Rutter Group 2008) p. 13-5, §13:8, citing Sierra On-Line, Inc. v. Phoenix Software, Inc. (9th Cir. 1984) 739 Fed.2d 1415, 1422; and others.)

"An injunction may be defined as an order directed to a party, enforceable by contempt, and designed to accord or protect some or all of the substantive relief sought by a complaint in more than temporary fashion." (Gon v. First State Ins. Co. (9th Cir. 1989) 871 Fed.2d 863, 865, citation omitted; see also Schwarzer, Tashima & Wagstaffe, CAL. PRAC. GUIDE: FED. CIV. PRO. BEFORE TRIAL (The Rutter Group 2008) p. 13-3, §13:2.)

"The sole function of an action for injunction is to forestall future violations. . . . All it takes to make the cause of action for relief by injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or recur." (United States v. Oregon State Med. Soc. (1952) 343 US 326, 333; 72 S. Ct. 690, 695; see also Schwarzer, Tashima & Wagstaffe, CAL. PRAC. GUIDE: FED. CIV. PRO. BEFORE TRIAL (The Rutter Group 2008) p. 13-3, §13:2.)  No showing of past wrongdoing is required.  (Schwarzer, Tashima & Wagstaffe, CAL. PRAC. GUIDE: FED. CIV. PRO. BEFORE TRIAL (The Rutter Group 2008) p. 13-3,

NOTICE AND MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION AND/OR TO ADVANCE
ACTION FOR TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

§13:2, citing <u>United States v. W.T. Grant Co.</u> (1953) 345 US 629, 633, 73 S. Ct. 894, 898; and <u>United States v. Laerdal Mfg. Corp.</u> (9th Cir. 1995) 73 Fed.3d 852, 855.)

Based on the undisputed facts agreed to by the parties pursuant to the Joint Pretrial Order and documentation signed by PCF and THE PRESERVE, THE PRESERVE has suffered damages recoverable from PCF in the minimum liquidated sum of $460,558.80 (representing the commissions PCF admittedly received from the unfunded portion of the Loan) from no later than October 23, 2006 to the present.  THE PRESERVE should not be forced to continue to make payments to PCF given the undisputed amounts due it under threat of a default under its bankruptcy plan or foreclosure of the subject real property.

Further, pursuant to California <u>Civil Code</u> §3289, absent a stipulated legal rate of interest, the obligation owed to THE PRESERVE shall bear interest at a rate of 10 percent per annum after a breach.  The sum of $460,558.80 accrues daily interest of $126.18. (($460,558.80 x 10%)/365 = $126.18.)  From October 24, 2006 through October 11, 2012 (a total of 2,178 days) the total interest that has accrued is $274,820.04.  This sum should be added to the undisputed sums due and owing to THE PRESERVE from PCF.

Further, the commissions PCF received from the unfunded portions of the Loan are an "advance fee" under California law. "The term 'advance fee,' as used in this part, is a fee, regardless of the form, that is claimed, demanded, charged, received, or collected by a licensee for services requiring a license, . . ., before fully completing the services the

8

licensee contracted to perform or represented would be performed." (California Business and Professions Code §10026.)

Pursuant to California Business and Professions Code §10146, any real estate broker who collects an advance fee from any other person must deposit any such fee in a trust account, to be withdrawn for the benefit of the agent (PCF) only when actually expended for the benefit of the principal (THE PRESERVE), and when said funds are not handled in accordance with said provisions, the principal may recover treble damages for the amounts so misapplied plus attorney's fees in any action brought to recover said sums. PCF is a real estate broker, who collected funds from investors for the benefit of The PRESERVE, and accepted and paid itself commissions totaling $460,558.80 from funds it never obtained in clear violation of Business and Professions Code §10146. THE PRESERVE respectfully requests this Court consider that violation in calculating the sums due THE PRESERVE in connection with this request for an injunction.

PCF's actions are not only inappropriate and in violation of the relevant Business and Professions Code section, but also were a basis for PCF's collection of interest due on the very sums it inappropriately paid itself. Therefore, from day one – October 23, 2006 – THE PRESERVE was paying the note interest rate on commissions paid for services never rendered.

III.

CONCLUSION

It is irrefutable and actually undisputed that PCF has obtained $460,558.80 and has had use of that money since October 23, 2006. Interest on that sum which should be applied

NOTICE AND MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION AND/OR TO ADVANCE ACTION FOR TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

pursuant to the statute now has accrued through October 11, 2012 to the sum of $274,820.04 for a total admittedly due to THE PRESERVE of $735,378.84.  Since it is clear by the documents prepared by PCF or its agents and forwarded to THE PRESERVE, PCF received "advance fees", never completed the services for which the advance fees were performed and therefore, this is a situation that demands the recovery of treble damages for the amounts so misapplied.  Therefore, the true amount that should be utilized to offset any payments due under the plan should be as follows:  Interest on $460,558.80 of $274,820.04 plus treble the amount of advance fees for $460,558.80 times 3 or $1,381,676.40.

     It is respectfully submitted that it is inequitable to have THE PRESERVE continue to pay for PCF's expenditures when PCF has admitted, on multiple occasions, it did not render the full services.  It is further requested that in order to have the entire matter decided as soon as possible, the Court exercise its discretion and advance the matter for trial to a date convenient to this Court.

DATED:  September 10, 2012     LAW OFFICE OF RICHARD A. HARVEY


                               By:/S/ Richard A. Harvey
                                  Richard A. Harvey, Esq.,
                                  Attorney for Plaintiff
                                  THE PRESERVE, LLC


Notice and Motion re Preliminary Injunction (Preserve-USDC)

NOTICE AND MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION AND/OR TO ADVANCE
ACTION FOR TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**PROOF OF SERVICE**

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 111 Pacifica, Suite 130, Irvine, California 92618.

On September 10, 2012, I served the document described as **NOTICE AND MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION AND/OR TO ADVANCE ACTION FOR TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** on the interested parties in this action.

[XX] (BY CM/ECF SYSTEM ELECTRONIC MAIL [PDF]) I caused such document(s) to be sent to counsel via CM/ECF System to the email addresses listed.

Jeffrey S. Benice - jsb@jeffreybenice.com

[XX] (BY OVERNIGHT MAIL) I am readily familiar with the practice of this office for the collection and processing of correspondence for overnight delivery and know that the document(s) described herein will be deposited in a box or other facility regularly maintained by Federal Express/United Parcel Service/Overnite Express for overnight delivery.

Honorable George Wu
United States District Court
312 N. Spring Street, Room 128
Los Angeles, CA 90012

Jeffrey S. Benice, Esq.
Law Office of Jeffrey S. Benice
South Coast Corporate Center
3080 Bristol St., 6th Flr., Ste. 630
Costa Mesa, CA 92626

Catherine Convy, Esq.
Grant, Genovese & Baratta, LLP
2030 Main Street, Suite 1600
Irvine, CA 92614

11

NOTICE AND MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION AND/OR TO ADVANCE ACTION FOR TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

[XX] (FEDERAL) I declare under penalty of perjury under the laws of the United States of America that the above is true and correct and that I took said action(s) at the direction of a licensed attorney authorized to practice before the Federal Courts.

Executed on September 10, 2012 at Irvine, California.


_____/S/ Gaylene Oyama_____

12

NOTICE AND MOTION FOR ISSUANCE OF A PRELIMINARY INJUNCTION AND/OR TO ADVANCE
ACTION FOR TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

EXHIBIT "1"                                                    PAGE 29

Richard A. Harvey, Esq. (SBN 61442)
LAW OFFICE OF RICHARD A. HARVEY
111 Pacifica, Suite 130
Irvine, CA 92618
Tel: (949) 336-6611 Ext. 222
Fax: (949) 336-6616
Email:  dickatlaw@cox.net

Attorney for Plaintiff
THE PRESERVE, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION (SPRING STREET)

| | |
|---|---|
| In re: | District Court Case No.: |
| | 5:12-cv-01023-GW |
| THE PRESERVE, LLC, | |
| | Bankruptcy Case No.: |
| Plaintiff, | 2:10-bk-18429-BB |
| | |
| v. | Adversary Case No.: |
| | 2:10-ap-01296-BB |
| POINT CENTER FINANCIAL, INC., | |
| ESCROW PROFESSIONALS, INC., POINT | Hon. George H. Wu |
| CENTER MORTGAGE FUND, I, LLC, | Ctrm. 10 |
| NATIONAL FINANCIAL LENDING, INC., | |
| NATIONAL FINANCIAL LENDING, LLC, | |
| DANIEL J. HARKEY aka DANNY JOE | DECLARATION OF SCOTT KRENTEL |
| HARKEY, VERNON ALAN BERGFELD, | IN SUPPORT OF MOTION FOR |
| STEPHAN GEORGE LIVINGSTON, | PRELIMINARY INJUNCTION |
| TD SERVICE COMPANY, RENE E. | |
| ESPARZA, M. GWEN MELANSON, LOIS | |
| R. BEJERANO, JOSHUA RETA, et al., | DATE:  October 11, 2012 |
| | TIME:  8:30 a.m. |
| Defendants. | CTRM:  10 |
| | 312 North Spring St. |
| | Los Angeles, CA 90012 |

1

DECLARATION OF SCOTT KRENTEL IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

I, Scott Krentel, declare and state as follows:

1. I am over the age of 18 and competent to give testimony in this action. The matters stated herein are true and correct and are within my personal knowledge, and if called upon to testify as a witness, I would and could testify competently thereto.

2. I am the manager of Beaumont 1600, a California Limited Liability Company, which is the manager of THE PRESERVE, LLC ("THE PRESERVE"). As the manager of the manager of THE PRESERVE, I am familiar with THE PRESERVE's business operations. I was the contact on behalf of THE PRESERVE with POINT CENTER FINANCIAL, INC. ("POINT CENTER") during the period the $39,000,000.00 loan was being processed.

3. In late October or early November 2006, I received a document entitled "Borrower Statement, Final" confirming the loan had closed and POINT CENTER received the entire commission of $2,340,000.00 on October 23, 2006. A true and correct copy of that statement is attached hereto as Exhibit "A".

4. THE PRESERVE has been charged interest on the full amount of the commission since the closing.

5. On or about November 15, 2007, I received a fully executed copy of the letter agreement of even date in which POINT CENTER admits it was not entitled to the full commission. A true and correct copy of that letter is attached hereto as Exhibit "B".

///

///

///

2

DECLARATION OF SCOTT KRENTEL IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

6.    THE PRESERVE has made the first two payments called for under the Chapter 11 plan.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct, and that this declaration was executed by the undersigned this ____ day of September, 2012 at Riverside, California.

SEE ATTACHMENT FOR SIGNATURE
Scott Krentel

Decl of Krentel in Support of Motion for Preliminary Injunction (Preserve-USDC)

3

DECLARATION OF SCOTT KRENTEL IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## PROOF OF SERVICE

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 111 Pacifica, Suite 130, Irvine, California 92618.

On September 10, 2012, I served the document described as **DECLARATION OF SCOTT KRENTEL IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** on the interested parties in this action.

[XX] (BY CM/ECF SYSTEM ELECTRONIC MAIL [PDF])  I caused such document(s) to be sent to counsel via CM/ECF System to the email addresses listed.

Jeffrey S. Benice - jsb@jeffreybenice.com

[XX] (BY OVERNIGHT MAIL) I am readily familiar with the practice of this office for the collection and processing of correspondence for overnight delivery and know that the document(s) described herein will be deposited in a box or other facility regularly maintained by Federal Express/United Parcel Service/Overnite Express for overnight delivery.

Honorable George Wu
United States District Court
312 N. Spring Street, Room 128
Los Angeles, CA 90012

Jeffrey S. Benice, Esq.
Law Office of Jeffrey S. Benice
South Coast Corporate Center
3080 Bristol St., 6th Flr., Ste. 630
Costa Mesa, CA 92626

Catherine Convy, Esq.
Grant, Genovese & Baratta, LLP
2030 Main Street, Suite 1600
Irvine, CA 92614

4

DECLARATION OF SCOTT KRENTEL IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

[XX] (FEDERAL) I declare under penalty of perjury under the laws of the United States of America that the above is true and correct and that I took said action(s) at the direction of a licensed attorney authorized to practice before the Federal Courts.

Executed on September 10, 2012 at Irvine, California.


_____/S/ Gaylene Oyama_____

5
DECLARATION OF SCOTT KRENTEL IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

6.    THE PRESERVE has made the first two payments called for under the Chapter 11 plan.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct, and that this declaration was executed by the undersigned this _10_ day of September, 2012 at San Diego, California.

_____
Scott Krentel

Decl of Krentel in Support of Motion for Preliminary Injunction (Preserve-USDC)

3

DECLARATION OF SCOTT KRENTEL IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
EXHIBIT "1"                                                                PAGE 35

# EXHIBIT A

## Escrow Professionals, Inc.

33161 Camino Capistrano, Unit H
San Juan Capistrano, CA 92675
Phone: (949) 661-5066 • Fax: (949) 661-9727

**BORROWER STATEMENT**
Final

| | |
|---|---|
| Escrow Number: 57323 | Title Order Number: 09301656-12 |
| Escrow Officer: Beverly A. Miali | Date: 10/25/2006 - 10:30:29AM |
| | Closing Date: 10/23/2006 |

Borrower: The Preserve LLC

Property: 1,300+ Acres Located Beamont, Ca, CA

| | DEBITS | CREDITS |
|---|---|---|
| **TOTAL CONSIDERATION** | | |
| **TITLE CHARGES** | | |
| Lender/Mortgagee Premium for 39,000,000.00: Land America Lawyers Title | 26,520.00 | |
| Mortgage Recording Fee: Land America Lawyers Title | 223.00 | |
| Agreement fee: Land America Lawyers Title | 82.00 | |
| UCC Financing Statement: Land America Lawyers Title | 20.00 | |
| Inspection fee: Land America Lawyers Title | 50.00 | |
| **ESCROW CHARGES TO: Escrow Professionals, Inc.** | | |
| Es. Fee | 10,250.00 | |
| Wire Fee | 45.00 | |
| Audit & Assessment Fee | 9.50 | |
| **LENDER CHARGES** | | |
| New to Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries: | | 39,000,000.00 |
| Loan Fee @ 0.00 %: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 2,340,000.00 | |
| Interest Adjustment From 10/20/2006 To 11/01/2006, 11 Days, @ 7,520.3300/per day: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 90,243.96 | |
| Underwriting Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 5,000.00 | |
| Credit Investigation Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 81.00 | |
| Processing Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 500.00 | |
| Documentation Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 300.00 | |
| Securitization Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 1,000.00 | |
| County Property Tax Reserve (24 Months): Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 250,000.00 | |
| Interest Reserves (24 Months): Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 9,650,000.00 | |
| Pcf Inspection Site Fee: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 250.00 | |
| Construction Hold Back: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | 7,251,736.00 | |
| **LOAN PAYOFF: Point Center Financial** | | |
| Principal Balance — 19,000,000.00 | | |
| Interest Per Diem From 10/01/2006 To 10/19/2006, 18 Days, @ 6,069.4444 — 113,739.70 | | |
| Less The Trust Account Balance — -2,434.58 | | |
| Total Loan Payoff | 19,113,739.70 | 2,434.58 |
| **TAXES:** | | |
| Property Tax to: Riverside County Tax Collector | 44,322.25 | |
| **ADDITIONAL DISBURSEMENTS:** | | |
| Reimbursement Of Appraisal: The Preserve LLC | 16,000.00 | |
| Funds Returned To PCF For Reserves: Point Center Financial | 202,062.17 | |
| **TOTALS** | 39,002,434.58 | 39,002,434.58 |

THIS IS A FINAL CLOSING STATEMENT

EXH: ___A___
PAGE: ___6___

39-00002

⊕ OMB No. 2502-0265

| A. U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT SETTLEMENT STATEMENT | B. TYPE OF LOAN |
|---|---|
| | 1. ☐ FHA  2. ☐ FHMA  3. ☒ CONV. UNINS.  4. ☐ VA  5. ☐ CONV. INS. |
| | 6. FILE NUMBER: 57323   7. LOAN NUMBER: |
| | 8. MORTGAGE INS. CASE NO.: |

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

D. NAME & ADDRESS OF BORROWER: The Preserve LLC

E. NAME & ADDRESS OF SELLER:

F. NAME & ADDRESS OF LENDER: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries 30900 Rancho Viejo Road #110, San Juan Capistrano, CA 92675

G. PROPERTY LOCATION: 1,300+ Acres Located Beamont, Ca., CA

H. SETTLEMENT AGENT: Escrow Professionals, Inc.
PLACE OF SETTLEMENT: 33161 Camino Capistrano Unit H, San Juan Capistrano, CA 92675 (949) 661-8066

I. SETTLEMENT DATE: 10/23/2006 Final

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| 100. Gross Amount Due From Borrower: | | 400. Gross Amount Due To Seller: | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower: (line 1400) | 19,844,372.63 | 403. | |
| 104. Property Tax | 44,322.25 | 404. | |
| 105. Payoff To Point Center Financial | 19,111,305.12 | 405. | |
| | | | |
| | | | |
| | | | |
| | | | |
| Adjustments For Items Paid By Seller In Advance: | | Adjustments For Items Paid By Seller In Advance: | |
| 106. Town taxes    to | | 406. City/town taxes    to | |
| 107. County taxes    to | | 407. County taxes    to | |
| 108. Assessments    to | | 408. Assessments    to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 116. | | 416. | |
| 120. Gross Amount Due From Borrower: | 39,000,000.00 | 420. Gross Amount Due To Seller: | |
| 200. Amounts Paid By Or In Behalf Of Borrower: | | 500. Reductions In Amount Due To Seller: | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 39,000,000.00 | 502. Settlement charges to seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff 1st Mtg. Ln. | |
| 205. | | 505. Payoff 2nd Mtg. Ln. | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| | | | |
| | | | |
| | | | |
| Adjustments For Items Unpaid By Seller: | | Adjustments For Items Unpaid By Seller: | |
| 210. City/town taxes    to | | 510. City/town taxes    to | |
| 211. County taxes    to | | 511. County taxes    to | |
| 212. Assessments    to | | 512. Assessments    to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| | | | |
| 220. Total Paid By/For Borrower: | 39,000,000.00 | 520. Total Reductions In Amount Due Seller: | |
| 300. Cash At Settlement From/To Borrower: | | 600. Cash At Settlement From/To Seller: | |
| 301. Gross amount due from borrower (line 120) | 39,000,000.00 | 601. Gross amount due to seller (line 420) | |
| 302. Less amount paid by/for borrower (line 220) | 39,000,000.00 | 602. Less reductions in amount due seller (line 520) | |
| 303. Cash (☐FROM ☐TO) Borrower: | 0.00 | 603. Cash (☐TO ☐FROM) Seller: | 0.00 |

Previous Edition is Obsolete
Form No. 1581
'86

SB-4-3538-000-1
HUD-1 (3-86)
RESPA HB 4305.2

EXH: A
PAGE: 7

30-00003

| | SETTLEMENT CHARGES | Escrow: 57323 | Paid From Borrower's Funds At Settlement | Paid From Seller's Funds At Settlement |
|---|---|---|---|---|
| 700. Total Sales/Broker's Commission: Based On Price $ @ % = | | | | |
| Division of Commission (line 700) As Follows: | | | | |
| 701. $ to | | | | |
| $ to | | | | |
| 703. Commission paid at settlement | | | | |
| 704. | | | | |
| 800. Items Payable In Connection With Loan: | | | | |
| 801. Loan Origination fee % | | | | |
| 802. Loan Discount % | | | | |
| 803. Appraisal fee to: | | | | |
| 804. Credit report to: | | | | |
| 805. Lender's inspection fee | | | | |
| 806. Mortgage insurance application fee to | | | | |
| 807. Assumption fee | | | | |
| 808. Loan Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | | | 2,340,000.00 | |
| 809. Securitization Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | | | 1,000.00 | |
| 810. County Property Tax Reserve (24 Months) To: Point Center Financial, Inc., as Designated Lender for M | | | 250,000.00 | |
| 811. Interest Reserves (24 Months) To: Point Center Financial, Inc., as Designated Lender for Multi-Benef | | | 9,630,000.00 | |
| 812. Pre-Inspection Site Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiary | | | 250.00 | |
| 813. Construction Hold Back To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiarie | | | 7,251,735.00 | |
| 814. Underwriting Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiaries | | | 5,000.00 | |
| 815. Credit Investigation Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Beneficiar | | | 81.00 | |
| 816. Exhibit "C" Attached Hereto | | | 800.00 | |
| 900. Items Required By Lender To Be Paid In Advance: | | | | |
| 901. Interest from 10/20/2006 to 11/01/2006 @ 7,520.3300 /day | | | 90,243.96 | |
| 902. Mortgage insurance premium for mo. to | | | | |
| 903. Hazard insurance premium for yrs. to | | | | |
| 904. Flood insurance premium for yrs. to | | | | |
| 905. | | | | |
| | | | | |
| 1000. Reserves Deposited With Lender: | | | | |
| 1001. Hazard insurance months @ $ per month | | | | |
| 1002. Mortgage insurance months @ $ per month | | | | |
| 1003. City property taxes months @ $ per month | | | | |
| 1004. County property taxes months @ $ per month | | | | |
| 1005. Annual assessments months @ $ per month | | | | |
| 1006. Flood insurance months @ $ per month | | | | |
| 1007. months @ $ per month | | | | |
| 1008. Aggregate Adjustment | | | | |
| 1009. | | | | |
| 1100. Title Charges: | | | | |
| 1101. Settlement or closing fee to Escrow Professionals, Inc. | | | 10,250.00 | |
| 1102. Abstract or title search to | | | | |
| 1103. Title examination to | | | | |
| 1104. Title insurance binder to | | | | |
| 1105. Document preparation to | | | | |
| 1106. Notary fees to | | | | |
| 1107. Attorney's fees to | | | | |
| (includes above item Numbers: ) | | | | |
| 1108. Title Insurance to Land America Lawyers Title | | | | |
| (includes above item Numbers: ) | | | 26,520.00 | |
| 1109. Lender's coverage $39,000,000.00 Premium: $26,520.00 | | | | |
| 1110. Owner's coverage $ | | | | |
| 1111. Wire Fee to Escrow Professionals, Inc. | | | 45.00 | |
| 1112. Audit & Assessment Fee to Escrow Professionals, Inc. | | | 9.50 | |
| Agreement fee to Land America Lawyers Title | | | 32.00 | |
| 1113. Exhibit "D" Attached Hereto | | | 70.00 | |
| 1200. Government Recording and Transfer Charges: | | | | |
| 1201. Recording fees: Deed $ :Mortgage $ 223.00 :Releases $ | | | 223.00 | |
| 1202. City/county tax/stamps: Deed $ :Mortgage $ | | | | |
| 1203. State tax/Stamps: Deed $ :Mortgage $ | | | | |
| 1204. | | | | |
| 1205. | | | | |
| 1300. Additional Settlement Charges | | | | |
| 1301. Survey to | | | | |
| 1302. Pest inspection to | | | | |
| 1303. Reimbursement Of Appraisal to The Preserve LLC | | | 16,000.00 | |
| 1304. Funds Returned To PCF For Reserves to Point Center Financial | | | 202,062.17 | |
| 1305. | | | | |
| 1306. | | | | |
| 1307. | | | | |
| 1308. | | | | |
| 1309. | | | | |
| 1310. | | | | |
| 1311. | | | | |
| 1312. | | | | |
| 1313. | | | | |
| 1400. Total Settlement Charge (Enter on line 103, Section J - and - line 502, Section K) | | | 19,844,377.63 | |

Form No. 1582

SB-4-3518-000-1

EXH: A

PAGE: 8

30=00004

| SELLER'S AND/OR BORROWER'S STATEMENT | Escrow: 57323 |
|---|---|

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

Settlement Agent: _____     Date: _____

Beverly A. Miall, Escrow Professionals, Inc.

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

Page 3 of 3

EXH: _____A_____

PAGE: _____9_____

39-00005

ATTACHMENT TO HUD 1                                           Escrow No.:              57323
Settlement Date: 10/23/2006                                  Title No.:            09301656-12
                                                                          Page:        1

**EXHIBIT A: Tax Payment Breakdown**
Breakdown of Tax Payments:
County Taxes

| Year | Amount | Interest | Penalty |
|------|--------|----------|---------|
|      |        |          |         |

**EXHIBIT B: (HUD Section 100)**                                  Buyer Amount
Gross Amount Due From Borrower - Loan Payoff Breakdown:

Point Center Financial
Principal Balance To: Point Center Financial                      19,000,000.00
Interest Per Diem From 10/01/2006 to 10/19/2006 @ $  6,069.4444 To: Point Center Fi      113,739.70
Less The Trust Account Balance To: Point Center Financial            -2,434.58
                                                        Total:    19111,305.12

**EXHIBIT C: (HUD Section 800 )**                                 Buyer Amount
Items Payable In Connection With Loan:

Processing Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Benefici      500.00
Documentation Fee To: Point Center Financial, Inc., as Designated Lender for Multi-Bene      300.00
                                                        Total:       800.00

**EXHIBIT D: (HUD Section 1100)**                                 Buyer Amount
Title Charges:

UCC Financing Statement to Land America Lawyers Title               20.00
Inspection fee to Land America Lawyers Title                        50.00
                                                        Total:       70.00

EXH:_____A_____
PAGE:____10_____                                   39-00006

OCT-26-2006 THU 13:43 TEL:951 369-9889 HAWTHORN DESK P. 1

**LAWYERS TITLE COMPANY** 951-369-9889

1920 Main Street, Suite 1200, Irvine, Ca 92614
(949) [illegible]

**SUB-ESCROW CLOSING STATEMENT**
**FINAL**

| | | | |
|---|---|---|---|
| To: | Escrow Professionals<br>Beverly [illegible]<br>33161 Camino Capistrano #[illegible]<br>San Juan Capistrano, CA 92675 | Title No: | [illegible] MK4 |
| | | Close Date: | 10/23/2006 |
| | | Proration Date: | |
| | | Date Prepared: | 10/23/2006 |

Re: 97323-RAM

Phone: (949) 661-8066
Fax: (949) 661-9727
[illegible]@escrowprofessionals[illegible].com

Property: see Escrl legal
Beaumont, CA 92223

| [illegible] | Debit | Credit |
|---|---|---|
| TOTAL CONSIDERATION: | | |
| point center financial | | $299,583.92 |
| TITLE AND ESCROW CHARGES: | | |
| Title Insurance to Lawyers Title Company | 26,895.00 | |
| ADDITIONAL CHARGES: | | |
| 1st 06/07 apn: 421-070-001-5 to riverside county tax collector | 4,210.20 | |
| 1st 06/07 apn: 421-070-005-9 to riverside county tax collector | 1,694.60 | |
| 1st 06/07 apn: 421-070-006-0 to riverside county tax collector | 1,623.36 | |
| 1st 06/07 apn: 421-070-007-1 to riverside county tax collector | 1,931.60 | |
| 06/07 1st apn: 421-080-002-7 to riverside county tax collector | 19,889.31 | |
| 06/07 1st apn: 421-190-002-7 to riverside county tax collecto | 3,798.45 | |
| 06/07 1st apn: 421-190-003-8 to riverside county tax collector | 5,051.20 | |
| 06/07 1st apn: 421-190-004-9 to riverside county tax collector | 4,220.91 | |
| 06/07 1st apn: 421-190-005-0 to riverside county tax collector | 709.72 | |
| 06/07 1st apn: 421-190-006-1 to riverside county tax collecto | 709.72 | |
| 06/07 1st apn: 421-190-011-5 to riverside county tax collecto | 492.96 | |
| Sub Totals | 71,217.25 | 299,583.92 |
| Refund Due Buyer/Borrower | $228,366.67 | $0.00 |
| Totals | $299,583.92 | $299,583.92 |

Printed on 10/23/2006 at [illegible]

OCT-26-2006 04:31 PM Escrow Professionals 9496619727 1/1

EXH: A
PAGE: 11

39-00007

# EXHIBIT B



**POINT CENTER**
**FINANCIAL, INC.**

Trust Deed, Mortgage, and Real Estate Secured Investments since 1979

November 15, 2007

Mr. Scott Krentel
7006 Magnolia Avenue, #309
Riverside, CA  92506

Re:  The Preserve, LLC

Dear Mr. Krentel:

This letter will confirm the agreement among Point Center Financial Inc. ("PCF"), and The Preserve, LLC, sometimes referred to herein as the "Parties" regarding loan number 206070 (the "Preserve Loan").

1.      The Parties acknowledge PG&E, A California General partnership or another entity which may be named prior to funding as described below (collectively "PGE") will become an investor in the Preserve Loan subject to and contingent on PCF'S performance as described herein.  The amount initially invested shall be sufficient to pay three months. interest and bring any delinquent property taxes current. All amounts invested by PGE (less applicable, contractual servicing fees) shall be immediately disbursed to the investors in the Preserve Loan. The initial amount invested shall be approximately $1,000,000.00. PCF shall provide appropriate documentation which must be acceptable to PGE as to the actual amounts needed to pay the interest. PGE shall provide formation documents, or other evidence of existence, to PCF. PCF shall provide the investor information, investor packet and all reports generated for other investors in the Preserve Loan prior to PGE funding of its investment and in no event later than November 20, 2007. PGE shall have the right, but not the obligation, to further invest in the Preserve Loan on a monthly schedule commencing with the interest due to investors on January 1, 2008. Said monthly payment shall not exceed $350,000.00.

2.      PCF shall immediately rescind its letter to The Preserve dated October 4, 2007 relating to The Preserve Loan and  and shall not send any  equivalent or like notice as long as PGE or others invest sufficient funds on at least a monthly basis to equal the interest due and  payable to investors under the Preserve Loan. PCF warrants it has not filed or recorded any notice of default on the Preserve Loan and shall take all steps necessary to ensure no such notice of default is recorded as long as investments  sufficient to pay the interest due and payable to investors on a monthly basis are received on or before the interest due date.

30900 Rancho Viejo Road, Suite 100
San Juan Capistrano, CA 92675
1-800-544-8800, (949) 661-7070, fax (949) 661-1850
www.pointcenter.com                                    *A Licensed Real Estate Broker - DRE # 00745721*

EXH:  _B_
PAGE:  _12_

13-0002

Case 5:12-cv-01023-GW  Document 6-2  Filed 03/10/12  Page 10 of 10  Page ID #:45

3.     PCF shall treat PGE in the same manner as any other investor and the parties acknowledge and agree that PCF has no fiduciary obligation to The Preserve by reason of PGE becoming an investor.

4.     PCF acknowledges that it received compensation in the form of points, fees and interest for raising investor money to fund the Preserve Loan.  PCF further acknowledges that it did not raise the full loan amount called for under the Preserve Loan, but that it received points as if it had raised the full loan amount. PCF hereby acknowledges that the compensation received on that portion of the loan amount that was not funded as of October 1, 2007 was not earned. PCF reserves the right to continue its efforts to raise 3rd party investor funds, and to the extent additional funds not already invested by PGE are raised by PCF and invested in the Preserve Loan, the points related to those funds will be deemed earned.

5.     PCF and The Preserve, by making arrangements as described herein do not intend to otherwise alter their respective legal or equitable positions in any manner.  In this regard, the parties do not intend to waive any right or remedy which such party has as of the date of this communication incident to the subject transactions.

6.     The execution of this letter by both parties is intended to bind them to the foregoing terms and is entered as of the date set forth above.

The Preserve, LLC,

By Beumont 1600, LLC,
Its Manager,

By Scott Krente],
Its Manager.

Point Center Financial, Inc.
Dan J. Harkey, President

EXH:_____ β_____

PAGE:____ 13_____

13-0003

Richard A. Harvey, Esq. (SBN 61442)
LAW OFFICE OF RICHARD A. HARVEY
111 Pacifica, Suite 130
Irvine, CA 92618
Tel: (949) 336-6611 Ext. 222
Fax: (949) 336-6616
Email:  dickatlaw@cox.net

Attorney for Plaintiff
THE PRESERVE, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION (SPRING STREET)

| | |
|---|---|
| In re: | District Court Case No.: 5:12-cv-01023-GW |
| THE PRESERVE, LLC, | Bankruptcy Case No.: |
| Plaintiff, | 2:10-bk-18429-BB |
| v. | Adversary Case No.: 2:10-ap-01296-BB |
| POINT CENTER FINANCIAL, INC., ESCROW PROFESSIONALS, INC., POINT CENTER MORTGAGE FUND, I, LLC, NATIONAL FINANCIAL LENDING, INC., NATIONAL FINANCIAL LENDING, LLC, DANIEL J. HARKEY aka DANNY JOE HARKEY, VERNON ALAN BERGFELD, STEPHAN GEORGE LIVINGSTON, TD SERVICE COMPANY, RENE E. ESPARZA, M. GWEN MELANSON, LOIS R. BEJERANO, JOSHUA RETA, et al., | Hon. George H. Wu Ctrm. 10  DECLARATION OF DOUGLAS BEACH IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION  DATE:  October 11, 2012 TIME:  8:30 a.m. |
| Defendants. | CTRM:  10 312 North Spring St. Los Angeles, CA 90012 |

1

DECLARATION OF DOUGLAS BEACH IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

I, Douglas Beach, declare and state as follows:

1.    I am over the age of 18 and competent to give testimony in this action.  The matters stated herein are true and correct and are within my personal knowledge, and if called upon to testify as a witness, I would and could testify competently thereto.

2.    I am a vice president of Deep Canyon Holdings, Inc. ("Deep Canyon").  In that capacity I am personally familiar with ongoing negotiations between Deep Canyon and THE PRESERVE, LLC ("THE PRESERVE") with regard to Deep Canyon's equity investment in THE PRESERVE as a result of the confirmation of THE PRESERVE's Fifth Amended Chapter 11 Plan (the "Plan") which is pending in the United States Bankruptcy Court, Central District of California, Los Angeles Division.

3.    On December 11, 2007, Deep Canyon invested the sum of $1,000,000.00 in the loan that was known as "The Preserve Loan" and was carried on POINT CENTER FINANCIAL, INC.'s ("POINT CENTER") records as loan number 206070 (the "PRESERVE Loan"). See Exhibit "A" which is a true and correct copy of the wire instruction utilized to transfer the funds.

4.    On or about January 25, 2008, Deep Canyon invested the further sum of $341,600.00 in the PRESERVE Loan.  See Exhibit "B" which is a true and correct copy of the wire instruction utilized to transfer the funds.

5.    Within one year last past, I became aware that THE PRESERVE, as part of its responsibilities under the bankruptcy Plan which was confirmed by the Honorable Sheri Bluebond, was to make quarterly payments in the sum of

2

$302,750.00.  It was Deep Canyon's understanding that these quarterly payments were made in order to establish distributions to the investors.

6.    On or about May 2, 2012, Deep Canyon received correspondence from POINT CENTER confirming POINT CENTER had received the first installment in full and further indicated that essentially the funds would be used not to pay investors, but rather would be for payment of POINT CENTER's legal costs. A true and correct copy of this letter is attached hereto as Exhibit "C".

7.    On May 11, 2012, I, on behalf of Deep Canyon, responded to POINT CENTER in writing indicating that Deep Canyon had not received its check for proportional interest due from the payment received by POINT CENTER and demanding payment within ten days of the date of that letter.  No response to that letter was ever received.  A true and correct copy of that letter is attached hereto as Exhibit "D".  (The certified mail was returned marked "refused".)

8.    Thereafter I received information that POINT CENTER had received yet another payment in the sum of $302,750.00 from THE PRESERVE in accordance with the Court approved Chapter 11 Reorganization Plan.

9.    On July 3, 2012, I, on behalf of Deep Canyon, again wrote to POINT CENTER demanding POINT CENTER pay over the amounts due to Deep Canyon as a result of the Deep Canyon investment and the Chapter 11 Reorganization Plan.  A true and correct copy of that correspondence is attached as Exhibit "E".

///

3

DECLARATION OF DOUGLAS BEACH IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Case 9:12-cv-01025-GW   Document 7   Filed 09/10/12   Page 4 of 6   Page ID #:49

10.   To date, POINT CENTER has refused to respond in any fashion to any of Deep Canyon's demands for information or for payment.

11.   Deep Canyon has taken those steps necessary to file a notice of default on its portion of the underlying Trust Deed which secures its investment in the PRESERVE Loan in the amount of $2,086,757.55.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct, and that this declaration was executed by the undersigned this _____ day of September, 2012 at El Segundo, California.

SEE ATTACHMENT FOR SIGNATURE
Douglas Beach

Decl of Beach in Support of Motion for Preliminary Injunction (Preserve-USDC)

4
DECLARATION OF DOUGLAS BEACH IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## PROOF OF SERVICE

I am employed in the County of Orange, State of California. I am over the age of 18 and not a party to the within action. My business address is 111 Pacifica, Suite 130, Irvine, California 92618.

On September 10, 2012, I served the document described as **DECLARATION OF DOUGLAS BEACH IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** on the interested parties in this action.

[XX] (BY CM/ECF SYSTEM ELECTRONIC MAIL [PDF])  I caused such document(s) to be sent to counsel via CM/ECF System to the email addresses listed.

Jeffrey S. Benice - jsb@jeffreybenice.com

[XX] (BY OVERNIGHT MAIL) I am readily familiar with the practice of this office for the collection and processing of correspondence for overnight delivery and know that the document(s) described herein will be deposited in a box or other facility regularly maintained by Federal Express/United Parcel Service/Overnite Express for overnight delivery.

Honorable George Wu
United States District Court
312 N. Spring Street, Room 128
Los Angeles, CA 90012

Jeffrey S. Benice, Esq.
Law Office of Jeffrey S. Benice
South Coast Corporate Center
3080 Bristol St., 6th Flr., Ste. 630
Costa Mesa, CA 92626

Catherine Convy, Esq.
Grant, Genovese & Baratta, LLP
2030 Main Street, Suite 1600
Irvine, CA 92614

5

DECLARATION OF DOUGLAS BEACH IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

[XX] (FEDERAL) I declare under penalty of perjury under the laws of the United States of America that the above is true and correct and that I took said action(s) at the direction of a licensed attorney authorized to practice before the Federal Courts.

Executed on September 10, 2012 at Irvine, California.

_____/S/ Gaylene Oyama_____

DECLARATION OF DOUGLAS BEACH IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

10. To date, POINT CENTER has refused to respond in any fashion to any of Deep Canyon's demands for information or for payment.

11. Deep Canyon has taken those steps necessary to file a notice of default on its portion of the underlying Trust Deed which secures its investment in the PRESERVE Loan in the amount of $2,086,757.55.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct, and that this declaration was executed by the undersigned this _9th_ day of September, 2012 at El Segundo, California.

_____
Douglas Beach

Decl of Beach in Support of Motion for Preliminary Injunction (Preserve-USDC)

---

4

DECLARATION OF DOUGLAS BEACH IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Case 3:12-cv-01023-GW Document 7-2 Filed 09/10/12 Page 1 of 12 Page ID #:53

# EXHIBIT A

December 11, 2007
Michael B. Kira
UBS Paine Webber
**Page 2**

## WIRE INSTRUCTION

### WIRE TO:

Pacific Mercantile Bank
31601 Avenida Cerritos, #100
San Juan Capistrano, CA 92675
(949) 487-4200

ROUTING NUMBER:  122242869

FOR THE CREDIT TO:  Point Center Financial, Inc.
Client Trust Account FBO:  **Deep Canyon Holdings**
30900 Rancho Viejo Road, Ste 100
San Juan Capistrano, CA 92675

ACCOUNT NUMBER:  2104750

REF:  Wire

AMOUNT:  $ 1,000,000.00

FROM ACCOUNT NO:  KR

SPECIAL INSTRUCTION:  Loan No. 206070 / The Preserve, LLC. (DCHI)

XXXXXXXXXXXXXXXXX:

DEEP CANYON HOLDINGS, INC.

_____
A. Parrin

**EXH:** A
**PAGE:** 7

EXHIBIT "1"                                           PAGE 54

Case 3:12-cv-01023-GW   Document 7-2   Filed 09/10/12   Page 3 of 12   Page ID #:55

# EXHIBIT B

January 25, 2008
Michael B. Kira
UBS Paine Webber
**Page 2**

# WIRE INSTRUCTION

## WIRE TO:

Pacific Mercantile Bank
31601 Avenida Cerritos, #100
San Juan Capistrano, CA 92675
(949) 487-4200

CREDIT:

Point Center Financial, Inc.
Client Trust Account FBO: **Deep Canyon Holdings**
30900 Rancho Viejo Road, Ste 100
San Juan Capistrano, CA 92675
(949) 661-7070

ACCOUNT NUMBER: 2104750

ABA/ROUTING NUMBER: 122242869

REF: Wire

AMOUNT: $ 341,600.00

FROM ACCOUNT NO: KR.

SPECIAL INSTRUCTION: Loan No. 206070 / The Preserve, LLC. (DCHI)

XXXXXXXXXXXXXXXXXX:

DEEP CANYON HOLDINGS, INC.

A. Parrin

Deep Canyon Holdings, Inc.

**EXH:** $\mathcal{B}$
**PAGE:** 8

EXHIBIT "1"

Case 3:12-cv-01023-GW Document 7-2 Filed 09/10/12 Page 5 of 12 Page ID #:57

# EXHIBIT C



May 2, 2012


DEEP CANYON HOLDINGS, INC.
P.O. BOX 10723
PALM DESERT, CA 92255


Re:   The Preserve; "Legacy Highlands"; Loan No. 206070;
      1,330 acres of vacant residential land; SW of 1-10 & SR-60, Beaumont, CA


Dear Investor(s):

Point Center Financial, Inc. ("PCF") is writing to inform you about the status of the borrower's Bankruptcy Plan.

The status conference hearing was held on April 11th.  The judge reprimanded the borrower for failing to make their first payment under the Bankruptcy Plan on time. The judge also did not appreciate the alleged failure of paying the property taxes.  The borrower attempted to make amends by stating they did not foresee any further issues of delay in payment and would immediately provide evidence of future tax payments.  The next status conference hearing is scheduled for October 31, 2012.

The borrower cured their default by making their first payment under their Bankruptcy Plan as well as paying their second installment of the 2011 property taxes, which has been confirmed by the County of Riverside Tax Collector.  As a reminder, any payments received under the Bankruptcy Plan will first be applied to expenses that have been accruing.  These expenses are primarily legal costs.  Once expenses are paid, cash call funds will then be repaid.  After all liabilities are paid in full, PCF will begin to distribute payments received under the Bankruptcy Plan to the investors as interest payments.  The second payment under the Bankruptcy Plan is due by the end of June 2012.

PCF will continue to keep you informed of any developing details.  We anticipate our next update around the beginning of July, at that time we plan on providing you with an up-to-date expense breakdown so you can see what the Bankruptcy Plan payments are being applied towards.

Sincerely,

Your PCF Loan Servicing Team


7 Argonaut, Aliso Viejo, CA 92656
1-800-544-8800, (949) 661-7070 ext. 6140
Direct phone/fax (949) 276-6140 | www.pointcenter.com
Real Estate Broker – CA. Dept. of Real Estate 00745721

EXH:____C____
PAGE:___9___

.

# EXHIBIT D

EXHIBIT "1"                                                                PAGE 59

**Deep Canyon Holdings, Inc.**
c/o Doug Beach
861 Parkview Drive North, Suite 200
El Segundo, CA  90245

*Via Fax - (949) 521-7312 and US Mail (certified, return receipt)*

May 11, 2012

Mr. Dan Harkey
Point Center Financial, Inc.
7 Argonaut
Aliso Viejo, CA, 92656

RE:    **Payment due to Deep Canyon Holdings, Inc.**

Dear Dan:

I have called and left three separate messages to you with respect to amounts due to Deep Canyon Holdings, Inc., but have yet to hear back from you.

Deep Canyon Holdings, Inc. is aware that in April, 2012, The Preserve, LLC made a payment to Point Center Financial, Inc. in the amount of $302,750, in accordance with its court-approved Chapter 11 re-organization plan.  As of this date, Deep Canyon Holdings, Inc. has not received a check for its proportional interest in that payment.

Please consider this letter as our formal demand that Point Center Financial, Inc. pay to Deep Canyon Holdings, Inc., within ten 10 days of the date of this letter,  the amount proportional to its fractional interest as referenced above, together with supporting documentation showing how the payment was calculated.  This payment must be received at our address as shown at the top of this letter and be in the form of certified funds.

Sincerely,

**Deep Canyon Holdings, Inc.**

Doug Beach

**EXH:**_____D_____
**PAGE:**___10_____

EXHIBIT "1"                                    PAGE 60



| EXH: | D |
|------|---|
| PAGE: | 11 |

EXHIBIT "1"                                                    PAGE 61

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X  □ Agent  □ Addressee |
| | B. Received by *(Printed Name)*  C. Date of Delivery |
| 1. Article Addressed to:<br><br><br>Mr. Dan Harkey<br>Point Center Financial Inc<br>7 Argonaut<br>Aliso Viejo, CA 92656 | D. Is delivery address different from item 1?  □ Yes<br>    If YES, enter delivery address below:   □ No<br><br>3. Service Type<br>  □ Certified Mail  □ Express Mail<br>  □ Registered    □ Return Receipt for Merchandise<br>  □ Insured Mail   □ C.O.D.<br>4. Restricted Delivery? *(Extra Fee)*   □ Yes |
| 2. Article Number<br>   *(Transfer from service label)*   7009 0820 0002 1277 8106 | |
| PS Form 3811, February 2004   Domestic Return Receipt   102595-02-M-1540 | |

Case 5:12-cv-01023-GW Document 7-2 Filed 03/10/12 Page 1 of 12 Page ID #:63

# EXHIBIT E

# Deep Canyon Holdings, Inc.

July 3, 2012

Mr. Dan Harkey
Point Center Financial
7 Argonaut
Aliso Viejo, CA  92656

Re:  Deep Canyon Holdings, Inc./The Preserve, LLC loan/Point Center Financial

Dear Mr. Harkey:

We have tried to reach you by telephone, by fax and by mail for several months.  You have
refused to respond to any of our efforts.

As you know, Deep Canyon Holdings, Inc. terminated Point Center Financial (and any and all
related entities and individuals) as trustee of its investment in The Preserve, LLC loan in 2008.  In
March 2012, Point Center Financial received a payment in the amount of $302,575 from The
Preserve, LLC in accordance with its bankruptcy plan.  Point Center Financial fraudulently
received that payment on behalf of Deep Canyon Holdings, Inc. and demand is hereby made to
return that payment to Deep Canyon Holdings, Inc. immediately.  We have made many attempts
since then to receive the payment rightfully due to us, but have received no response.  We have
only received a "form letter" promising an accounting that has never come.  It is very clear to us
that you and Point Center Financial have fraudulently embezzled these funds, just as you have
embezzled tens of millions of dollars from The Preserve, LLC, Deep Canyon Holdings, Inc. and
the other investors.

We are aware that Deep Canyon Holdings, Inc. is the largest non-broker controlled investor in
The Preserve, LLC loan.  As you are well aware that Point Center Financial has no claim or right
to any funds due to Deep Canyon Holdings, Inc., and since payments have not been made by
Point Center Financial pursuant to the deed of trust and note, we have filed a Notice of Default in
the amount of $2,086,757.55.  A copy of the Notice of Default and Substitution of Trustee are
enclosed for your records.

Unless Deep Canyon Holdings, Inc. receives payment in full, we will proceed in taking all
necessary and available steps to protect our investment and stop your continued fraud and
embezzlement.

Sincerely,

**Deep Canyon Holdings, Inc.**

Douglas Beach

Enclosures

EXH:____E____
PAGE:____13____

EXHIBIT "1"                                    PAGE 64

# EXHIBIT 2

# EXHIBIT 2

# GOE & FORSYTHE, LLP

Robert P. Goe
California State Bar No. .137019

18101 Von Karman Avenue, Suite 510
Irvine, CA 92612
(949) 798-2460

Direct Dial (949) 798-2461
Facsimile (949) 955-9437
rgoe@goeforlaw.com

September 12, 2012

**Via e-mail: jbroker@brokerlaw.biz**
Jeffrey W. Broker, Esq.
BROKER & ASSOCIATES
18191 Von Karman Avenue
Suite 470
Irvine, CA 92612-0187

The Preserve, LLC
c/o Beaumont 1600, LLC
P.O. Box 55317
Riverside, CA 92517

> Re:    **The Preserve, LLC**
> **United States Bankruptcy Case No. 2:10-bk-18429-BB**
> **NOTICE OF DEFAULT IN PERFORMANCE OF PLAN**

Dear Mr. Broker:

This letter will serve as notice that The Preserve, LLC ("Debtor") is in default of the Order Confirming Debtor's Fifth Amended Chapter 11 Plan As Modified entered on December 1, 2011 [docket number 503] (the "Order") for failure to make payment of $302,575.00 to Point Center Financial Inc. ("PCF") by the 90th day following the second payment which was due on June 13, 2012 as called for under the Fifth Amended Chapter 11 Plan As Modified [docket number 478] (the "Plan").

On December 16, 2011, Debtor filed the Notice of Occurrence of Effective Date of Debtor's Fifth Amended Chapter 11 Plan As Modified [docket number 513] (the "Notice"). The Notice states "the Effective Date of the Plan has occurred on **December 16, 2011**."

The Plan specifically calls for payment of $302,575.00 on the 90th day following the December 16, 2011 Effective Date, and every 90 days thereafter. The 90th day following the Effective Date was March 15, 2012. The second payment was due June 13, 2012. Debtor's third payment was due 90 days later on September 11, 2012. PCF has not received payment, and therefore, Debtor is in default. Pursuant to the Order and Plan, Debtor has thirty (30) days, after written notice to Debtor and Debtor's counsel, to cure any default. Should Debtor fail to cure the default, PCF shall pursue any and all remedies available under non-bankruptcy law, its deed of trust, and/or the Order and Plan. PCF will also be immediately seeking remedies concerning Debtor's attempts in District Court to improperly modify the Order and Plan.

Very truly yours,

GOE & FORSYTHE, LLP

By:_____
Robert P. Goe

RPG/jda

EXHIBIT "2"                                                   PAGE 65

# EXHIBIT 3

# EXHIBIT 3

LAW OFFICES

## BROKER & ASSOCIATES
### PROFESSIONAL CORPORATION

SUITE 470
18191 VON KARMAN AVENUE
IRVINE, CALIFORNIA 92612-7114

TELEPHONE  (949) 222-2000
FACSIMILE  (949) 222-2022

WRITER'S E-MAIL:
*jbroker@brokerlaw.biz*

September 13, 2012

## *VIA EMAIL ONLY*

Robert Goe, Esq.
Goe & Forsythe, LLP
18101 Von Karman Avenue, Suite 510
Irvine, CA 92612

**Re:  The Preserve, LLC;**
**USBC Case No. 2:10-18429-BB;**
**REJECTION OF NOTICE OF DEFAULT IN PERFORMANCE OF PLAN**

Dear Mr. Goe:

Reference is made to your letter to the undersigned dated September 12, 2012 which is entitled 'NOTICE OF DEFAULT IN PERFORMANCE OF PLAN.'

The Debtor agrees that the Plan provides for the first payment to "commence on the 90th day following Effective Date and shall be paid with an initial **quarterly payment** in the amount of $302,505.00 and thereafter paid in accordance with the terms set out in Exhibit D-2 with payment of the remaining balance due no later than the fourth quarter of 2021." (See, Plan, page 11, lines 12-15; emphasis added). The Debtor also agrees that the 90th day following the Effective Date was March 15, 2012.

Your letter suggests that the payment schedule is based upon payments being due *every 90 days thereafter*. Your letter is incorrect since there would have to be a calculation every quarter as to the due date of the payment, which is absurd. The only reference to **90 days** was to set the initial payment date under the Plan. **Subsequent quarterly payments are to be made on the 15th day of each succeeding quarter once the initial date was set**. Under your analysis, which is predicated upon a 360 day year not mentioned in the Plan, *the payment dates will always be advanced*. That is not what the Plan and Exhibit D-2 provide for. The payment for the Third Quarter of 2012 is due on September 15, 2012 per the terms of the Plan. Inasmuch as that payment date does not fall on a business day, the payment for the Third Quarter of 2012 is actually due on Monday, September 17, 2012.

Robert Goe, Esq.
September 13, 2012
Page 2

In view of the foregoing, the 'NOTICE OF DEFAULT IN PERFORMANCE OF PLAN' is hereby **rejected** as being based upon inaccurate facts.

Very truly yours,

Jeffrey W. Broker

JWB/bjr
cc: client

BROKER & ASSOCIATES
PROFESSIONAL CORPORATION

# EXHIBIT 4




# EXHIBIT 4

## EXHIBIT B                    Loan# 206070

### LOAN SERVICING AGREEMENT
#### (Deed of Trust)

THIS LOAN SERVICING AGREEMENT (Agreement) is made as of **September 28, 2006** by and among Point Center Financial, Inc., a California corporation (Servicer), and each of the individuals and entities listed on Exhibit A attached hereto (each, a Lender and collectively the Lenders).

### RECITALS

A.     Servicer has made or arranged a **$39,000,000.00** loan (the Loan) to **The Preserve, LLC., a California Limited Liability Company**(the Borrower). The Loan will be evidenced by a secured Promissory Note (the Secured Note) given by Borrower in favor of Servicer and the initial Lenders which will have an interest accrual date as of the date that the Loan is closed. The Secured Note will be secured by a Deed of Trust (the Deed of Trust) that will be recorded in the Official Records of **Riverside** County, and will encumber certain real property more particularly described therein (the Property). Servicer has sold a fractionalized undivided interest in the Secured Note to each of the Lenders. To the extent that Servicer retains an interest in the Secured Note, Servicer shall also be a Lender.

B.     The Loan may be used to construct or renovate certain improvements on the Property (the Improvements), in which case the Loan will be disbursed to Borrower, or on Borrower's behalf, pursuant to the terms of a Disbursement Agreement (the Disbursement Agreement) between Servicer as agent for the Lenders, Borrower, a general contractor (if applicable), and a licensed third party loan disbursement agent (the Disbursement Agent).

C.     The Lenders desire to appoint Servicer as their agent to enter into the Disbursement Agreement (if applicable), service the Secured Note and to protect their interest in and enforce their rights under the Secured Note, Deed of Trust, Disbursement Agreement (if applicable) and any other agreements, security instruments and other documents executed in connection therewith (collectively the Loan Documents), all in accordance with the terms of this Agreement.

NOW, THEREFORE, the parties hereto agree as follows:

1.     Relationship of Parties. Each Lender understands and acknowledges that he or she owns only a fractional undivided interest in the Secured Note and that other Lenders also own fractional undivided interests in the Secured Note. The fractional undivided interest of any Lender in the Secured Note, the Property (if Borrower should default under the Secured Note and the Lenders, Servicer or some entity formed by the Lenders and Servicer should take title to the Property) or any proceeds therefrom shall be referred to herein as a Fractional Interest. The Lenders acknowledge that Servicer is serving as their agent with respect to the Secured Note and that no other relationship between the Lenders and Servicer, including that of a partnership, joint venture, tenancy-in-common or trustee

1

EXHIBIT 2                    PAGE 205

EXHIBIT "4"                   PAGE 68

relationship, is created by this Agreement. The Lenders further acknowledge that the services provided by the Servicer will be discharged in strict accordance with the terms of this Agreement and, when applicable, with the exercise of Servicer's reasonable and prudent business judgment and that such services are administerial and not discretionary in nature and that no fiduciary relationship is created between the Servicer and any Lender by reason of the services being provided for in this Agreement. Notwithstanding the foregoing, the Lenders acknowledge that Servicer or its affiliates may also own a Fractional Interest, in which case Servicer or its affiliate shall, to the extent of its Fractional Interest, be a Lender and be entitled and subject to all the rights and obligations of a Lender under this Agreement.

2. Appointment. The Lenders hereby appoint Servicer as their agent to act for them under any Disbursement Agreement, to service the Secured Note, to protect their interest in and enforce their rights under the Secured Note, Deed of Trust and any other Loan Documents and, if necessary, to manage, refinance or sell the Property, all in accordance with the terms of this Agreement. Servicer hereby accepts this appointment and agrees to exercise diligent and good faith efforts in the execution of its duties as agent in accordance with reasonable and customary commercial practice.

3. Secured Note Servicing. Servicer shall provide written notification to Borrower of Servicer's appointment as agent for the Lenders under any applicable Disbursement Agreement and to service the Secured Note, and shall instruct Borrower to make all payments (Payments) due under the Secured Note and Deed of Trust payable to Servicer. With respect to its obligations as servicing agent, Servicer agrees as follows:



a. If the Loan is subject to a Disbursement Agreement, Servicer shall disburse funds to the Disbursement Agent and otherwise act in accordance with Servicer's obligations under the Disbursement Agreement; provided, however, that Servicer may agree to a modification in the plans and specifications or in the construction timetable, budget or disbursement schedule provided in the Disbursement Agreement or otherwise modify the manner in which the Loan is disbursed or administered if in its business judgment it is advisable to do so, or if the change will not, in its business judgment, materially impair the value of the property securing the Loan or impair the Borrower's ability to perform under the Disbursement Agreement.

b. Upon Servicer's receipt of any Payments, such Payments shall be immediately deposited into a non-interest bearing trust account (the Trust Account) established with a federally insured bank in the name of Servicer, as agent for the Lenders, and maintained in accordance with the California Business and Professions Code, the California Administrative Code, any applicable rules or regulations promulgated by the California Department of Real Estate and any other applicable laws, rules and regulations. The Lenders acknowledge that they shall not receive any interest on funds held in the Trust Account.

c. Payments shall not be commingled with any other assets of Servicer or used for any transactions other than the transaction for which such Payments are received by Servicer.

d.      Prior to the occurrence of an event of default under the Loan Documents, that portion of any Payment received by Servicer that constitutes principal, accrued interest, and other sums owing under the Secured Note for any month (less any holdbacks made by Servicer pursuant to Paragraph 7(a) below) shall be delivered to each of the Lenders pro rata according to his or her Fractional Interest within the later of ten (10) business days after Servicer's receipt thereof or the date that such Payment is due under the Note. Following the occurrence of an event of default under the Loan Documents, all Payments shall be distributed as provided in Paragraph 13, below.

e.      Servicer shall maintain records of its receipt, maintenance and disbursement of all Payments.

f.      Servicer shall provide or cause Borrower to provide to each Lender a monthly statement that indicates all Payments disbursed to such Lender during the calendar year. Additionally, Servicer shall provide or cause Borrower to provide to each Lender an IRS form 1099-INT for each calendar year.

g.      Servicer shall at all times maintain a valid California real estate broker's license.

4.      Original Documents. Servicer shall maintain possession of all original Loan Documents on behalf of all Lenders for such period as is required by law.

5.      Servicing Fee. Servicer will be entitled to receive a Servicing Fee in the amount of **1.50%** annually, paid monthly from the borrower's loan payment, calculated upon unpaid principal loan amount outstanding at the end of each month for the term of the Loan.

6.      Late Charges, Default Interest and Prepayment Penalties. Servicer will be entitled to receive, and Lenders hereby assign to Servicer 50% of any prepayment penalties and 50% all late charges and default interest collected from Borrower by the Servicer under the Loan Documents.

7.      Interest Reserve Holdback; Advance of Funds.

a.      If Servicer should determine, in its reasonable judgment, that Borrower may default in its payment or other obligations under the Loan Documents and that costs will need to be incurred to enforce the rights of the Lenders thereunder, Servicer shall have the right to retain in the Trust Account an amount not to exceed three (3) months' interest under the Secured Note in order to pay for such enforcement costs.

b.      Servicer shall not advance or be obligated to advance its own funds to the Lenders for any principal or interest owing under the Loan Documents. Servicer may, however, in its sole discretion and without being so obligated to the Lenders, advance its own funds on behalf of the Lenders to be applied towards the payment of such items, costs and expenses as Servicer may reasonably determine are necessary to protect the Lenders' interest in and to enforce the Lenders' rights under the Loan Documents and, if necessary,

to manage, refinance or sell the Property. These items, costs and expenses may include, without limitation, the advancement of funds necessary to complete construction or renovation of all or a phase of the Improvements, the cost and expense of engaging attorneys, accountants, appraisers and other third parties and of obtaining market studies and other reports as Servicer deems advisable. The Lenders agree that all such advances shall bear interest at the maximum legal rate of interest allowable from the date such advances are made until such advances are repaid in full. These advances, together with any interest accrued thereon, shall be paid as provided in Paragraph 13 below. Each Lender shall be entitled to repay at any time his or her pro rata share of any advance made by Servicer on such Lender's behalf.

8.    Enforcement.

a.    Upon the discovery by Servicer of the occurrence of a monetary event of default under the Loan Documents or an event of default which materially impairs or threatens the value of the Lenders' security or the ability of Borrower or any other party to perform its obligations under the Loan Documents, Servicer shall promptly notify the Lenders of such event of default. Additionally, Servicer shall exercise diligent and good faith efforts to cause a Notice of Default to be recorded against the Property within sixty (60) days following Servicer's discovery of such event of default. Unless otherwise directed by the Lenders as hereafter described, Servicer shall take one of the following courses of action following the occurrence of such event of default: (i) promptly perform all acts and execute all documents necessary to (A) exercise the power of sale contained in the Deed of Trust, including, without limitation, select a foreclosure agent, make demands, accept reinstatements, seek relief from any stay of foreclosure proceedings, and defend any litigation which seeks to restrain such foreclosure proceedings, and (B) enforce all rights and remedies available to the Lenders with respect to any other collateral for the Loan; or (ii) negotiate and enter into a forbearance agreement in accordance with reasonable and customary commercial practices if (X) Servicer determines that such action is necessary or appropriate to protect the interests of the Lenders, (Y) the term of such forbearance agreement does not extend more than ninety (90) days from the date Servicer discovers the occurrence of such event of default, and (Z) the purpose of such forbearance is to allow Borrower additional time to refinance or sell the Property or otherwise arrange to pay all amounts owing under the Loan Documents. If Servicer should agree to forbear for ninety (90) days as provided in clause (ii) above and Borrower has not paid all amounts owing under the Loan Documents on or before the end of such ninety (90) day period, then Servicer shall promptly proceed to exercise the power of sale contained in the Deed of Trust as provided in clause (i) above. Additionally, Servicer may, without first obtaining the prior written consent of any of the Lenders, (i) accept a deed in lieu of foreclosure from Borrower if doing so would cause the Lenders to incur no greater expense or liability than if Servicer completed a non-judicial foreclosure, and (ii) file suit or pursue other legal remedies against any guarantors of the Loan if such action will not impair the Lenders' security interest in the Property. Any actions taken by Servicer pursuant to this Paragraph 8 shall be taken by Servicer as agent for and on behalf of all the Lenders.

b.    If there is a Disbursement Agreement applicable to the Loan, Servicer shall have the right, without first obtaining the written consent of any of the Lenders, to

4

EXHIBIT 2                                                    PAGE 208

EXHIBIT "4"                                                    PAGE 71

exercise those additional remedies in the Disbursement Agreement which are supplemental to those available to the Lenders under the Secured Note and Deed of Trust including demanding termination of further disbursement from the construction disbursement account (as outlined in the Construction Loan Agreement), declaring the Loan immediately due and payable, ordering the work stopped if it appears to be proceeding in substantial deviation from the plans and specifications, ordering defaults to be corrected and additional funds added to the Disbursement Account to pay for additional work, and demanding funds from the Disbursement Account and dispensing same to the Lenders to be credited against the Loan. Without the written consent of Lenders holding more than fifty percent (50%) of the Fractional Interests, Servicer will not, however, have the authority to enforce any supplemental remedy which would require that, in order to complete or further construction, Lenders expend funds or become liable for funds advanced or which would require that the Secured Note be subordinated to repayment of funds advanced by others, except as provided in subparagraph (c) of this paragraph 8.

c.    Servicer agrees that it shall not, without the prior written consent of Lenders holding more than fifty percent (50%) of the Fractional Interests: (i) forbear from exercising the power of sale contained in the Deed of Trust more than ninety (90) days; (ii) forgive debt; (iii) modify the terms of the Loan Documents (other than a modification as described in Paragraph 3(a) above or a forbearance as described in Paragraph 8(a) above; or (iv) conduct a judicial foreclosure (as opposed to foreclosure under the power of sale). Additionally, if the Loan is a construction loan and an event of default occurs under the Loan Documents before the construction or renovation has been completed pursuant to the Disbursement Agreement, Servicer shall not complete such construction or renovation except pursuant to a plan approved in writing by Lenders holding more than fifty percent (50%) of the Fractional Interests. Servicer shall promptly relay to each Lender for such Lender's review and approval or disapproval the terms of any proposals discussed in this Paragraph 8(c). The failure of Servicer to receive any Lender's written approval of the terms of any proposals within thirty (30) days after Servicer's delivery thereof to such Lender shall be deemed to constitute such Lender's disapproval of such terms. Notwithstanding the foregoing, Servicer may complete all or portions of the construction or renovation (X) using all or a portion of any undisbursed funds in any Construction Loan Account required by the Construction Loan Agreement, and (Y) using funds advanced by Servicer for the benefit of the Lenders, if Servicer determines in its business judgment that such work is required to avoid the risk of material damage to or material deterioration in value of the Property before the consent of Lenders can be obtained.

d.    If title to the Property transferred from Borrower as a consequence of a default by Borrower under the Loan Documents, whether such transfer is by judicial or non-judicial foreclosure or by a deed in lieu of foreclosure, the grantee of the deed shall be one of the following, as determined by Servicer in its sole discretion: (i) Servicer, in trust and as trustee for the Lenders, (ii) Servicer, as nominee or agent for the Lenders, (iii) the Lenders, as tenants in common, or (iv) a limited liability company or partnership that is formed and capitalized as follows:  the limited liability company or partnership shall be formed by Servicer; each of the Lenders shall contribute his or her Fractional Interest in exchange for a pro rata share of membership interest or partnership interest, and the limited liability company or partnership shall succeed to the interest of each of the Lenders under this Agreement. The occurrence of such a transfer of title shall constitute a Transfer. If

5

EXHIBIT 2                                             PAGE 209

EXHIBIT "4"                                          PAGE 72

requested by Servicer, each Lender shall execute and deliver any documents reasonably necessary to effectuate a Transfer. If Servicer takes title to the Property in trust and as trustee for the Lenders, Servicer shall have only those duties and obligations expressly provided for in this Agreement.

9.    Waiver of Foreclosure Rights and Right to Partition.    Each Lender acknowledges that he or she is a tenant-in-common with the other Lenders as to the Secured Note and the Deed of Trust. Additionally, if there is a Transfer, the Lenders shall hold, as tenants-in-common, either a direct interest or a beneficial interest in the Property. Each Lender acknowledges that he or she has appointed Servicer as his or her agent to (i) protect his or her interest in and enforce his or her rights and remedies under the Loan Documents, and (ii) manage, refinance and/or sell the Property following a Transfer. Each Lender also acknowledges that Lenders holding more than fifty percent (50%) of the Fractional Interests may direct such enforcement and management efforts. Accordingly, as a material part of the consideration for Servicer and the other Lenders to enter into this Agreement, each Lender hereby waives and relinquishes during the term of this Agreement (i) any right he or she may have to institute foreclosure proceedings under the Deed of Trust on his or her own initiative or to otherwise pursue separately his or her rights and remedies under the Loan Documents, and (ii) any direct or beneficial right he or she may have to seek a partition of the Property after the occurrence of a Transfer.

10.    Appointment as Property Manager/Broker. The Lenders and Servicer agree that, following the occurrence of a Transfer, Servicer shall (i) manage the Property as provided in Paragraph 11 below, (ii) serve as the exclusive mortgage broker for the Lenders with respect to the Property as provided in Paragraph 12(a) below, (iii) serve as the exclusive listing broker of the Property for the Lenders with respect to any subsequent sale of the Property as provided in Paragraph 12(b) below, and (iv) undertake such other obligations as Servicer shall agree to undertake and as shall be approved in writing by Lenders holding more than fifty percent (50%) of the Fractional Interests. The exclusive listing and brokerage appointments made in clauses (ii) and (iii) above shall be effective for a maximum thirty-six (36) months following the date of Transfer during which period Servicer shall use its diligent good faith efforts to refinance and/or sell the Property, as may be appropriate, in accordance with the provisions of Paragraphs 12, 13 and 14 below; provided, however, that if Servicer undertakes to complete construction or renovation of all or a phase of the Improvements pursuant to Paragraph 8 above, then the thirty-six (36) month exclusive listing period shall commence as to each parcel of the Property (if the Property consists of separate legal parcels) as of the date that such construction or renovation is completed with respect to each such parcel of the Property pursuant to the Disbursement Agreement or any other plan of completion or renovation approved by the Lenders pursuant to Paragraph 8. Servicer shall have no management or other obligations with respect to the Lenders and the Property following the occurrence of a Transfer except as contained in this Agreement.

11.    Insurance/Security/Maintenance. Following the occurrence of a Transfer, Servicer shall (i) obtain and/or maintain liability insurance with respect to the Property in such amounts as are customarily maintained on properties similar to the Property, (ii) if there are Improvements on the Property, obtain and/or maintain insurance against loss or damage by risks of the type covered by the broad form of extended coverage for the full

replacement value of the Improvements, as well as worker's compensation and other forms of insurance if deemed necessary by Servicer, (iii) take reasonable security precautions to protect the Property from damage and the Lenders from liability to trespassers who may enter onto the Property, and (iv) provide a minimum level of maintenance of the Property.

12.    Refinance or Sale of Property. In case of a Transfer, Servicer shall refinance, sell or refinance in part and sell in part all or any portion of the Property as Servicer deems appropriate in its reasonable business judgment.

a.    With respect to a refinance of all or any part of the Property, Servicer shall be entitled to a brokerage fee equal to the lesser of (i) two percent (2.0%) of the total amount of any refinance arranged by Servicer, or (ii) the amount of commission usual and customary for the arranging of loans secured by properties similar to the Property. Such a commission, together with all other costs relating to such a refinancing, shall be deducted from the proceeds of such refinancing. Servicer's brokerage fee will be reduced on a dollar for dollar basis to pay any brokerage fees owing to third parties in connection with the refinance of the Property, but not below zero.

b.    With respect to any efforts to sell all or any portion of the Property, Servicer shall provide periodic reports to the Lenders that briefly describe the marketing activity conducted by Servicer for the applicable period. The Lenders agree that Servicer shall be entitled to a sales commission when all or any portion of the Property is sold equal to the greater of (i) five percent (5%) of the sales price or (ii) 30% of the profit (any amount more than principal plus accrued interest through the date of Transfer). This commission, together with all other costs relating to such a sale, shall be deducted from the proceeds of such sale. Servicer's sales commission shall be reduced on a dollar for dollar basis to pay any sales commissions owing to third parties in connection with a sale of the Property, but not below zero. The Lenders acknowledge and agree that Servicer or an affiliate of Servicer may offer to purchase the Property following a Transfer. Such an offer shall not be accepted unless Lenders holding more than fifty percent (50%) of the Fractional Interests shall have consented in writing to the terms of such offer, as provided in Paragraph 14 below; provided, however, that if Servicer, or its affiliate is also a Lender, then the Fractional Interests of Servicer or such affiliate of Servicer shall not be included for purposes of determining whether the Lenders' consent to such an offer has been obtained.

13.    Distribution of Proceeds. Upon the receipt by Servicer of any proceeds from Borrower, any other person or the Property following a default by Borrower under the Loan Documents, whether such proceeds result from subsequent payments by Borrower or a guarantor, loan enforcement efforts by Servicer, the operations of the Property, or the sale or refinance of the Property, such proceeds shall be applied towards the payment of the following items and in the following order:

(i)    all expenses incurred in enforcing the Loan Documents and managing, selling or refinancing the Property including, without limitation, all financing provided by Servicer, if any, to complete the construction or renovation of the Improvements, all reasonable and customary sales, mortgage brokerage and closing costs (including any such costs owing to Servicer under this Agreement), and all advances made

7

EXHIBIT 2                                    PAGE 211

EXHIBIT "4"                                    PAGE 74

by Servicer on behalf of the Lenders to pay such costs, together with any accrued interest thereon;

      (ii)     all interest and late charges that have accrued under the Secured Note prior to the occurrence of a Transfer;

      (iii)     all principal outstanding under the Secured Note;

      (iv)     the balance, if any, to be distributed to the Lenders in proportion to their respective Fractional Interests.

14.    Approval of Sale/Refinance.

a.     Servicer may enter into any proposed sale or refinance of the Property without first obtaining the written consent of any of the Lenders if (i) in the case where the Property consists of completed dwelling units, Servicer determines that the sales price for such dwelling units is reasonable compared to the sales price of comparable dwelling units in the general area around the Property, and (ii) in all other cases, the cash proceeds available at the closing of such a proposed sale or refinance are sufficient to repay all amounts described in subparagraphs 13(i) through 13(iii) above, and the prospective purchaser in a proposed sale is not Servicer or any affiliate of Servicer.

b.     With respect to any proposed sale or refinance other than as described in subparagraph 14(a) above, Servicer shall promptly forward the terms of such sale or refinance to the Lenders for their review and approval, which such approval must be received by Servicer within a period of time specified by Servicer but in any event no later than thirty (30) days after Servicer's delivery of such terms to the Lenders. The failure of Servicer to receive any Lender's written approval of the terms of such sale or refinance within the specified time period shall constitute such Lender's disapproval of such terms. If approval is required pursuant to this Paragraph 14(b), Lenders holding more than fifty percent (50%) of the Fractional Interests must give their written approval before Servicer is authorized to enter into such proposed sale or refinance. If Servicer is the prospective purchaser in a proposed sale of the Property and if Servicer or an affiliate of Servicer or its affiliate is also a Lender, then the Fractional Interests of Servicer or its affiliate shall not be included for purposes of determining whether the Lenders' consent to such a sale has been obtained.

c.     With respect to any proposed sale or refinance that Servicer is authorized to enter into pursuant to this Paragraph 14, Servicer is authorized as the agent of the Lenders to negotiate, execute and deliver such documents and instruments as are necessary to effectuate such sale or refinance so long as the terms of such documents and instruments are consistent with the terms of the authorized sale or refinance. The Lenders agree that Servicer may, in anticipation of the occurrence of a Transfer, solicit and negotiate offers to sell or refinance the Property prior to such Transfer. No such sale or refinance of the Property, however, shall become effective until the Transfer has occurred and the Lenders have approved the terms of such sale or refinance as provided for in this Agreement.

8

15.    Duration of Agreement.

a.    This Agreement may be terminated by the Lenders or Servicer upon at least thirty (30) days' prior written notice to the other party. Termination by the Lenders shall not be effective unless signed by Lenders holding more than fifty percent (50%) of the Fractional Interests. Upon termination by Lenders or Servicer, Lenders shall pay (or cause to be paid) to Servicer an amount equal to the sum of (i) any monthly servicing fees accrued but unpaid as of the termination date; plus (ii) any sums advanced by Servicer on behalf of the Lenders. In addition, if Servicer is terminated by the Lenders when the Loan is not in default and Servicer is not in material breach of this Agreement, Lenders shall pay (or cause to be paid) to Servicer an amount equal to the sum of all monthly servicing fees remaining due through the date of the maturity of the Loan.

b.    Unless sooner terminated pursuant to clause (a) above, this Agreement shall automatically terminate when (i) principal, interest and all other sums owing under the Loan Documents have been paid in full; or (ii) Lenders holding more than fifty percent (50%) of the Fractional Interests shall have accepted in writing other consideration in full satisfaction of all amounts owing to all Lenders under the Loan Documents.

16.    Limitation of Liability. The Lenders hereby release Servicer and its officers, directors, shareholders, employees and agents (Servicer Parties) from any and all actions, liabilities, damages, claims, suits and demands of every kind, nature and description that the Lenders may hereafter acquire against the Servicer Parties arising out of any acts or omissions of the Servicer Parties under this Agreement, so long as the Servicer Parties are acting in good faith under this Agreement, are not grossly negligent and have not engaged in willful misconduct. Additionally, each Lender hereby agrees, but only to the extent of such Lender's Fractional Interest, to indemnify, defend and hold the Servicer Parties harmless from and against any and all losses, claims, liabilities, costs and expenses threatened against or incurred by the Servicer Parties not covered by insurance and arising out of or in connection with any acts or omissions of the Servicer Parties under this Agreement, so long as the Servicer Parties are acting in good faith under this Agreement, are not grossly negligent and have not engaged in willful misconduct.

17.    Return of Principal and Interest. Nothing contained in this Agreement or any other agreement between the Lenders and the Servicer Parties with respect to the Secured Note or the Property is intended, nor shall it be construed to be, as any type of representation, warranty or guaranty whatsoever by the Servicer Parties that the Secured Note is collectible, that any Lender shall ultimately receive his or her pro rata share of the entire unpaid principal balance, accrued interest and costs with respect to the Secured Note and the Deed of Trust or that the equity in the Property is sufficient to protect such Lender's investment.

18.    Power of Attorney. The Lenders hereby grant Servicer an irrevocable power of attorney, coupled with an interest, to perform all acts that Servicer is authorized to perform on behalf of the Lenders pursuant to this Agreement including, without limitation, the power to enforce the terms of the Loan Documents, to assume and enter into contracts

for the completion of the construction or renovation of the Improvements or any phase thereof, to take title to the Property as trustee or nominee for the Lenders, to cause title to the Property to be taken in the name of all Lenders as tenants in common or in the name of a corporation or partnership of which the Lenders shall constitute the shareholders or partners, and to manage, encumber and sell the Property. Without limiting the foregoing, Servicer is expressly authorized to do the following: execute requests for reconveyance, file notices of default, select a foreclosure agent, make demands, request substitutions of trustees, seek a receiver, publish and record notices of sale, file complaints, obtain judgments and deficiency judgments, seek relief from any stay of foreclosure proceedings or defend any litigation which seeks to restrain such foreclosure proceedings, accept reinstatements, bid at a foreclosure sale and otherwise conduct judicial or non-judicial foreclosure proceedings; file, prosecute and defend legal actions and otherwise enforce the terms of the Loan Documents; employ attorneys, accountants, appraisers and other third parties; obtain market studies and other reports; and enter into contracts for and execute documents in connection with the refinancing or sale of the Property, including the execution of deeds of trust or grant deeds.

19    Reliance by Third Parties.  Every document or instrument executed by Servicer in connection with the Loan Documents or Property shall be conclusive evidence in favor of every person relying upon or claiming under any said document or instrument: (i) that at the time of the delivery thereof, the agency or trust created by this Agreement was in full force and effect; (ii) that such document or instrument was executed in accordance with the terms, conditions and limitations contained in this Agreement, and (iii) that Servicer was duly authorized and empowered to execute and deliver every such document or instrument.

20.    Notices.  All payments, notices and other documents or communication required or contemplated under this Agreement shall be given in the manner provided in this paragraph as follows: Point Center Financial, Inc., 30900 Rancho Viejo Road, Ste. 100, San Juan Capistrano, CA 92675, Attention: Dan J. Harkey. If to Lenders to the address stated in such Lender's Subscription Agreement.  Such addresses may be changed by notice given in the manner provided herein. All payments, notices and other documents or communications shall be deemed given when hand-delivered or 48 hours after being deposited with the United States Post Office, first class mail, postage prepaid, or when received with respect to facsimiles sent to Servicer. Servicer shall not be liable to any Lender for the failure of such Lender to receive any payment, notice or other document or communication if such Lender should change its address without notifying Servicer in the manner provided herein. Should Servicer be put on notice by any Lender of conflicting claims as to the right to any proceeds of such Lender's Fractional Interest, Servicer may retain such proceeds, without liability or interest thereon, until such time as Servicer is satisfied that such conflict is resolved, or, in the alternative, Servicer may interplead the claimants and if Servicer so interpleads or if Servicer is made a party to any other suit between such claimants, the Lenders agree that Servicer may deduct from any amounts owing to such Lender with respect to his or her Fractional Interest all costs, expenses and reasonable attorney's fees suffered or incurred by Servicer as a result thereof.

10

EXHIBIT 2                                        PAGE 214

EXHIBIT "4"                                      PAGE 77

21.    Attorneys' Fees.  If legal action is commenced to enforce any provisions of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and other costs and expenses in such sum as shall be fixed by the court or by an arbitrator in connection with any arbitration proceedings.

22.    Assignment.  This Agreement shall be binding on and shall inure to the benefit of the parties hereto, and to their respective heirs, legal representatives, successors and assigns.  The fractional undivided interests in the Secured Note are being offered and sold without registration under the Securities Act of 1933, as amended, and in reliance upon the exemption from such registration requirements for intrastate offerings. Accordingly, the fractional undivided interests in the Secured Note cannot be sold, assigned or otherwise transferred (i) for a period of nine months from the termination of the offering for these fractional undivided interests, (ii) except to certain selected residents of the State of California, and (iii) except as provided in Section 260.141.11 of the Rules of the California Corporations Commissioner, without the consent of the Commissioner of Corporations for the State of California. Additionally, no such sale, assignment or transfer shall be valid until the assignee has executed a copy of this Agreement and Servicer has received this executed copy.

23.    Arbitration.  All disputes between the parties and/or the borrower, and their respective officers, directors, agents, employees and assignees, arising out of this Agreement or relating to the Loan, including, the arranging and servicing of the Loan and any services in connection with property acquired, shall be determined by binding arbitration under the applicable rules of the American Arbitration Association (AAA) or Judicial Arbitration and Mediation Services, Inc. (JAMS), at the election of the party initiating arbitration.  Judgment on the arbitrators' award may be entered in any court having jurisdiction. Lender acknowledges that by agreeing to arbitration, Lender is waiving Lender's right to have the dispute litigated in a court or jury trial, with rights of discovery, application of the rules of evidence and appeal.

24.    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California.

25.    Counterparts.  This Agreement may be executed in any number of counterparts.  Each counterpart hereof shall constitute an original document, and all counterparts which relate to the Secured Note and Deed of Trust shall constitute one and the same document.

11

EXHIBIT 2                                                                                         PAGE 215

EXHIBIT "4"                                                                                        PAGE 78

**Loan # 206070  Loan Amount: 39,000,000.00**

SERVICER:          POINT CENTER FINANCIAL, INC., a California corporation

By: _____
Dan J. Harkey, President

Deep Canyon Holdings, Inc.

✓ BY: _____, PRESIDENT          ✓  11.30.07
By : A. Parrin, President                                    Date

✓ _____          ✓ _____
                                                              Date

12

EXHIBIT 2                                    PAGE 216

EXHIBIT "4"                                  PAGE 79

## EXHIBIT A

At the close of escrow a complete Exhibit A reflecting each Lender and their undivided interest will be attached to this document.

A copy of the completed Exhibit A will be provided to each Lender along with another copy of the Promissory Note and any prepaid interest collected at the close of escrow.

# EXHIBIT 5

# EXHIBIT 5

JEFFREY W. BROKER – State Bar No. 53226
BROKER & ASSOCIATES PROFESSIONAL CORPORATION
18191 Von Karman Avenue, Suite 470
Irvine, CA 92612-7114

Telephone:   (949) 222-2000
Facsimile:   (949) 222-2022
Email:       *jbroker@brokerlaw.biz*

General Reorganization Counsel to
Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### RIVERSIDE DIVISION

In re

THE PRESERVE, LLC, a California Limited
Liability Company,

        Debtor and
        Debtor in Possession.

Case No. 6:08-bk-23006-BB
Chapter 11 Case

**DEBTOR'S ORIGINAL DISCLOSURE STATEMENT DESCRIBING DEBTOR'S ORIGINAL CHAPTER 11 PLAN**

**Disclosure Statement Hearing**

Date:    April 14, 2010
Time:    2:00 p.m.
Ctrm:    1475
         255 East Temple Street
         Los Angeles, CA 90012

**Plan Confirmation Hearing**
   [See Disclosure Statement for
   Voting and Objecting Procedures]

Date:    _____, 2010
Time:    _____.m.
Ctrm:    1475
         255 East Temple Street
         Los Angeles, CA 90012

the Effective Date relating to the Class 2 Claim after its secured portion is determined by the Court.

• In the event that the Point Center Litigation results in an affirmative damages recovery for the Debtor in <u>any</u> amount, the Debtor may, in its business judgment seek to apply, in whole or in part, such recovery <u>first</u> against the payments called for under the secured portion of the Point Center Class 2 Claim, and thereafter against the unsecured portion of the Point Center Class 5 Claim if no Section 1111(b) election is made by this Claimant. The Debtor may, in its business judgment, retain, in whole or in part, any monetary damages recovery for use in its future business operations.

• If the holder of the Allowed Class 2 Claim qualifies and timely elects to be treated pursuant to Bankruptcy Code Section 1111(b)(2), then such claim shall be deemed to be fully secured (with no Class 5 Claim) and shall be fully paid over a time period sufficient to provide a present value equal to such holder's interest in the collateral using a discount rate as deemed appropriate by the Court. Payments to commence on the Effective Date in an amount equal to the interest accrued under such Claim under the terms of this Plan, with a balloon payment of the balance due two hundred forty (240) months after the Effective Date. The Debtor will receive a <u>credit</u> by way of offset against the monthly installment payment requirements hereunder for the overcharged loan fee charged by Point Center in the same fashion that is described above. In addition, in the event that the Point Center Litigation results in an affirmative damages recovery for the Debtor in <u>any</u> amount, the Debtor may, in its business judgment seek to apply, in whole or in part, such recovery against the fully secured Point Center Class 2 Claim in the event that the Section 1111(b) election is made. The Debtor may, in its business judgment, retain, in whole or in part, any monetary damages recovery for use in its future business operations. The holder of the Class 2 Claim will retain its lien on the collateral for the amount of its allowed secured claim until it is paid in full. The Debtor will request pursuant to Bankruptcy Rule 3014 that the Class 2 Claimant be required to make the election by no later than five days after the entry of an Order valuing the collateral securing this Claim in this case.

• The Debtor shall have the right to prepay this claim in whole or in part at any time without penalty and obtain a full or partial reconveyance of the lien pertaining to this claim, subject to the requirements for the treatment of Disputed Claims. The Bankruptcy Court will reserve jurisdiction in the event that the Debtor brings on for hearing a future motion for the imposition of a release price for a portion of the property subject to the lien of the Class 2 Claimant for operational purposes. The Bankruptcy Court will be requested by a motion to be heard prior to Plan confirmation to establish future procedures for the reconveyance of the lien relating to the Loan and for the imposition of release prices for vacant land parcels in the Legacy Highlands project.

24

# EXHIBIT 6

# EXHIBIT 6

JEFFREY W. BROKER – State Bar No. 53226
PAMELA J. ZYLSTRA – State Bar No. 147977
BROKER & ASSOCIATES PROFESSIONAL CORPORATION
18191 Von Karman Avenue, Suite 470
Irvine, CA 92612-7114

Telephone:  (949) 222-2000
Facsimile:  (949) 222-2022
email:      *jbroker@brokerlaw.biz*

General Reorganization Counsel
for Debtor and Debtor-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

|  |  |
|---|---|
| In re | Case No.  2:10-bk-18429-BB<br>Chapter 11 Proceeding |
| THE PRESERVE, LLC, a California Limited Liability Company, | **DEBTOR AND DEBTOR-IN-POSSESSION'S SPECIAL BRIEF ON THE ISSUE OF ITS USE OF UNEARNED LOAN FEES AS A CREDIT TOWARDS PAYMENTS CALLED FOR UNDER DEBTOR'S PLAN IN PROSPECT; DECLARATIONS OF SCOTT KRENTEL AND DOUGLAS BEACH IN SUPPORT THEREOF** |
| Debtor and<br>Debtor-in-Possession | |
| | Date:   May 26, 2010<br>Time:   11:00 a.m.<br>Ctrm:   1475<br>255 East Temple Street<br>Los Angeles, CA 90012 |

TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY JUDGE;

THE OFFICE OF THE UNITED STATES TRUSTEE; OBJECTING PARTY POINT

CENTER FINANCIAL, INC. AND PARTIES IN INTEREST:

J:\40410.2 THE PRESERVE CH 11\0140 Briefs\Special Brief Use of Credit for 5-26-10 FINAL.doc

# TABLE OF CONTENTS

                                                                                    **Page**

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................  2

    I.    OVERVIEW..................................................................................  2

    II.    STATEMENT OF RELEVANT FACTS ...............................................  2

    III.    ARGUMENT .............................................................................  7

        (A)    DEBTOR IS ENTITLED TO A *CREDIT* FOR THE ADMITTEDLY
UNEARNED LOAN FEE IN CONNECTION WITH THE
UNDERLYING $39,000,000 LOAN TRANSACTION TO BE
UTILIZED IN CONNECTION WITH PAYMENTS CALLED FOR
UNDER ITS PLAN IN PROSPECT ...........................................  7

            (i)    THERE IS NO ISSUE AS TO THE UNEARNED LOAN FEE......  7

            (ii)    THE CURRENT AMOUNT OF THE UNEARNED LOAN FEE....  8

            (iii)    DEBTOR RECEIVED CASH REFUND AT THE CLOSE
OF ESCROW IN THE NORMAL COURSE..........................  10

        (B)    11 U.S.C. § 553 OFFSET IS NOT NECESSARY IN ORDER FOR
THE DEBTOR TO OBTAIN THE BENEFIT OF THE 'CREDIT'..........  10

        (C)    THE SECURED PROOF OF CLAIM FILED BY PCF SHOULD
NOT BE SUBJECT TO 11 U.S.C. §553 OFFSET ON
EQUITABLE GROUNDS...........................................................  11

    IV.    CONCLUSION...............................................................................  13

DECLARATION OF SCOTT KRENTEL..............................................................  14

DECLARATION OF DOUGLAS BEACH.............................................................  19

-i-

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page(s)**

**Federal**

In re Straightline Investments, Inc.,
    525 F. 3d 870, 882 (9th Cir. 2008)................................................................ 12

U.S. v. Atkinson (In re Cascade Roads, Inc.),
    34 F. 3d 756, 762-766 (9th Cir. 1994)............................................................ 11

**State**

Friddle v. Epstein
    (1993) 16 Cal.App.4th 1649, 1656................................................................. 11

Gift v. Ahrnke
    (1951) 107 Cal.App.2d 614, 623................................................................... 11

**Statutes**                                                                       **Page(s)**

Federal

11 U.S.C. §542................................................................................... 10

11 U.S.C. §553................................................................................... 10, 11

-ii-

THE PRESERVE, LLC, a California Limited Liability Company, the Debtor and Debtor-in-Possession in the within Chapter 11 case (the "Debtor"), hereby presents its Special Brief on the Issue of Unearned Loan Fees as a Credit Towards Payments Called For Under Plan. Annexed hereto are the Declarations of Scott Krentel (the "Krentel Declaration") and Douglas Beach (the "Beach Declaration") in support hereof.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### OVERVIEW

This is a complex real estate case that was filed on September 25, 2008, originally assigned to the Riverside Division of the Bankruptcy Court, and later transferred to the Los Angeles Division on March 8, 2010. In connection with the anticipated future confirmation hearing on the Debtor's Plan (as it may be amended and/or modified) in the near future, there is a discrete issue pertaining to the proposed treatment of the Class 2 Claim of Point Center Financial, Inc. ("PCF") as to the use of a *credit* existent in connection with the underlying Loan transaction that has arisen pertaining to which the Court has requested special briefing. By way of further background, there is litigation against PCF and others (the "PCF Litigation") in pending Adversary Proceeding No. 2:10-ap-01296-BB before this Court. The Debtor expressly reserves all rights as are set forth in the PCF Litigation.

### II.

### STATEMENT OF RELEVANT FACTS

This case was commenced by the filing of a voluntary Chapter 11 petition by the Debtor on September 25, 2008 (the "Petition Date") to protect itself against the predatory and criminal acts of PCF. The Debtor is in the business of acquiring and making real estate investments, and by and through the efforts of its consultants, both political and technical, designs, plans and delivers their projects consisting of single family residential lots, commercial and industrial projects to then sell

to public and private builder-developers throughout the United States at a profit. See, Krentel Declaration at ¶2.

The Debtor's principal asset is the residential portion The Legacy Highlands project, which is a unique, multi-generational master planned community set within the rolling hills of West Beaumont, located in Riverside County, California. The Debtor also owns 112 acres of land near the Legacy Highlands project, an office building in the City of Riverside, CA, and a finished residential lot in Adelanto, San Bernardino County, CA. See, Krentel Declaration at ¶3.

The Debtor has secured and unsecured creditors. The Debtor is current in all reporting and quarterly fee requirements with the Office of the United States Trustee. PCF filed Proof of Claim No. 4 in this case on or about April 8, 2009 (the "PCF Claim"), a true and correct copy of which is attached to the Krentel Declaration as Exhibit "1" thereto. The Debtor filed its Plan and Disclosure Statement on March 8, 2010. PCF is classified as Class 2 in the Plan as to the Secured portion of the PCF Claim and it will also have a Class 5 General Unsecured Claim if does not make the Section 1111(b) election. The PCF Claim is a Disputed Claim under the Debtor's Plan that is in prospect as the same may be amended and/or modified. See, Krentel Declaration at ¶4 and Exhibit "1" thereto.

Prior to the Petition Date, in or about September 2006 the Debtor entered into a loan transaction arranged by PCF for a purported $39,000,000.00 fully funded development loan (the "Loan") which included 24 months of draws, secured by a Deed of Trust on a portion of the Legacy Highlands project, with two 1-year extensions. Among other aspects of the Loan was that $9,650,000.00 would be retained by PCF as a 24-month "interest reserve" plus the extension fees for the two 1-year extensions and there was a further soft cost holdback of $7,251,736.00 placed in a trust account on behalf of the Debtor. PCF was paid a loan broker fee of **$2,340,000.00** *which was calculated on a fully funded $39 million loan* (the "Loan Fee"). The Loan Fee was at all times considered to be a part of the principal balance of the Loan, and interest thereon was paid by the Debtor up to and including the date of the alleged default in early 2008 claimed by PCF. That is to say, since the Debtor was not in breach of any Loan covenants, it had the absolute right to

-3-

$39,000,000.00 of funding according to the set schedule which funds included the interest reserve and the expense holdbacks. If the Debtor subsequently had a third party 'takeout' lender or buyer who would have deposited $39,000,000.00 into an escrow account, for payment to the holders of the beneficial interests, the Debtor would have had an absolute contractual right to the entire $39,000,000.00 purportedly 'invested by the PCF group' (which included all amounts actually received and to be received by the Debtor) and a recordable reconveyance of the underlying deed of trust and all assignments thereof. See, Exhibit "2" to the Krentel Declaration which attaches collectively the Escrow Closing Statement and "HUD-1"[1] received by the Debtor from the Escrow that confirm the foregoing details, including (i) a $39,000,000.00 fully funded loan, (ii) a 24 month interest reserve of $9,650,000.00, (iii) a holdback of $7,251,736.00, (iv) a Loan Fee of **$2,340,000.00** for the arranging of the $39,000,000.00 Loan,[2] see also, Exhibit 1, page 3 which is a summary of the PCF Proof of Claim. In addition, the Debtor received a cash refund by check in the amount of $16,000.00 as reflected in the Escrow Closing Statement and a copy of the check is included within Exhibit "2" at the last page thereof. See, Krentel Declaration at ¶5 and Exhibit "2" thereto.

In or about October 2007 the Debtor was advised by PCF that the loan that it arranged in 2006 for the benefit of the Debtor (the Loan in the amount of $39,000,000.00) was not fully funded as the Debtor contends was previously represented, and that there was a *funding shortfall* of approximately $7,675,980.00. Prior to the notification that further Loan draws would not be honored, Mr. Krentel was never notified that the Debtor was in breach of any obligations or covenants concerning the Loan. Attached to the Krentel Declaration as Exhibit "3" thereto is a true and correct copy of a letter dated October 12, 2007 from PCF to the Debtor claiming that $7,675,980.00 was not raised in connection with the Loan. As a direct result of the allegedly

---

[1] The HUD-1 states the following prominent warning at page 3 thereof: "WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment. For details see: Title 18 U.S. Code Sections 1001 and 1010." See, Exhibit 2.

[2] See, Exhibit 2, line items for the Loan Fee at pages 2, 3 and 5 thereof.

-4-

"missing" funds of approximately $7,675,980.00 described above, there were no funds available from the Loan after the tenth draw to pay for "interest reserves" or "soft costs" relating to the ongoing development of the residential portion of Legacy Highlands which include but are not limited to property tax reserves, property maintenance costs, engineering fees, consulting fees, 'contingency' and legal and insurance costs, as well as there being no remaining interest reserve for the Loan all as indicated on closing statements and other transactional documents as of the date of the original funding. Mr Krentel was shocked and in total disagreement with the content of Exhibit 3. However, he determined that it was in the Debtor's best interest to attempt to avoid litigation and continue to complete the development of the Legacy Highlands while the claims against PCF and any other participants in the alleged shortfall were sorted out. See, Krentel Declaration at ¶6 and Exhibit "3" thereto.

After the *existence of the alleged shortfall* was disclosed to the Debtor by PCF, the Debtor immediately made arrangements to raise the entirety of the missing money through Deep Canyon Holdings, Inc. ("DCH") in order to replace all of the alleged shortage in Loan proceeds. Attached to the Krentel Declaration as Exhibit "4" is a true and correct copy of a duly executed agreement dated November 15, 2007 between the Debtor and PCF (duly executed by PCF) in connection with the Loan (the "Loan Modification Agreement"). PCF also confirms in the Loan Modification Agreement that it had no right to the full commission it had paid itself from the $39,000,000.00 that the Debtor had borrowed pursuant to the Loan. The Loan Modification Agreement provides as follows at paragraph 4 thereof regarding the unearned points, fees and interest (collectively "Loan Fees") that were received by PCF pursuant to the Loan transaction:

> "PCF acknowledges that it received compensation in the form of points, fees and interest for raising investor money to fund the Preserve Loan. PCF further acknowledges that it did not raise the full loan amount called for under the Preserve Loan, but that it received points as if it had raised the full loan amount. PCF hereby acknowledges that the compensation received on that portion of the

loan amount that was not funded as of October 1, 2007 was not earned. ... ." (Emphasis added).

See, Krentel Declaration at ¶7 and Exhibit "4" thereto.

Pursuant to the Loan Modification Agreement, the Debtor, through Mr. Krentel, located DCH for the purpose of becoming an investor in the Loan. PCF was not entitled to a fee for DCH becoming an investor in the Loan in accordance with the terms of paragraph 4 of the Loan Modification Agreement. DCH made its initial funding of $1,000,000.00 as called for under the Loan Modification Agreement and was granted an undivided 2.5641% fractionalized interest in the Loan in its own name. DCH thereafter provided an additional $341,600.00 and was granted an undivided 0.876% fractionalized interest in the Loan in its own name. In total, DCH furnished $1,341,600.00 to PCF for the benefit of the Debtor and in exchange was granted a definitive 3.4401% fractionalized interest in the Loan in its own name. In February, 2008 Mr. Krentel received correspondence and telephone calls from PCF, through Rene Esparza, that further funding by DCH was refused by PCF and no further investment would be allowed by DCH in connection with the Loan, which the Debtor contends was in violation of the terms of the Loan Modification Agreement. No explanation of any kind was given to Debtor or DCH as to why additional funding was by DCH was being refused.   See, Krentel Declaration at ¶8.

The Debtor caused interest to be paid on the Loan after its funding, which included within it the full amount of the Loan Fees, up to and until the time when it was advised by PCF in or about October 2007 that there was an *alleged shortfall* in the Loan of approximately $7,675,980.00 and the Loan Modification Agreement was later negotiated and signed. It is the Debtor's understanding that there were four (4) months' of interest paid thereafter on the Loan out of the funds raised from DCH pursuant to the Loan Modification Agreement which paid interest for the months of October through December, 2007 and January 2008 since interest was paid in advance by the Debtor. The Debtor is informed and believes that the funds provided by DCH were applied against the full amount of the Loan, which included the full amount of the Loan Fees without any reduction. The unearned Loan Fees, clearly a part of the Loan transaction, together with interest paid thereon by

-6-

the Debtor (as well as interest accruing for the benefit of the Debtor at the legal rate since February 1, 2008) operates to create a credit within the four corners of the Loan transaction for the benefit of the Debtor. See, Krentel Declaration at ¶9.

### III.

### ARGUMENT

A.    **DEBTOR IS ENTITLED TO A *CREDIT* FOR THE ADMITTEDLY UNEARNED LOAN FEE IN CONNECTION WITH THE UNDERLYING $39,000,000 LOAN TRANSACTION TO BE UTILIZED IN CONNECTION WITH PAYMENTS CALLED FOR UNDER ITS PLAN IN PROSPECT**

(i)    **THERE IS NO ISSUE AS TO THE UNEARNED LOAN FEE**

It is undisputed that there was an alleged *shortfall* in the Loan that was confirmed in writing by PCF to the Debtor in October 2007, notwithstanding what is reflected in the Escrow Closing Statement as a fully funded Loan.[3] As described in Section II above, a Loan Modification Agreement was entered into between the Debtor and PCF in connection with the Loan (Exhibit "4" to the Krentel Declaration) that was dated November 15, 2007. The Loan Modification Agreement provides as follows at paragraph 4 thereof regarding the unearned "points" (the "Loan Fees") that were received by PCF out of the total of $2,340,000.00 in Loan Fees pursuant to the Loan transaction:

> "PCF acknowledges that it received compensation in the form of points, fees and interest for raising investor money to fund the Preserve Loan. **PCF further acknowledges that it did not raise the full loan amount called for under the Preserve Loan, but that it received points as if it had raised the full loan amount. PCF hereby acknowledges that the compensation received on that**

---

[3] See, Exhibit "3" to the Krentel Declaration.

-7-

portion of the loan amount that was not funded as of October 1, 2007 was not earned. ... ." (Emphasis added).

See, Krentel Declaration at ¶7 and Exhibit "4" thereto.

As a result, there is an unequivocal admission on the part of PCF in the Loan Modification Agreement that a portion of the funds that it was paid out of the proceeds of the Loan as reflected in the Escrow Closing Statement (Exhibit 2, line items at pages 2, 3 and 5 thereof) in the amount of $2,340,000.00 were in fact admittedly not earned. The Debtor contends that this unearned Loan Fee should have been refunded to it, in cash, at the close of escrow and, failing that, can and should be used now in the same manner as cash in connection with the Debtor's Plan in prospect.

(ii)    **THE CURRENT AMOUNT OF THE UNEARNED LOAN FEE**

The full amount of the Loan Fees paid to PCF was considered to be a part of the principal obligation under the Loan and at all times was included in the calculation of the monthly interest obligation that was paid by the Debtor "in advance" as opposed to being paid "in arrears." The unearned Loan Fees, clearly a part of the Loan transaction, together with interest paid thereon by the Debtor (as well as interest accruing for the benefit of the Debtor at the legal rate since February 1, 2008) operates to create a credit within the four corners of the Loan transaction for the benefit of the Debtor. The calculation of a portion of the credit claimed by the Debtor is as follows:

| | |
|---|---|
| Unfunded Portion of Loan | $7,675,908 |
| Points Charged but Not Earned | 6% |
| Amount Overcharged at Loan Closing | $460,559 |
| Points on Overcharge (at 6%) | $27,634 |
| Total Overcharge | **$488,192** |

The Debtor was also charged 'points on the points' in the additional amount of **$27,634** as a part of the transaction since the Loan amount was *increased* by the points (Six (6) points or 6%) of the amount that represented moneys that were not funded) and the Debtor was charged points *on that incremental amount as well.* As a result, the total amount of the overcharge in connection with the unearned Loan Fees, including the 'points on points' aspect of the overcharge, is **$488,192**. See, Beach Declaration at ¶3 and Exhibit 5 thereto.

-8-

The Debtor caused interest to be paid on the Loan after its funding, <u>which included within it the full amount of the Loan Fees,</u> up to and until the time when it was advised by PCF in or about October 2007 that there was an *alleged shortfall* in the Loan of approximately $7,675,980.00 and the Loan Modification Agreement was later negotiated and signed. Thereafter, DCH invested amounts equal to four (4) interest payments in the fashion described above, which the Debtor is informed and believes also included interest on the unearned Loan fees through January 31, 2008. The calculation of interest paid on the $488,192 overcharge representing the unearned Loan Fees from the date of funding through January 31, 2008 is as follows:

*Interest from funding through 1/31/2008*    **$82,101** (at 12.5% for 14 months)

The total amount paid by the Debtor in the way of unearned Loan Fees, including 'points on points' together with interest calculated and paid at the contract rate of 12.5% per annum through January 31, 2008, is **$570,293** by way of subtotal. <u>See,</u> Krentel Declaration at ¶9 and Beach Declaration at ¶4 and Exhibit 5 thereto.

Notwithstanding the admission that a portion of the overall Loan Fee was not earned, no refund was forthcoming to the Debtor despite the fact that the Debtor paid interest on that money *as if it had the use of it.* As a result, the Debtor is entitled to the accrual of interest at the legal rate of 10%, annualized, under California law, on the **$570,293** (representing the total of the principal amount of the unearned Loan Fee plus interest heretofore paid at 12.5%) from and after February 12, 2008. That calculation is as follows:

*Interest from 2/1/2008 to 6/1/10*    **$142,638** (at 10%)

This amount will continue to accrue interest until its application by the Debtor pursuant to the terms of its Plan, but the present total as of June 1, 2010 of the foregoing is $712,931. <u>See,</u> Beach Declaration at ¶5 and Exhibit 5 thereto.

By way of summary, the amount of the unearned Loan Fees, 'points on points', plus interest, is as follows:

| | |
|---|---|
| Unfunded Portion of Loan | $7,675,908 |
| Points Charged but Not Earned | 6% |
| Amount Overcharged at Loan Closing | $460,559 |

-9-

| | | |
|---|---|---|
| Points on Overcharge | $27,634 | |
| Total Overcharge | | $488,192 |
| Interest from funding through 1/31/2008 | $82,101 | |
| Subtotal | | $570,293 |
| Interest from 2/1/2008 to 6/1/2010 | $142,638 | |
| Total Overcharge, to 6/1/2010 | | **$712,931** |

See, Beach Declaration at ¶6 and Exhibit 5 thereto.

### (iii)    DEBTOR RECEIVED A CASH REFUND AT CLOSE OF ESCROW IN THE NORMAL COURSE

At the close of escrow, Debtor received a cash refund as a part of the Loan transaction in the normal course. See, Krentel Declaration at ¶5. Had PCF been forthcoming that the Escrow Closing Statement and HUD-1 were materially false in that they confirmed a fully funded $39,000,000.00 Loan, the Debtor *could* at that time have rescinded the transaction and found other replacement financing in an appropriate amount. In fact, Debtor had multiple other offers of financing for the project at the time of the Loan closing and would have selected one of those offers had its known of the alleged shortfall. See, Krentel Declaration at ¶10. That, of course, is part of the basic fraud claim that the Debtor is pursuing in the Point Center Litigation.

However, for the present purposes of dealing with the Debtor's Plan, there is no logical reason why the Debtor should not have a similar benefit of a *cash refund* in connection with the Loan transaction in the same fashion *had PCF been forthcoming at close of escrow.* However, instead of requiring cash at this time through a turnover action under 11 U.S.C. §542, the Debtor would be satisfied with the use of the unearned portion of he Loan Fee line items in the Escrow Closing Statement in the form of a credit going forward, used just as cash and this matter deemed to be a contested proceeding for that purpose. That solution is equitable under the circumstances of this case. The Debtor will have the use of the money that it has already 'paid for' (plus interest at the legal rate from February 1, 2008) which then can be used for the initial monthly payments called for under its Plan in prospect with regard to the treatment of the Class 2 Claim of PCF.

### B.    11 U.S.C. §553 OFFSET IS NOT NECESSARY IN ORDER FOR THE DEBTOR TO OBTAIN THE BENEFIT OF THE 'CREDIT'

-10-

The Debtor does not seek 11 U.S.C. §553 offset in connection with its assertion of a **credit** in connection with the Loan transaction. The credit was created *ab initio* at the close of escrow and at that time the Debtor was actually entitled to the use of those funds since it has subsequently paid interest on those funds which in fact have never been returned to it. *However*, the Debtor has elected instead to have the application of the credit used as the initial payments called for under its Plan in prospect for the Class 2 Claim of PCF. That portion of the principal balance of the Claim and interest attributable to the unearned portion of the Loan Fee will remain calculated through the Petition Date as set forth in the Claim (Exhibit "1") *so long as* the Debtor gets the use of the credit for the unearned Loan Fee, along with interest paid, and interest owing as a result of the credit in the manner set forth herein. The proposed use of the 'credit' is essentially an accounting entry that should have been implemented at the time of the closing of the Loan and reflected in the Escrow Closing Statement in the same fashion as other overpayments/credits were handled in the form of refunds and is actually a windfall for the beneficiaries / investors. However, since that was not done, the Debtor should not be penalized since it was the innocent borrower in the Loan transaction and the alleged underfunding contracted by the Escrow Closing Statement further supports the equities being in favor of the Debtor.

C.    **THE SECURED PROOF OF CLAIM FILED BY PCF SHOULD NOT BE SUBJECT TO 11 U.S.C. §553 OFFSET ON *EQUITABLE* GROUNDS**

PCF has taken the position that it is the 'authorized agent' for the fractionalized interest holders / / beneficiaries / lenders in this case in connection with the Loan transaction, and that there has been 'ratification' of its actions in this case by a substantial number of those parties. A principal's ratification cannot be selective – "in for an inch, in for a mile." Ratification is an all or nothing proposition. Friddle v. Epstein (1993) 16 Cal.App.4th 1649. If a principal with full knowledge of the material facts ratifies any part of an agent's action, the principal ratifies the entire transaction. The principal is not allowed to ratify the unauthorized action of an agent to the extent they are beneficial and disavow them to the extent they are damaging. Friddle, supra This disallows a beneficiary from taking the benefits of a transaction without the burden. See for

-11-

example, Gift v. Ahrnke (1951) 107 Cal.App.2d 614. Thus, on that basis there is the necessary *mutuality* for offset had the Debtor sought to pursue that course of action.

However, it is clear in the 9th Circuit that the implementation of 11 U.S.C. §553 offset is discretionary and setoff may properly be denied where **inequitable conduct** has been demonstrated. U.S. v. Atkinson (In re Cascade Roads, Inc.), 34 F. 3d 756, 762-766 (9th Cir. 1994). The Cascade Court specifically noted (at 764) that –

> "The conclusion that the Bankruptcy Code independently grants courts the equitable discretion to deny setoff claims is consistent with the statute's legislative history. The former Bankruptcy Act enunciated setoff rights in mandatory language: "In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account *shall* be stated and one debt *shall* be set off against the other, and the balance only shall be allowed or paid." *11 U.S.C. § 108(a)* (emphasis added) (repealed 1978). Nevertheless, courts interpreted the statute to permit setoff only "in the sound discretion of the trial court." *Riggs, 623 F.2d at 73.*
>
> *Section 553,* which does not contain such mandatory language, was intended to restrict the former setoff provision, which "is now considered to have been too broad." 4 *Collier on Bankruptcy Par. 553.02* at 553-10 (15th ed. 1994). It would be anomalous to conclude (as the government urges) that, in cases where *section 553* incorporates non-discretionary setoff law, the bankruptcy court possesses no equitable authority to deny setoffs. Such a result would give creditors greater setoff rights under the Bankruptcy Code than under the former Bankruptcy Act and would, therefore, directly contravene the legislative purpose of limiting setoff rights."

-12-

Cascade, supra, was cited with approval by the 9th Circuit in In re Straightline Investments, Inc., 525 F. 3d 870, 882 (9th Cir. 2008) wherein the panel affirmed the denial of the equitable remedy of the similar remedy of *recoupment* based upon the engaging in inequitable conduct.

In the instant case, it is clear that PCF engaged in inequitable conduct from the inception of the Loan transaction. If the loan was not fully funded as PCF has claimed, then it should have been forthcoming about it and not have been paid the full Loan Fee as if the Loan was fully funded. Surely PCF will not argue that the Debtor paying the full Loan Fee was by accident. Such conduct, which appears to be actual fraud in the intentional withholding of a material fact (the Loan was not fully funded at close of escrow), can hardly be characterized as 'equitable' conduct on the part of PCF. Further, such conduct has been ratified by certain of the investors / beneficiaries. However, as previously argued, the proposed use of the 'credit' as essentially an accounting entry giving rise to the present use of those funds by the Debtor without this Court needing to consider the offset issue due to the *mala fides* on the part of PCF. This position as to the discrete use of the admitted overcharge portion of the Loan Fee, is without prejudice to the Debtor's continued pursuit of damages against PCF and others in connection in the Point Center Litigation with other aspects of the Loan transaction, including whether or not PCF was entitled to a Loan Fee in the first place.

<div align="center">

**IV.**

**CONCLUSION**

</div>

For the reasons set forth herein, the Debtor prays that the Court enter an order granting the relief requested herein regarding the use of a 'credit' in connection with the Debtor's Plan in prospect.

DATED: May 5, 2010

BROKER & ASSOCIATES
PROFESSIONAL CORPORATION

By: _____
Jeffrey W. Broker
General Reorganization Counsel to Debtor and
Debtor-in-Possession

<div align="center">-13-</div>

## DECLARATION OF SCOTT KRENTEL

I, Scott Krentel, first being duly sworn, do hereby declare and state as follows:

1.     I am over the age of 18 and the manager of Beaumont 1600, a California Limited Liability Company, which is the manager of the Debtor and competent to give testimony in this action. I am personally familiar with the transaction involving the Loan and its related documentation, being the person who executed loan documents on behalf of the Debtor. All of the matters testified to herein are based upon my own personal knowledge, are true and correct, and if called upon to testify, I could and would testify competently thereto.

2.     This case was commenced by the filing of a voluntary Chapter 11 petition by the Debtor on September 25, 2008 (the "Petition Date") to protect itself against the predatory and criminal acts of PCF. The Debtor is in the business of acquiring and making real estate investments, and by and through the efforts of its consultants, both political and technical, designs, plans and delivers their projects consisting of single family residential lots, commercial and industrial projects to then sell to the public and private builder-developers throughout the United States at a profit.

3.     The Debtor's principal asset is the residential portion of The Legacy Highlands project, which is a unique, multi-generational master planned community set within the rolling hills of West Beaumont, located in Riverside County, California. The Debtor also owns 112 acres of land near the Legacy Highlands project, an office building in the City of Riverside, CA, and a finished residential lot in Adelanto, San Bernardino County, CA.

4.     The Debtor has secured and unsecured creditors. The Debtor is current in all reporting and quarterly fee requirements with the Office of the United States Trustee. PCF filed Proof of Claim No. 4 in this case on or about April 8, 2009 (the "PCF Claim"), a true and correct copy of which is attached hereto as Exhibit "1". The Debtor filed its Plan and Disclosure Statement on March 8, 2010. PCF is classified as Class 2 in the Plan as to the Secured portion of the PCF Claim and it will also have a Class 5 General Unsecured Claim if does not make the

-14-

Section 1111(b) election. The PCF Claim is a Disputed Claim under the Debtor's Plan that is in prospect as the same may be amended and/or modified.

5.    Prior to the Petition Date, in or about September 2006 the Debtor entered into a loan transaction arranged by PCF for a purported $39,000,000.00 fully funded development loan (the "Loan") which included 24 months of draws, secured by a Deed of Trust on the residential portion Legacy Highlands project, with two 1-year extensions. Among other aspects of the Loan was that $9,650,000.00 would be retained by PCF to cover the 24-month "interest reserve" plus the extension fees for the two 1-year extensions and there was a further soft cost holdback of $7,251,736.00 placed in a trust account on behalf of the Debtor. PCF was paid a loan broker fee of $2,340,000.00 *which was calculated on a fully funded $39 million loan* (the "Loan Fee"). The Loan Fee was at all times considered to be a part of the principal balance of the Loan, and interest thereon was paid by the Debtor up to and including the date of the alleged default in early 2008 claimed by PCF. That is to say, since the Debtor was not in breach of any Loan covenants, it had the absolute right to $39,000,000.00 of funding according to the set schedule which funds included the interest reserve and the expense holdbacks. If the Debtor subsequently had a third party 'takeout' lender or buyer who would have deposited $39,000,000.00 into an escrow account, for payment to the holders of the beneficial interests, the Debtor would have had an absolute contractual right to the entire $39,000,000.00 purportedly 'invested by the PCF group' (which included all amounts actually received and to be received by the Debtor) and a recordable reconveyance of the underlying deed of trust and all assignments thereof. In addition, the Debtor received a cash refund out of the escrow by check in the amount of $16,000.00. Attached hereto collectively as Exhibit "2" are the Escrow Closing Statement and "HUD-1"[4] received by the Debtor from the Escrow that confirm the foregoing details, including (i) a $39,000,000.00 fully

---

[4] The HUD-1 states the following prominent warning at page 3 thereof: "WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment. For details see: Title 18 U.S. Code Sections 1001 and 1010." See, Exhibit 2.

-15-

funded loan, (ii) a 24 month interest reserve of $9,650,000.00, (iii) a holdback of $7,251,736.00 (iv) a Loan Fee of **$2,340,000.00** for the arranging of the $39,000,000.00 Loan and (v) a refund in the amount of $16,000.00 per the check at the last page of the Exhibit.

6.    In or about October 2007 the Debtor was advised by PCF that the loan that it arranged in 2006 for the benefit of the Debtor (the Loan in the amount of $39,000,000.00) was not fully funded as the Debtor contends was previously represented and that there was a *funding shortfall* of approximately $7,675,980.00.  Prior to the notification that further Loan draws would not be honored, I was never notified that the Debtor was in breach of any obligations or covenants concerning the Loan. Attached hereto as Exhibit "3" is a true and correct copy of a letter dated October 12, 2007 from PCF to the Debtor claiming that $7,675,980.00 was not raised in connection with the Loan. As a direct result of the allegedly "missing" funds of approximately $7,675,980.00 described above, there were no funds available from the Loan after the tenth draw to pay for "interest reserves" or "soft costs" relating to the ongoing development of the residential portion of Legacy Highlands which include but are not limited to property tax reserves, property maintenance costs, engineering fees, consulting fees, 'contingency' and legal and insurance costs, as well as there being no remaining interest reserve for the Loan all as indicated on closing statements and other transactional documents as of the date of the original funding.  I was shocked and in total disagreement with the content of Exhibit 3.  However, I determined that it was in the Debtor's best interest to attempt to avoid litigation and continue to complete the development of the Legacy Highlands while the claims against PCF and any other participants in the alleged shortfall were sorted out.

7.    After the *existence of the alleged shortfall* was disclosed to the Debtor by PCF, the Debtor immediately made arrangements to raise the entirety of the missing money through Deep Canyon Holdings, Inc. ("DCH") in order to replace all of the alleged shortage in Loan proceeds. Attached hereto as Exhibit "4" is a true and correct copy of a duly executed agreement dated November 15, 2007 between the Debtor and PCF (duly executed by PCF) in connection with the Loan (the "Loan Modification Agreement"). PCF also confirms in the Loan Modification

-16-

Agreement that it had no right to the full commission it had paid itself from the $39,000,000.00 that the Debtor had borrowed pursuant to the Loan. The Loan Modification Agreement provides as follows at paragraph 4 thereof regarding the unearned points, fees and interest (collectively "Loan Fees") that were received by PCF pursuant to the Loan transaction:

> "PCF acknowledges that it received compensation in the form of points, fees and interest for raising investor money to fund the Preserve Loan. **PCF further acknowledges that it did not raise the full loan amount called for under the Preserve Loan, but that it received points as if it had raised the full loan amount. PCF hereby acknowledges that the compensation received on that portion of the loan amount that was not funded as of October 1, 2007 was not earned. ... ."** (Emphasis added).

8. Pursuant to the Loan Modification Agreement, the Debtor, through me, located DCH for the purpose of becoming an investor in the Loan. PCF was not entitled to a fee for DCH becoming an investor in the Loan in accordance with the terms of paragraph 4 of the Loan Modification Agreement. DCH made its initial funding of $1,000,000.00 as called for under the Loan Modification Agreement and was granted an undivided 2.5641% fractionalized interest in the Loan in its own name. DCH thereafter provided an additional $341,600.00 and was granted an undivided 0.876% fractionalized interest in the Loan in its own name. In total, DCH furnished $1,341,600.00 to PCF for the benefit of the Debtor and in exchange was granted a definitive 3.4401% fractionalized interest in the Loan in its own name. In February, 2008 I on behalf of the Debtor received correspondence and telephone calls from PCF, through Rene Esparza, that further funding by DCH was refused by PCF and no further investment would be allowed by DCH in connection with the Loan, which the Debtor contends was in violation of the terms of the Loan Modification Agreement. No explanation of any kind was given to Debtor or DCH as to why additional funding was by DCH was being refused.

-17-

9.    I on behalf of the Debtor caused interest to be paid on the Loan after its funding, which included within it the full amount of the Loan Fees, up to and until the time when I was advised by PCF in or about October 2007 that there was an *alleged shortfall* in the Loan of approximately $7,675,980.00 and the Loan Modification Agreement was later negotiated and signed. It is my understanding on behalf of the Debtor that there were four (4) months' of interest paid thereafter on the Loan out of the funds raised from DCH pursuant to the Loan Modification Agreement which paid interest for the months of October through December, 2007 and January 2008 since interest was paid in advance by the Debtor. I am informed and believe that the funds provided by DCH were applied against the full amount of the Loan, which included the full amount of the Loan Fees without any reduction. The unearned Loan Fees, clearly a part of the Loan transaction, together with interest paid thereon by the Debtor (as well as interest accruing for the benefit of the Debtor at the legal rate since February 1, 2008) operates to create a credit within the four corners of the Loan transaction for the benefit of the Debtor.

10.    Debtor had multiple other offers of financing for the project at the time of the Loan closing and would have selected one of those offers had its known of the alleged shortfall.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed this 5th day of May, 2010 at Riverside, California.

_____

Scott Krentel

-18-

## DECLARATION OF DOUGLAS BEACH

I, Douglas Beach, first being duly sworn, do hereby declare and state as follows:

1.      I am over the age of 18 and competent to give testimony in this action. I am personally familiar with the transaction involving the Loan and its related documentation, having been directly involved in its negotiation, preparation of schedules used in connection therewith and the accounting information that is described below on behalf of the Debtor along with Scott Krentel. All of the matters testified to herein are based upon my own personal knowledge, are true and correct, and if called upon to testify, I could and would testify competently thereto.

2.      I am a certified public accountant and have, in the past, been retained as the outside financial consultant to the Debtor. I have been requested by the Debtor to prepare a report relating to the amount of the unearned Loan Fee as well as to prepare the calculations of interest paid by the Debtor on the unearned Loan Fee. In addition, I have been requested to calculate interest accrued on the moneys paid by the Debtor at the 'legal' rate of 10%, compounded annually. I routinely make calculations of the type requested as a part of my accounting practice, and I have personally prepared such a calculation, the details of which are set out below, along with a written schedule prepared by me, a true and correct copy of which is attached hereto as Exhibit "5" and incorporated by reference.

3.      The full amount of the Loan Fees paid to PCF was considered to be a part of the principal obligation under the Loan and at all times was included in the calculation of the monthly interest obligation that was paid by the Debtor "in advance" as opposed to being paid "in arrears." The calculation of a portion of the credit claimed by the Debtor is as follows:

| | |
|---|---|
| Unfunded Portion of Loan | $7,675,908 |
| Points Charged but Not Earned | 6% |
| Amount Overcharged at Loan Closing | $460,559 |
| Points on Overcharge (at 6%) | $27.634 |
| Total Overcharge | **$488,192** |

-19-

The Debtor was also charged 'points on the points' in the additional amount of **$27,634** as a part of the transaction since the Loan amount was *increased* by the points (<u>Six (6) points or 6%) of the amount that represented moneys that were not funded</u>) and the Debtor was charged points *on that incremental amount as well.* As a result, the total amount of the overcharge in connection with the unearned Loan Fees, including the 'points on points' aspect of the overcharge, is **$488,192**.

4.    The Debtor caused interest to be paid on the Loan after its funding, <u>which included within it the full amount of the Loan Fees</u>, up to and until the time when it was advised by PCF in or about October 2007 that there was an *alleged shortfall* in the Loan of approximately $7,675,980.00 and the Loan Modification Agreement was later negotiated and signed. Thereafter, I am aware that DCH invested amounts equal to four (4) interest payments in the fashion described above, which the Debtor is informed and believes also included interest on the unearned Loan fees through January 31, 2008. The calculation of interest paid on the $488,192 overcharge representing the unearned Loan Fees from the date of funding through January 31, 2008 is as follows:

*Interest from funding through 1/31/2008*    **$82,101** (at 12.5% for 14 months)

The total amount paid by the Debtor in the way of unearned Loan Fees, including 'points on points' together with interest calculated and paid at the contract rate of 12.5% per annum through January 31, 2008, is **$570,293** by way of subtotal.

5.    Notwithstanding the admission that a portion of the overall Loan Fee was not earned, no refund was forthcoming to the Debtor despite the fact that the Debtor paid interest on that money *as if it had the use of it.* As a result, the Debtor is entitled to the accrual of interest at the legal rate of 10%, annualized, under California law, on the **$570,293** (representing the total of the principal amount of the unearned Loan Fee plus interest heretofore paid at 12.5%) from and after February 1, 2008. That calculation is as follows:

*Interest from 2/1/2008 to 6/1/10*    **$142,638** (at 10%)

This amount will continue to accrue interest until its application by the Debtor pursuant to the terms of its Plan, but the present total as of June 1, 2010 of the foregoing is $712,931.

-20-

6.    By way of summary, the amount of the unearned Loan Fees, 'points on points', plus interest, is as follows:

| | | |
|---|---|---|
| Unfunded Portion of Loan | $7,675,908 | |
| Points Charged but Not Earned | 6% | |
| Amount Overcharged at Loan Closing | | $460,559 |
| Points on Overcharge | $27,634 | |
| Total Overcharge | | $488,192 |
| Interest from funding through 1/31/2008 | $53,305 | |
| Subtotal | | $570,293 |
| Interest from 2/1/2008 to 6/1/2010 | $142,638 | |
| Total Overcharge, to 6/1/2010 | | **$712,931** |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed this 4th day of May, 2010 at El Segundo, California.

_____
Douglas Beach

-21-

# EXHIBIT 7

# EXHIBIT 7

Robert P. Goe - State Bar No. 137019
Elizabeth A. LaRocque – State Bar No. 219977
**GOE & FORSYTHE, LLP**
18101 Von Karman Ave., Ste. 510
Irvine, CA 92612
Email: rgoe@goeforlaw.com
        elarocque@goeforlaw.com

Telephone:  (949) 798-2460
Facsimile:   (949) 955-9437

Attorneys for Beneficiaries (See Attached List)
by and through authorized agent, Point Center Financial, Inc.

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>THE PRESERVE, LLC,<br><br><br>Debtor and Debtor in Possession. | Case No.  2:10-bk-18429-BB<br>(formerly Case No. 6:08-bk-23006-BB)<br><br>Chapter 11 Case<br><br>**BENEFICIARIES BRIEF ON THE ISSUES OF:**<br>**1. DEBTOR'S USE OF ALLEGED UNEARNED LOAN FEES TO CRAM DOWN SECURED CREDITORS UNDER DEBTOR'S PROPOSED PLAN;**<br>**2. SEPARATE CLASSIFICATION OF DEEP CANYON HOLDINGS INC.'S CLAIM; AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF**<br><br><br>**Hearing:**<br>Date:      May 26, 2010<br>Time:      11:00 a.m.<br>Courtroom: 1475<br>            255 East Temple Street<br>            Los Angeles, CA 90012 |

**TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUTPCY**

**JUDGMENT, DEBTOR, DEBTOR'S COUNSEL AND PARTIES IN INTEREST:**

Beneficiaries (as set forth in the attached list) of the first deed of trust ("Beneficiaries") by

EXHIBIT "7"    1                                                    PAGE 106

and through authorized agent, Point Center Financial, Inc. ("PCF") secured against the Property of The Preserve, LLC ("Debtor") hereby files its Brief on the Issue of Debtor's Use of Alleged Unearned Loan Fee to Cram Down Secured Creditors Under Debtor's Proposed Plan (the " Credit Issue") and Separate Classification of Deep Canyon Holdings, Inc.'s ("DCH") claim Under Debtor's Proposed Plan (the "Classification Issue"). As discussed herein, the Debtor's proposed plan is patently unconfirmable as this Court has already stated. Further, both of the issues addressed herein evidence the desperation of the Debtor by showing the utter lack of funding to support a feasible plan and effort to illegally prefer one small constituent of a single deed of trust over all the others just because DCH happens to be "friendly" to the Debtor.

# I.    INTRODUCTION

The Court made it clear at the disclosure statement hearing that it did not want further briefing on the litigation issues between Debtor and PCF. The Court stated "I actually thought less discussion of the merits of the litigation with PCF is probably due".[1] A true and correct copy of the transcript for the April 14, 2010 Disclosure Statement hearing ("DS Transcript") is attached to the Request for Judicial Notice ("RJN") as **Exhibit "1"**. See page 7, lines 12-13. Despite this, a substantial portion of Debtor's Briefs are simply a rehash of the pending litigation, all of which PCF disputes. Accordingly, in order to preserve judicial economy and not reiterate those facts and issues for which the Court is either already aware, or not interested, PCF will limit this brief to those two issues requested by the Court.

At the hearing on Debtor's Disclosure Statement, the Court requested briefing on two discreet issues; whether there is mutuality between PCF and the Beneficiaries and if so, whether any alleged set off amount could be used as a credit to cram down the proposed plan on the Beneficiaries; and whether Debtor can separately classify the 4.1% fractional interest of DCH from all the other Beneficiaries holding approximately 95.9% of the deed of trust.

- **Credit Issue**

The Court stated at the Disclosure Statement hearing:

---

[1] Debtor's desperation can be seen by the heightened rhetoric that PCF's conduct was allegedly now "criminal". PCF hereby reserves its claims against all involved parties in making such unprotected statement.

"But let's assume for a moment that there was agreement that the debtor is entitled to a refund of "X" dollars. It's far from clear to me that the debtor is entitled to use that in lieu of making any payments into the disputed claim reserve.

And I'd need to have a whole lot more information and argument about how that would work because it seems to me either there's mutuality or there isn't mutuality. And when I'm talking about "mutuality," I mean in the context of a setoff.

And if there is mutuality such that this is a viable setoff, then I think it simply serves to reduce the amount of the debt and is not something that you can say, well, effectively, give us the money and we're going to use it for payments.

If there is no mutuality – and maybe there isn't, because maybe PCF owes it in its individual capacity, if you will, as distinguished from a representative capacity, because it's really PCF that got the money and not the beneficiaries.

So if there is no mutuality, then how do you use money that PCF owes you to pay the beneficiaries? I mean, that's sort of like saying – I guess you could assign them your claim against PCF. But I don't think you can simply apply it.

So I wasn't sure that that whole concept worked, of using that refund essentially to make payment. <u>And that was the only source I saw, in the short run, of any money at all</u>."

RJN Exhibit 1, DS Transcript Page 4, line 22 through Page 5, line 25 (emphasis added)

As noted, this is a cram down issue under section 1129(b) concerning the Beneficiaries entitlement to receive, among other things, "deferred cash payments totaling at least the allowed amount of such claims." That is, can Debtor utilize an alleged credit from PCF (which Debtor consistently references as only the alleged "arranger", not a lender on the loan) to meet this cram down requirement. However, when reviewing the 100 plus pages of documents submitted by the Debtor, there is not a single reference to Section 1129.

Debtor wholly fails to address the issue, or provide any legal authority whatsoever, as to how it can use a credit to fund the Plan, assuming PCF and the Beneficiaries have a mutuality such that monies allegedly owed by PCF can be attributed to the Beneficiaries. Debtor cites to 11 U.S.C. Section 553 to argue set off. However, as set forth below, Section 553 is not applicable as the Beneficiaries as the creditor, are not seeking a set off and this section makes it abundantly clear that a set off claim is held by the creditor, not the debtor. Debtor is the party that is attempting to assert a set off claim and convert that into a credit, thus its argument under this code

section is misplaced.   Section 553 is the <u>only</u> Bankruptcy Code section cited in Debtor's Brief.

Debtor is attempting to cram down the Plan on the secured creditors, including the Beneficiaries.  As part of the Plan, Debtor is attempting to convert alleged unearned fees of PCF into an obligation of the Beneficiaries and then use any monies owed as a credit to fund the Plan. In this context, the Debtor must meet the stringent requirements for cram down under 11 U.S.C. Section 1129(b)(2)(A)(i).  Accordingly, even if Debtor was able to convince the Court that it is entitled to a credit, Debtor cannot show, and has not even attempted to show, that it can satisfy the cram down requirements, specifically deferred cash payments to which the creditor is entitled, with the use of a credit.

As discussed herein below, Debtor cannot fund a Plan with a credit and meet the requirements of a cram down under 11 U.S.C. § 1129(b)(2)(A)(i).

- **Classification Issue**

Another issue raised the by Court had to do with whether DCH, a 4.1% fractionalized interest holder in the deed of trust encumbering Debtor's Property, could be separately classified. On this issue the Court stated:

> **"**But let me give you - -walk through what the tentative has to say and then some additional thoughts too.
> The tentative says:
> 'Deny approval of disclosure statement.  Plan that it describes is unconfirmable on its face and disclosure statement fails to contain adequate information on a number of issues.  The following are among the more prominent problems:
> The Court agrees with PCF, that the Class 1 claim which is a fractional interest in the Class 2 claim' - -
> - - that's the Deep Canyon claim.
> I looked at that and even - - you know, before I even got to the objection, said, yeah, I just don't think you can separately classify a fractional interest to something.
> You know, no matter how much of an outright transfer, et cetera, it's still the same body of collateral, and they get a percentage of an interest in the whole, and I just don't see how it makes sense to separately classify them."

RJN Exhibit 1, DS Transcript; Page 2, line 9 through page 3, lines 1-5

Essentially, Debtor's argument is that it is placing DCH's claim in a different class than

PCF's because "DCH has consistently and independently supported the Debtor's efforts to reorganize in this case …" See Classification Brief, page 7, lines 14-15. Further, because Debtor has <u>unilaterally</u> chosen not to sue DCH, that somehow justifies separate classification. That is not and cannot be the law on this issue. As the Ninth Circuit has clearly stated in <u>In re Johnston</u>, 21 F.3d 323 (9th Cir. 1994):

> Whether the issue on appeal is denial of separate classification or approval of separate classification, the question resolved by the bankruptcy court is the same: are the claims substantially similar? To resolve that question, bankruptcy court judges must evaluate the nature of each claim, i.e., the kind, species, or character of each category of claims.

<u>Id</u>. at 327.

Although both Debtor and DCH submit hundreds of pages of briefs and documents, they have actively mislead the Court as to DCH's relation to PCF and the other Beneficiaries. Although Mr. Parrin admits in his declaration (page 8, paragraph 5) that "Deep Canyon made two loans totaling $1,341,600 to Debtor and was granted <u>definitive fractional interests in the note and deed of trust</u>" (emphasis added), he and the Debtor fail to inform the Court and attach documents that he signed, just like every other investor/Beneficiary, as follows:

-- In connection with the $1,000,000 investment made by DCH with PCF for a 2.564% interest in the Debtor's loan, Mr. Parrin signed the (i) Exhibit A Lender/Purchaser Disclosure Statement to Subscription Agreement, (ii) Multiple Lender Addendum to Lender/Purchaser Disclosure Statement, (iii) Addendum A, (iv) Addendum B, (v) Loan Servicing Agreement (Deed of Trust)[2] and (vi) Exhibit C to Subscription Agreement. The foregoing are collectively referred to as the "First Subscription Agreement" and

---

[2] This is the same loan Servicing Agreement signed by all the other Beneficiaries previously introduced into evidence before this Court without objection.

attached to the RJN as **Exhibit "2"** and incorporated herein by reference. The First Subscription Agreement has previously been introduced into evidence before this Court without objection.

--- DCH made a second investment with PCF in the amount of $341,600.00 bringing its total investment in the loan up to approximately 3.44% (actually 4.1070% based on amounts funded) signing an additional six (6) documents (including the same Loan Servicing Agreement). The foregoing are collectively referred to as the Second Subscription Agreement and attached to the RJN as **Exhibit "3"** and incorporated herein by reference and was also previously introduced into evidence before this Court without objection.

In sum, just like every other Beneficiary, Mr. Parrin signed twelve (12) documents with PCF (the First Subscription Agreement and Second Subscription Agreement) including two (2) Loan Servicing Agreements. DCH signed the exact same documents and has the exact same claim as the other Beneficiaries.

## II.    ARGUMENT

### A.    Debtor Has Not Even Addressed, Let Alone Demonstrated, That It Can Use a Credit to Make Deferred Cash Payments Thereby Complying With the Cram Down Requirements of 11 U.S.C. §1129(b)(2)(A)(i)

Due to its lack of funding, Debtor argues that it is entitled to a credit from PCF (the so-called loan arranger as Debtor has claimed) and that the credit will be used to fund the Plan payments to Beneficiaries. Despite the Court's specific request, Debtor has not even addressed, nor has it provided, any legal authority to support its contention that it can use the alleged credit to fund the Plan. Debtor skips over this analysis and essentially argues in the first ten (10) pages of its brief that it is entitled to a credit and then only discusses Section 553 in the last three (3) pages of its brief.    The Court should not allow the Debtor to "sand bag" the Beneficiaries by raising this for the first time in a reply.

Even if Debtor was entitled to a credit, an analysis of the cram down provisions of 11 U.S.C. §1129(b)(2)(A) makes it abundantly clear that Debtor would not be able to use a credit and cram down the Plan on the Beneficiaries/secured creditors, which is exactly what it is attempting to do.

11 U.S.C. § 1129(b)(2)(A) provides as follows:

"(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:
(A)  With respect to a class of secured claims, the plan provides -
(i)(I) that the holders of such claims retain the liens securing such  claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
(II) that each holder of a claim of such class receive on account of such claim          deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; ..."

In finding a plan to be confirmable, the court must find that the creditor "will receive deferred cash payments, as of the effective date of the plan, equal to the present value of the collateral." In re Capital W. Investors, 178 B.R. 824, 827 (Bankr. N.D. Cal 1995) (rev'd on other grounds, 186 B.R. 497 (N.D. Cal. 1995)).

In this case, Debtor is not proposing to make deferred cash payments, but to make no payments and instead proposes to draw down on an alleged credit.

Under Debtor's proposal, payments would simply not be made and therefore by analogy would violate the Ninth Circuit's decision of Great Western Bank v. Sierra Woods Group, 953 F.2d 1174, 1176 (9th Cir. 1992) which generally prohibits negative amortization.

Negative amortization refers to "a provision wherein part or all of the interest on a secured claim is not paid currently but instead is deferred and allowed to accrue," with the accrued interest added to the principal and paid when income is higher.  The extent of negative amortization depends upon the difference between the "accrual rate," or the overall rate of interest to be paid on a claim, and the "pay rate," or the rate of interest to be paid on a monthly basis.

Great Western Bank v. Sierra Woods Group, 953 F.2d 1174, 1176 (9th Cir. 1992) (internal citations omitted).

EXHIBIT "7"    7                                                    PAGE 112

Case 2:10-bk-18429-BB    Doc 272    Filed 05/17/10    Entered 05/17/10 15:44:50    Desc
Main Document    Page 8 of 27

Bankruptcy Courts strongly disfavor negative amortization plans because they "tend to be fraught with pitfalls that unfairly endanger creditors."  See Great Western Bank, 953 F2d  at 1177. Moreover, negative amortization plans can be "extremely unfair and inequitable" to secured creditors because they will not recover the present value of their claims as required by the Bankruptcy Code, should the plan fail.  See In re Consolidated Properties Limited Partnership, 170 B.R. 93, 99 (Bankr. D.Md. 1994); see also In re Memphis, 99 B.R. 385, 388 (Bankr. M.D. Tenn. 1989).  For these reasons, negative amortization plans have been carefully scrutinized, and reluctantly confirmed.  See In re Oaks Partners, Ltd., 141 B.R. 453, 457 (Bankr. N.D. Ga. 1992); In re Consolidated Properties Limited Parternship, 170 B.R. 93, 99 (Bankr. D. Md. 1994); In re Howard, 212 B.R. 864, 877 (Bankr. E.D. Tenn. 1997); In re 641 Associates, Ltd., 140 B.R. 619, 630 (Bankr. E.D. Pa. 1992); In re Wynnefield Manor Associates, L.P., 163 B.R. 53, 59 (Bankr. E.D. PA. 1993).

The fairness of negative amortization plans is determined o a case-by-case basis.  See Great Western Bank, 953 F.2d at 1177-78.  In making this determination, a bankruptcy court may consider the following factors:

> 1.    Does the plan offer a market rate of interest and present Value of the deferred payments;
> 2.    Is the amount and length of the proposed deferral reasonable;
> 3.    Is the ratio of debt to value satisfactory throughout the plan;
> 4.    Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;
> 5.    What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;
> 6.    Are the risks unduly shifted to the creditor;
> 7.    Are the risks borne by one secured creditor or class of secured creditors;
> 8.    Does the plan preclude the secured creditor's foreclosure;
> 9.    Did the original loan terms provide for negative amortization; and
> 10.   Are there adequate safeguards to protect the secured creditor against plan failure.

Id. at 1178 (quoting In re Apple Tree Partners, L.P., 131 B.R. 380, 398 (Bankr. W.D. Tenn. 1991)).

There is no way Debtor could meet this high standard based on security consisting of raw

land that generates no income.  Moreover, Debtor is proposing a 20-year payout on a Property

Debtor claims has dropped from $103 million on the petition date to $8 million currently.

Finally, it would be unfairly discriminatory to pay cash to DCH while giving the other

Beneficiaries nothing, further violating Section 1129

**B.      Debtor Cannot Assert the Offset Defense Under 11 U.S.C. Section 553, as Such Defense is Held Only by a Creditor.**

Debtor's only legal argument in its brief to support its unprecedented Plan treatment to the

Beneficiaries is that the Beneficiaries are not entitled to setoff their claim against that claim the

Debtor is asserting against PCF.  Debtor argues that PCF and the Beneficiaries have mutuality

because the Beneficiaries ratified PCF as its servicing agent, and PCF engaged in fraud, thus

PCF/Beneficiaries are not entitled to a set off.  There are no facts to support such position.

In any event, this argument is not relevant because the Beneficiaries are not seeking a

setoff, and Debtor does not have the right under Section 553 to seek a setoff.

11 U.S.C. Section 553 provides:

> "Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case…" (emphasis added)

The plain language of Section 553 makes it clear that the setoff is a right of the creditor,

not the debtor.  As set forth in the case of In re Gosnell Development Corp. of Arizona 221 B.R.

776, 781 (Bkrtcy.D.Ariz.,1998), the Court specifically found that only a creditor can raise the

setoff defense.

> Courts have recognized that setoff and recoupment are the equivalent of lawful preferences in bankruptcy. See 5 Collier on Bankruptcy, ¶ 553.02 (15th ed.1998) (citing In re Pottier & Stymus Co., 262 F. 955, 956 (2d Cir.1919)). A creditor with a right of setoff or recoupment will recover a greater percentage of its claim from debtor as compared to other creditors without the right of setoff or recoupment. Preferences inure to the benefit of the creditor, not the debtor. **Under the language of § 553 and the setoff and recoupment cases, it makes little sense to allow a party other than the creditor with the recoupment or setoff defense to raise**

**the defenses**. See In re Gosnell Development Corp. of Arizona 221 B.R. 776, 781 (Bkrtcy.D.Ariz.,1998) [Emphasis added].

As it is Debtor that is attempting to assert a setoff right, and not the Beneficiaries, 11 U.S.C. §553 is not applicable. Thus, Debtor's entire argument regarding setoff is misplaced and of no relevance.

Finally, the claim that the Beneficiaries have somehow ratified PCF's alleged wrongful conduct is misplaced.

> "Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which as to some or all persons, is to treat the act as originally authorized by him."

Rakestraw v. Rodrigues, 8 Cal.3d 67, 73 (1992).

The Beneficiaries (as well as DCH) merely entered into the Loan Servicing Agreement with PCF to take action to protect their interests. That's it. Thus, ratification also does not work for Debtor.

**C.      There is No Basis for Separate Classification of the DCH Claim From The Other Beneficiaries.**

As discussed above, DCH signed the exact same documents and holds the exact same type of fractionalized interest in the deed of trust as the other Beneficiaries. The initial issue is whether Debtor can separately classify the claim of a fractionalized interest holder from the rest of the fractionalized interest holders. Both the Barakat and Johnston decisions are from the Ninth Circuit and address the classification issues. There is no reason for this Court to stray outside the Ninth Circuit for guidance and Debtor's cite to non-binding bankruptcy court decisions is off base.

Debtor tries to argue around the "one clear rule" announced in In re Greystone II Joint Venture, 995 F.2d 1274, 1279 (5th Cir. 1991) that "thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan", by citing to In re Bloomingdale Partners, 170 B.R. 984, 994-995 (Bankr. N. D. IL 1994), which rejected such

rule in favor a "restrictive classification" rule.

First, it is clear that the Ninth Circuit in In re Barakat, 99 F.3d 1520 (9ᵗʰ Cir. 1996) has spoken on the separate classification rule set forth in Greystone, and it is improper to cite to a 1994 bankruptcy court decision from Illinois.

Improper classification will result in denial of a disclosure statement as follows:

> The Court ruled, inter alia, that separate classification of Coppersmith and Seeley was improper pursuant to *In re Greystone III Joint Venture,* 995 F.2d 1274, 1279 (5th Cir.1991), *cert. denied,* 506 U.S. 822, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992) as adopted by the Ninth Circuit in *Barakat v. Life Ins. Co. of Va. (In re Barakat),* 99 F.3d 1520 (9th Cir.1996), *cert. denied,* 520 U.S. 1143, 117 S.Ct. 1312, 137 L.Ed.2d 475 (1997), because the separate classification was done to gerrymander to create an impaired class (the non-Coppersmith/Seeley general unsecured class) which might vote to accept the plan. The Court ruled it would be a waste of resources to approve any disclosure statement, unless the classification of the underlying plan was corrected, because the improper classification would render the plan nonconfirmable. There are numerous decisions which hold that where a plan is on its face nonconfirmable, as a matter of law, it is appropriate for the court to deny approval of the disclosure statement describing the nonconfirmable plan. *In re United States Brass Corp.,* 194 B.R. 420 (Bankr.E.D.Tex.1996); *In re Spanish Lake Assoc.,* 92 B.R. 875, 877 (Bankr.E.D.Mo.1988); *In re Pecht,* 57 B.R. 137, 139 (Bankr.E.D.Va.1986); *In re Century Investment Fund VIII Ltd. Partnership,* 114 B.R. 1003 (Bankr.E.D.Wis.1990).

In re Silberkraus, 253 B.R. 890, 899 (Bkrtcy.C.D.Cal.,2000); affirmed In re Silberkraus, 336 F.3d 864 (9ᵗʰ Cir. 2003).

Even if the Court were to consider the Bloomingdales case and the "restrictive classification" test, which instead of a two part test requires merely "a single finding of fact, whether the particular claim is "substantially similar" to the other claims in the class at issue, the result would be the same because under this test "if this claim is 'substantially similar' to other claims, then it must be classified together with these other claims." Id at 997. The only difference is that the Court will not look to the debtor's subjective motives, only determine whether the claims are substantially similar thus requiring classification together. Id.

The <u>Bloomingdales</u> Court goes on to state that:

> If it is not "substantially similar," then, as under the two-pronged analysis, this claim must be classified separately pursuant to the plain language of <u>§ 1122(a)</u>. However, if this claim is "substantially similar" to other claims, then it must be classified together with these other claims….

<u>Id.</u>

Even in <u>Bloomindales</u>, where the debtor argued that the claims were not substantially similar because the claim holders had different motivation, the Court held the:

> "Different creditors will always have different motivations.  The relevant issue is the similarity among the characteristics of the claims, not the motives of the holders of the claims.

<u>Id</u>. at 998

Thus, under Debtor's own cited authorities, the claims could not be separately classified based upon the fact that DCH is in favor of the Plan and PCF is not.

Under Ninth Circuit authority, should the Court determine that DCH's claim is not substantially similar, then the Court must look to whether DCH's claim is being separately classified for a legitimate business reason or to manipulate the plan votes.

Debtor argues that it has a business justification for separately classifying DCH's claim from that of PCH.   Debtor's "business justification" is as follows:  "DCH has elected to work with the Debtor toward reorganization.  That orientation is diametrically opposed to the actions of PCF in this case.  Thus, the claims are dissimilar."  See Classification Brief, page 12, lines 14-16.

Debtor's whole argument is that DCH's claim is being separately classified because DCH is in favor of the Plan and PCF is not.  This is the exact situation where separate classification is inappropriate.

The Beneficiaries and DCH are all fractionalized interest holders in the Property.   Their claims are substantially similar and should be in the same class.

/ / /

/ / /

/ / /

**D.  Reservation of Rights.**

To the extent the Court approves any of the Debtor's requests, the Beneficiaries reserve their rights to make further objections to any disclosure statement or plan proposed by the Debtor.

**III.    CONCLUSION**

Debtor should not be allowed to cram down the Beneficiaries through a purported credit owing by PCF and DCH should be classified with the other Beneficiaries..

DATED:  May 17, 2010                          **GOE & FORSYTHE, LLP**

                                              By: /s/Robert P. Goe
                                                  Robert P. Goe
                                              Attorneys for Beneficiaries by and through
                                              authorized agent, Point Center Financial, Inc.

Case 2:10-bk-18429-BB    Doc 272    Filed 05/17/10    Entered 05/17/10 15:44:50    Desc
Main Document    Page 112 of 27

| | Loan # 206070 | | | |
|---|---|---|---|---|
| | | | | |
| | | **Exhibit A** | | |
| | | | | |
| | | | | |
| | Point Center Financial Inc., as designated agent for: | | | |
| | Jeffrey Abraham, Trustee of the Jeff Abraham Trust | as to an undivided | 0.1520 % | interest |
| | Sandra S. Alden, Trustee of the Sandra S. Alden Family Trust dated August 18, 1992 | as to an undivided | 0.1530 % | interest |
| | Alan M. Markus and Trena L. Markus, husband and wife as joint tenants with right of survivorship. | as to an undivided | 0.1530 % | interest |
| | Lanny W. Aplanalp, Trustee of The Lanny W. Aplanalp Trust dated July 5, 2002 | as to an undivided | 0.1520 % | interest |
| | Adam M. Benecke and Angela K. Benecke, husband and wife as joint tenants. | as to an undivided | 0.1530 % | interest |
| | Richard T. Breene, Trustee of The Richard T. Breene Family Trust | as to an undivided | 0.1530 % | interest |
| * | Albert Hechinger and Kathryn Berkowitz, Co-Trustees of The Kathryn and Albert Family Trust dated May 15, 2001 | as to an undivided | 0.3090 % | interest |
| | Arlene Bruckner, a widow | as to an undivided | 0.1530 % | interest |
| | Richard Bruckner and Vicky Bruckner, husband and wife as community property. | as to an undivided | 0.3980 % | interest |
| | Lyle O. and Paula M. Burgess, husband and wife as community property with rights of survivorship | as to an undivided | 0.1530 % | interest |
| | Carleton Carlson as Custodian FBO Brianna Carlson | as to an undivided | 0.0370 % | interest |
| | Carleton Carlson, Trustee of The Carleton Carlson Family Trust | as to an undivided | 0.1920 % | interest |
| | Oscar Castro-Neves and Lorraine Castro-Neves, Trustees of the Castro-Neves Family Trust | as to an undivided | 0.1520 % | interest |
| | Willy Chin and Margarita C. Chieng, Trustees of the Chin Family Trust dated April 10, 2000 | as to an undivided | 0.1530 % | interest |
| | John H. Chang and/or Jessica S. Chang, Trustees of the Chang Family Revocable Trust of March 22, 2000 | as to an undivided | 0.3090 % | interest |
| | Steven C. Colburn and Andrea K. Colburn, husband and wife as community property with right of survivorship. | as to an undivided | 0.1530 % | interest |

| Loan # 206070 | | | | |
|---|---|---|---|---|
| | | | | |
| | **Exhibit A** | | | |
| | | | | |
| Stanley R. Connor and Genevieve C. Connor, Trustees as husband and wife as joint tenants with the right of survivorship | as to an undivided | 0.4600 | % | interest |
| Mario F. Costa and Evelyn K. Costa, as Trustees of The Costa 2003 Family Trust dated October 1, 2003 | as to an undivided | 0.1530 | % | interest |
| James Aden Davis, Trustee of The James Aden Davis Trust dated January 29, 1992 | as to an undivided | 0.6110 | % | interest |
| Don Duncan, a Single Man | as to an undivided | 0.1520 | % | interest |
| James N. Deglandon and Maureen Detoy, joint tenants with right of survivorship | as to an undivided | 0.3090 | % | interest |
| Michael M. Dulberg and Lucette R. Dulberg, husband and wife as joint tenants with right of survivorship. | as to an undivided | 0.1520 | % | interest |
| Timothy G. Du Moulin and Sherry L. Du Moulin, Trustees of The Du Moulin 2001 Living Trust | as to an undivided | 0.2900 | % | interest |
| Timothy George Du Moulin and Sherry Lee Du Moulin, Trustees of The 2000 Charitable Remainder Unitrust of Timothy George DuMoulin and Sherry Lee DuMoulin | as to an undivided | 0.1520 | % | interest |
| Shahab Emrani and Catherine Emrani, husband and wife as community property. | as to an undivided | 0.6120 | % | interest |
| Mary E. Farrell, LLC | as to an undivided | 0.1530 | % | interest |
| Kathleen B. Fisher, Trustee of the Kathleen B. Fisher Profit Sharing Plan | as to an undivided | 0.1520 | % | interest |
| David Friedman, Trustee of the David Friedman Sole Proprietorship Retirement Trust | as to an undivided | 0.1530 | % | interest |
| The Delbert and Carol Freeman Family LP, a Nevada limited partnership | as to an undivided | 0.3090 | % | interest |
| James D. Goodin and Carolyn J. Goodin, Trustees of the Goodin Family Trust dated September 22, 1990 | as to an undivided | 0.1520 | % | interest |
| Robin  B. Graham, Trustee of The Graham Marital Trust B | as to an undivided | 0.3090 | % | interest |
| Dale Hartley and Audrey Hartley, Trustees The Dale and Audrey Hartley Family Trust | as to an undivided | 0.3060 | % | interest |

| | | | | |
|---|---|---|---|---|
| | Loan # 206070 | | | |
| | | | | |
| | | **Exhibit A** | | |
| | | | | |
| * | Wanda Harrell, an unmarried woman | as to an undivided | 0.6110 % | interest |
| * | Terry Norman Holdt and Sharon Rae Holdt, Trustees of The Holdt Living Trust | as to an undivided | 0.1530 % | interest |
| | John L. Harding and Helga M. Harding, husband and wife as joint tenants with right of survivorship | as to an undivided | 0.1530 % | interest |
| | Thomas W. Hribar, Trustee of the Thomas W. Hribar Profit Sharing Plan and Trust | as to an undivided | 0.0750 % | interest |
| | John R. Hughes, Trustee of The John R. Hughes Separate Property Trust dated November 19, 2004 | as to an undivided | 0.4600 % | interest |
| | Pensco Trust Company as Custodian of IRA# CO445 FBO Steve Cotugno | as to an undivided | 0.1520 % | interest |
| | Pensco Trust Company as Custodian of IRA# GH1AA FBO Gerald J. Ghelfi | as to an undivided | 0.1860 % | interest |
| * | Pensco Trust Company as Custodian of IRA# PE1DY FBO Robert M. Peppercorn | as to an undivided | 0.1520 % | interest |
| | IRA Resources, Inc. FBO Blaine C. Strickland IRA #30609 | as to an undivided | 0.1520 % | interest |
| | Dennis L. Johnson and Charlene J. Johnson, Trustees of the Johnson Family Trust dated November 30, 1999 | as to an undivided | 0.3060 % | interest |
| | Byron D. Kinsman, Jr. and Sylvia L. Kinsman, Co-Trustees of The Kinsman Family Trust | as to an undivided | 0.1530 % | interest |
| | Albert R. Kleist and Jeanette H. Kleist, Trustees under Declaration of Trust dated December 12,1991, The Kelist Family Trust | as to an undivided | 0.1530 % | interest |
| * | Paul Krasner, M.D.  Trustee of the Paul Krasner, M.D.. Defined Benefit Pension Plan and Trust | as to an undivided | 0.4600 % | interest |
| | John W. Lang and Eugena M. Lang, Trustees of The John W. Lange and Eugena M. Lang 1988 Trust | as to an undivided | 0.3090 % | interest |
| | Shih Shen Ling and Ming Shen Margaret Ling, husband and wife as community property with right of survivorship | as to an undivided | 0.1530 % | interest |

| | Loan # 206070 | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | **Exhibit A** | | | |
| | | | | | |
| | William K. Little and Ronda L. Little, Trustees of the William K. Little and Ronda L. Little Revocable Trust, created on December 17, 1994 | as to an undivided | 0.2290 | % | interest |
| | Neva J. Lovell, Trustee of the Lovell Family Trust, dated July 2, 1985 (First Amendment/Restatement dated August 30, 1991) | as to an undivided | 0.1530 | % | interest |
| | Antonio N. Lucero and Laureana T. Lucero, husband and wife joint tenants with right of survivorship. | as to an undivided | 0.2270 | % | interest |
| | Michael E. Madden, Trustee of the Michael Madden Associates Retirement Trust dated December 27, 1998 | as to an undivided | 0.1840 | % | interest |
| | Maurice C. Mamo and Amy A. Mamo, Trustees of the Mamo Family Trust | as to an undivided | 0.1530 | % | interest |
| | Anna R. Maruca, Trustee of the Anna R. Maruca Family Trust Dated August 1, 1997 | as to an undivided | 0.1530 | % | interest |
| | Eamon J. McClory and Sue Anne McClory, Trustees of the McClory Family Trust | as to an undivided | 0.1530 | % | interest |
| | Mark Robert Medina and Barbara Louise Medina, Trustees of the Medina Living Trust dated July 28th 1993 | as to an undivided | 0.1530 | % | interest |
| | William Y. Morehart, an unmarried man | as to an undivided | 0.1530 | % | interest |
| | Jeffery Lee Morse and Paula Jeanette Morse, Trustees of The Morse Family Trust dated December 27, 2001 | as to an undivided | 0.1520 | % | interest |
| | The Church of the Movement of Spiritual Inner Awareness, a California nonprofit religious corporation.  Paul Kaye, President and Mark Lurie, Secretary | as to an undivided | 0.3090 | % | interest |
| | James D. Murchison, III and Deborah T. Murchison, Husband and Wife as Joint Tenants | as to an undivided | 0.2290 | % | interest |
| | Saleem S. Naber and Abla S. Naber, Trustees of The Saleem S. Naber and Abla S. Naber Revocable Living Trust Dated August 31, 1995 | as to an undivided | 0.1520 | % | interest |
| * | Paul P. Krasner, M.D.  Trustee of the Nephrology Medical Group, Inc. of Orange County Profit Sharing Plan Retirement Trust | as to an undivided | 0.1530 | % | interest |

EXHIBIT "7"                                                                                      PAGE 122

| | | | | |
|---|---|---|---|---|
| Loan # 206070 | | | | |
| | | | | |
| | **Exhibit A** | | | |
| | | | | |
| National Financial Lending, LLC, a California limited liability company | as to an undivided | 43.7430 | % | interest |
| Richard F. Norris, Trustee of The Richard F. Norris Inter Vivos Trust Dated February 3, 2010 | as to an undivided | 0.1860 | % | interest |
| Gregory T. Norman, an Unmarried Man | as to an undivided | 0.1530 | % | interest |
| Denis and Annie O' Connor, Trustees of the O'Connor Family Trust | as to an undivided | 0.1530 | % | interest |
| Ronald F. Ogletree, a Married Man as His Sole and Separate Property | as to an undivided | 0.3090 | % | interest |
| William G. Oliver, Trustee of the William G. Oliver 2002 Trust | as to an undivided | 0.1530 | % | interest |
| Robert M. Parks and/or Audrey L. Parks, Trustees of the Parks Family Trust Dated October 13, 1975 amended and restated on March 27, 2003 | as to an undivided | 0.3090 | % | interest |
| Richard L. Pasquini, Trustee, Diane M. Pasquini, Trustee, Living Trust of Richard L. Pasquini and Diane M. Pasquini dated June 29, 1998 | as to an undivided | 0.3060 | % | interest |
| Philip W. Payne and/or Helga G. Payne, Trustees of The Payne Family Trust dated February 10, 1992 | as to an undivided | 0.3670 | % | interest |
| Point Center Financial, Inc. a California corporation | as to an undivided | 4.3460 | % | interest |
| Samuel J. Poidmore and Elena Poidmore, Trustees of The Samuel J. Poidmore, D.D.S., Inc. Pension Plan Trust | as to an undivided | 0.2290 | % | interest |
| * Max Perry and Mary Perry, Trustees of the Alder Creek Family Trust | as to an undivided | 0.3060 | % | interest |
| George M. Phelps, a single man | as to an undivided | 0.2270 | % | interest |
| Bruce R. Pittenger and Johni H. Pittenger, Trustees. Or their successors in trust, under The Bruce R. Pittenger and Johni H. Pittenger Declaration of Trust, dated January 4, 2001, and any amendments thereto | as to an undivided | 0.2760 | % | interest |
| Ronald L. Prinzing and Rosalyn Yvonne Prinzing, Trustees of The Prinzing Revocable Living Trust UDT June 21, 1990 | as to an undivided | 0.2730 | % | interest |

| Loan # 206070 | | | | |
|---|---|---|---|---|
| | | | | |
| | **Exhibit A** | | | |
| | | | | |
| | | | | |
| Jesus Ramirez, M.D. A Medical Corporation Profit Sharing Plan | as to an undivided | 0.1530 | % | interest |
| | | | | |
| Richard A. J. Richardson and Barbara K. Richardson Trustee of the Richard A.J. Richardson and Barbara K. Richardson Trust restated July 25, 2005 or the successor trustee thereunder, | as to an undivided | 0.1530 | % | interest |
| Donovan H. Rittenbach, Sr. and Shelley Lynn Rittenbach, Trustees of the Rittenbach Family Trust | as to an undivided | 0.1530 | % | interest |
| Roger Kamranfar and Rosie Parivash, Husband and Wife as Community Property with Right of Survivorship | as to an undivided | 0.3000 | % | interest |
| Robert A. Roberto and Felicia M. Roberto, Trustees of the Roberto Family 1997 Trust | as to an undivided | 0.1520 | % | interest |
| Marvin J. Struiksma, G.P. ROCAL Financial L.P., a California limited partnership | as to an undivided | 0.4600 | % | interest |
| Barry Rodgers and Phyllis M. Rodgers, Husband and Wife as Joint Tenants | as to an undivided | 0.1530 | % | interest |
| * Robert L. Wells, Trustee of the Robert L. Wells Trust dated April 4, 1991 | as to an undivided | 0.6110 | % | interest |
| Robert G. White and Mary R. White, Husband and Wife as Community Property with Right of Survivorship | as to an undivided | 0.1520 | % | interest |
| Terry James Schleede and Susan Thee Schleede, Trustees of the Schleede Revocable Family Trust dated October 14, 1981 | as to an undivided | 0.1530 | % | interest |
| Roy L. Schubert and Terry Dixon Schubert, Husband and Wife as Community Property with Rights of Survivorship | as to an undivided | 0.3090 | % | interest |
| Pauline Mary Schell, Trustor and Sole Trustee The Schell Living Trust | as to an undivided | 0.1530 | % | interest |
| Henry Sze Ling Shing and Wing Lai Chin Shing, Co-Trustees of The Shing Trust dated May 21, 1996 | as to an undivided | 0.1530 | % | interest |
| Steve Hoffman, a single man | as to an undivided | 0.1530 | % | interest |
| Barbara Sklar, Trustee of The Barbara Sklar Living Trust dated 8/31/01 | as to an undivided | 0.2270 | % | interest |

| Loan # 206070 | | | | |
|---|---|---|---|---|
| | | | | |
| | **Exhibit A** | | | |
| | | | | |
| Melvin Small and Shirley Faye Small, Trustees of The 3rd Amendment and Restatement of The Melvin Small and Shirley Faye Small 1991 Trust | as to an undivided | 0.1520 | % | interest |
| Taylor Fletcher, Managing Member of Southwest Marketing, LLC, a Wyoming limited liability company | as to an undivided | 0.1520 | % | interest |
| H.W. Steere, Trustee of The H.W. Steere Trust established on November 1, 2004 | as to an undivided | 1.5310 | % | interest |
| Edwin B. Suddarth, Sr. and Kathleen Suddarth, Husband and Wife as Community Property with Right of Survivorship | as to an undivided | 0.1530 | % | interest |
| | | | | |
| John C. Hall, President - Tall Cotton, Inc. a California corporation | as to an undivided | 0.4600 | % | interest |
| Brian Tanklage, Managing Member of Tanks Enterprises LLC, a Delaware limited liability company | as to an undivided | 2.2980 | % | interest |
| Mary Kathryn Thee, Trustee of the Thee Family Trust B dated 10/8/80 | as to an undivided | 0.1530 | % | interest |
| Earl Gottfried, President Valley Financial West, Inc. a Nevada corporation | as to an undivided | 0.1530 | % | interest |
| Ninette R.Wassef, a single woman | as to an undivided | 0.2290 | % | interest |
| Maryalin Valone White, Settlor-Trustee of the Maryalin Valone White Revocable Trust | as to an undivided | 0.1520 | % | interest |
| Richard M. Wilbur, Trustee of The RM Wilbur Co. Employees Profit Sharing Plan | as to an undivided | 0.1520 | % | interest |
| Kenneth M. Wilson, Trustee of The Wilson Family Trust UTD October 5, 1989 | as to an undivided | 0.1520 | % | interest |
| Thomas F. Wilson and Patsy R. Wilson, Trustees of the Wilson Trust Dated September 9, 1993 | as to an undivided | 0.4290 | % | interest |
| Sherryl Wiseman, Trustee of the Sheryl Wiseman Trust | as to an undivided | 0.1530 | % | interest |
| Michael M. Yorba and Victoria D. Yorba, Trustees of the Yorba Family Trust dated December 7, 1988 | as to an undivided | 0.1520 | % | interest |
| Mark C. Yorba and Crista K. Yorba, Husband and Wife as Community Property with Rights of Survivorship | as to an undivided | 0.4600 | % | interest |

Case 2:10-bk-18429-BB   Doc 272   Filed 05/17/10   Entered 05/17/10 15:44:50   Desc
Main Document   Page 219 of 275

| | | | | |
|---|---|---|---|---|
| Loan # 206070 | | | | |
| | | | | |
| | | | | |
| | **Exhibit A** | | | |
| | | | | |
| Donald D. Clay and Linda S. Clay, husband and wife as Community Property with Rights of Survivorship | as to an undivided | 0.1530 | % | interest |
| William E. Dennison and/or Teresa J. Dennison, Trustees of The Dennison Family Trust | as to an undivided | 0.3090 | % | interest |
| Hearth & Home Investments, Inc., a California Corporation | as to an undivided | 0.6110 | % | interest |
| Frances M. Keller, Trustee of the Keller Family QTIP Trust | as to an undivided | 0.1530 | % | interest |
| Susan Jane Kenyon, Trustee of the SJ Kenyon Living Trust | as to an undivided | 0.1840 | % | interest |
| Janice D. Mick, an unmarried woman | as to an undivided | 0.1530 | % | interest |
| Barry L. Monblatt and Ellen C. Monblatt, Trustee's of the Monblatt Trust dated September 3, 1987 | as to an undivided | 0.1530 | % | interest |
| Lizanne B. Monahan, Trustee of the Dennis P. Monahan 1995 Irrevocable Trust | as to an undivided | 0.2750 | % | interest |
| Jerald B. Russ and Margaret A. Russ, Trustees of the Russ Family Trust dated 26 February 1991 | as to an undivided | 0.1530 | % | interest |
| Bruce R. Schwartz, an unmarried man | as to an undivided | 0.1530 | % | interest |
| * David Shore, a married man as his sole and separate property | as to an undivided | 0.1530 | % | interest |
| Bruce R. Ahlvin and Judith L. Ahlvin, Trustees of the Revocable Trust for Community Property and Separate Property , | as to an undivided | 0.1530 | % | interest |
| David I. Clough and Betty L. Clough, husband and wife as community property with right of survivorship | as to an undivided | 0.1530 | % | interest |
| The Quentin A. Edwards Family L.P., A California limited partnership | as to an undivided | 0.1530 | % | interest |
| Roy E. Futter and Betty L. Futter, Trustees of the Futter Living Trust dated October 28, 1994 | as to an undivided | 0.1530 | % | interest |
| Harold W. Garvin and Vlasta V. Garvin, Co-Trustees of the Harold and Vlasta Garvin Family Trust | as to an undivided | 0.1530 | % | interest |
| Dana Halsted, a married woman as her sole and separate property | as to an undivided | 0.1530 | % | interest |

| | | | | |
|---|---|---|---|---|
| Loan # 206070 | | | | |
| | | | | |
| | Exhibit A | | | |
| | | | | |
| Doreen T. Keith, a widow | as to an undivided | 0.1530 | % | interest |
| Harry W. Levy and Joan T. Levy, Trustees of the Levy Family Trust dated October 22, 1978 | as to an undivided | 0.4600 | % | interest |
| James R. Mitchell and Shelley A. Mitchell, Co-Trustees of the Mitchell Family Trust dated June 6, 1996 | as to an undivided | 0.3060 | % | interest |
| David R. Monson and Carol E. Monson, Trustees of the Monson Family Living Trust dated November 18, 1999 | as to an undivided | 0.1530 | % | interest |
| Manju A. Parekhji and Ashit B. Parekhji, husband and wife as joint tenants with rights of survivorship | as to an undivided | 0.1530 | % | interest |
| Reill Homes, Inc., a California Corporation | as to an undivided | 0.8570 | % | interest |
| Normandie S. Reill, Trustee of the Normandie S. Reill Trust dated May 6, 2003 | as to an undivided | 0.1530 | % | interest |
| * Sherwood L. Simpson and Jean C. Simpson as co-trustees of The Simpson Family Trust Dated September 6, 1967 | as to an undivided | 0.1530 | % | interest |
| Patricia M. Waddell a widow | as to an undivided | 0.1530 | % | interest |
| ** Steve Goldstrom and Kimberly Davis, Trustees of the Goldstrom-Davis Family Trust Dated 7/8/94 | as to an undivided | 0.1520 | % | interest |
| Rosendo L. Miranda and Cristina M. Miranda, Trustees, or their successors in trust, under the Miranda Living Trust Dated October 23, 1996 and any amendments thereto | as to an undivided | 0.2450 | % | interest |
| Anneliese Schneider Trustee of the Anneliese Schneider Revocable Trust 2001 | as to an undivided | 0.3060 | % | interest |
| Virgil Bowden and Alicia N. Bowden, Trustees of the Virgil and Alicia Bowden Family Trust dated January 7, 1997 | as to an undivided | 0.1530 | % | interest |
| Daniel James Carter, Trustee of the Daniel J. Carter Trust | as to an undivided | 0.3060 | % | interest |
| Paul C. Kratka, an unmarried man | as to an undivided | 0.1840 | % | interest |
| Michael D. Stewart and Mary Jude Stewart, Trustees of the Living Trust of Michael D. Stewart and Mary Jude Stewart | as to an undivided | 0.6120 | % | interest |
| Jeffrey H. Pooley and Reita Gail Pooley, Trustees of the Pooley Living Trust u/a 4-12-06 | as to an undivided | 0.1530 | % | interest |

Case 2:10-bk-18429-BB   Doc 272   Filed 05/17/10   Entered 05/17/10 15:44:50   Desc
Main Document   Page 123 of 27

| | Loan # 206070 | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | **Exhibit A** | | | |
| | | | | | |
| * | David Shore, O.D., Trustee of the David and Florence Shore Charitable Remainder Unitrust | as to an undivided | 0.2030 | % | interest |
| | Jon A. Vicars and Nobuko Mukai Vicars, husband and wife joint tenants with right of survivorship | as to an undivided | 0.2290 | % | interest |
| | Mary Aubrey Wallace, Trustee of the Aubrey Wallace Trust | as to an undivided | 0.1530 | % | interest |
| | Pensco Trust Company as Custodian of IRA #OLOAA FBO Gordon H. Olson | as to an undivided | 0.3090 | % | interest |
| | James Anthony Barton, Trustee of the James Anthony Barton Revocable Trust | as to an undivided | 0.2140 | % | interest |
| * | Vincent A. Bauerlein and Margaret E. Bauerlein, husband and wife as joint tenants with right of survivorship | as to an undivided | 0.1520 | % | interest |
| | Daniel H. Wiseman, Trustee of the Daniel H. Wiseman, M.D. Sole Proprietor Profit Sharing Pension Plan | as to an undivided | 0.4600 | % | interest |
| | Nick A. Dourbetas and Niki Dourbetas, husband and wife as community property with rights of survivorship | as to an undivided | 0.1840 | % | interest |
| | Alex Dourbetas and Christy Dourbetas, husband and wife as joint tenants with rights of survivorship | as to an undivided | 0.7650 | % | interest |
| | Arnie Garcia and Josephine Garcia, Co-Trustees of the John A. Garcia and Josephine Garcia Living Trust | as to an undivided | 0.1530 | % | interest |
| | Point Center Mortgage Fund I, LLC, a Delaware limited liability company | as to an undivided | 2.5790 | % | interest |
| | Roger D. Probst and Judith A. Probst, husband and wife as community property with rights of survivorship | as to an undivided | 0.1530 | % | interest |
| | Bruce Seldeen, a widower | as to an undivided | 0.1530 | % | interest |
| | Timothy J. Spaeth and Andrea N. Spaeth, Trustees of the Timothy J. Spaeth and Andrea N. Spaeth Living Trust Dated May 25, 2000 | as to an undivided | 0.1520 | % | interest |
| | Alice T Vieira, Trustee of the Alice Thie Vieira Revocable Living Trust Dated August 29, 2007 | as to an undivided | 0.1530 | % | interest |
| | Milton J. Chasin and Doris H. Chasin, Trustees of the Milton J. and Doris H. Chasin Trust Dated October 24, 1988 | as to an undivided | 0.4600 | % | interest |

| | Loan # 206070 | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | **Exhibit A** | | | |
| | | | | | |
| | | | | | |
| | Russell Connor, an unmarried man | as to an undivided | 0.1530 | % | interest |
| | George J. Hermestroff and Helen F. Hermestroff, Co-Trustees of the GHH Family Trust dated 4/18/94, as Amended and Restated on 12/31/00 | as to an undivided | 0.1530 | % | interest |
| | Edwin L. Foreman and Dianne E. Foreman, Trustees of the Edwin and Dianne Foreman Family Trust | as to an undivided | 0.1530 | % | interest |
| * | The Sid K. and Jessica M. Louie Family L.P., a California limited partnership | as to an undivided | 0.1530 | % | interest |
| | Winthrop B. Orgera and Sally L. Orgera, Trustees of the Orgera Family Trust dated February 14, 1996 | as to an undivided | 0.1530 | % | interest |
| | Frank E. Winans and Cynda D. Winans, husband and wife as community property with right of survivorship | as to an undivided | 0.1840 | % | interest |
| | Clemet L. Crossno and Suellen Crossno, Trustees of the Crossno Family Trust dated February 14, 2000 | as to an undivided | 0.1530 | % | interest |
| | Edwards V. Waters and/or Rose E. Waters, Trustees of the Waters Family Trust dated 10/26/89 | as to an undivided | 0.1530 | % | interest |
| | Bradley A. Weinstein, Trustee of the Bradley A. Weinstein 2005 Trust | as to an undivided | 0.1530 | % | interest |
| | Daniel H. Walker and Lucinda Berg Walker, husband and wife as joint tenants | as to an undivided | 0.3060 | % | interest |
| | Vahe Hacopian & Armine G. Hacopian, Trustees of the Hacopian Living Trust dated January 15, 1990 | as to an undivided | 0.1530 | % | interest |
| | Doris I. and Gary C. Lucas, L.P. a Nevada family limited partnership company | as to an undivided | 0.1530 | % | interest |
| | John Iagjian and Adrienne Iagjian, husband and wife as community property | as to an undivided | 0.1530 | % | interest |
| | Dorothy Peterson LoCicero, Trustees of the LoCicero Family Trust | as to an undivided | 0.1530 | % | interest |
| | Edward Curtis Ball, an unmarried man | as to an undivided | 0.1530 | % | interest |
| | Marvin J. Struiksma and Carol E. Struiksma, husband and wife as community property | as to an undivided | 0.1530 | % | interest |

EXHIBIT "7"

PAGE 129

Case 2:10-bk-18429-BB    Doc 272    Filed 05/17/10    Entered 05/17/10 15:44:50    Desc
Main Document    Page 125 of 27

| Loan # 206070 | | | | |
|---|---|---|---|---|
| | | | | |
| | **Exhibit A** | | | |
| | | | | |
| Tyler C. Anderson, a married man as his sole and separate property | as to an undivided | 0.1530 | % | interest |
| Arthur P. Villa and Maria T. Enriquez, Trustees of the Villa Revocable Living Trust | as to an undivided | 0.1530 | % | interest |
| Phyllis Morgenstern, Trustee of the Morgenstern Intervivos Trust Agreement Dated August 14, 1986 | as to an undivided | 0.1530 | % | interest |
| Richard Schachter, an unmarried man | as to an undivided | 0.1530 | % | interest |
| Harry A. Friedman, Trustee of the Friedman Revocable Declaration of Trust dated April 4, 2005 | as to an undivided | 0.1530 | % | interest |
| Michael D. Praiswater & Beverly J. McFadden Praiswater, Trustees of the 2007 Praiswater Family Trust | as to an undivided | 0.1530 | % | interest |
| Raymond E. Brown, a single man | as to an undivided | 0.1530 | % | interest |
| Scott E. McDaniel and Catherine M. McDaniel, Trustees of the McDaniel Family Living Trust dated August 18, 2008 and any amendments thereto | as to an undivided | 0.1530 | % | interest |
| Reva Saeta, Trustee of the E.M. and R. Saeta Family Trust - Credit Shelter Trust | as to an undivided | 0.2450 | % | interest |
| Gerardo D. Escobedo, Trustee of the Gerardo D. Escobedo Trust dated October 28 1986 | as to an undivided | 0.1530 | % | interest |
| Raymond George MacLean and Judith Anne MacLean, Trustees of the Raymond George MacLean and Judith Anne MacLean Revocable Trust dated April 29, 1998 | as to an undivided | 0.1530 | % | interest |
| Gaye Reinhold, Trustee of the Benson W. Seidman Living Trust dated October 27, 2004 | as to an undivided | 0.3060 | % | interest |
| Miguel E. Rodriguez and/or Altagracia A. Rodriguez, Trustees of the Rodriguez Family Trust dated November 22, 1994 | as to an undivided | 0.1540 | % | interest |
| Earl M. Saroyan Trustee of the 1996 Earl M. Saroyan Family Trust | as to an undivided | 0.4600 | % | interest |
| Julie C. Potter-Edgett, Trustee of the Potter Trust Dated December 12, 1996 | as to an undivided | 0.1530 | % | interest |

Case 2:10-bk-18429-BB   Doc 272   Filed 05/17/10   Entered 05/17/10 15:44:50   Desc
Main Document   Page 26 of 27

| | Loan # 206070 | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | **Exhibit A** | | | |
| | | | | | |
| | George J. Grupp and Babette O. Grupp, Co-Trustees of the Grupp Living Trust dated April 10, 2007 | as to an undivided | 0.3060 | % | interest |
| | Robert A. Levin and Mary B. Levin, Trustees of the Levin Family Revocable Trust dated February 22, 2007 | as to an undivided | 0.2290 | % | interest |
| *** | Deep Canyon Holdings, Inc., a Nevada Corporation | as to an undivided | 4.1070 | % | interest |
| | Irving A. Yudovin, Trustee of The Yudovin Survivor's Trust under the Yudovin Family Trust dated February 20, 1992 | as to an undivided | 0.1530 | % | interest |
| | | | | | |
| | and/or their heirs and/or assignees | | | | |
| | | | | | |
| * | Represented by Grant, Genovese & Baratta, L.P. (David Grant, Catherine Convy & Amanda Breneman) | | | | |
| ** | Represented by Milberg & De Phillips, L.P. (Russell De Phillips & Roy Carson) | | | | |
| *** | Represented by Reid & Hellyer (Mark C. Schnitzer) | | | | |

## REQUEST FOR JUDICIAL NOTICE

Beneficiaries by and through their authorized agent, Point Center Financial, Inc. secured against the Property of The Preserve, LLC ("Debtor") hereby requests the Court take judicial notice pursuant to *Federal Rule of Evidence 201* of the following documents submitted in support of Beneficiaries' Brief on the Issue of Debtor's Use of Alleged Unearned Loan Fees to Cram Down Secured Creditors Under Debtor's Proposed Plan and Separate Classification of Deep Canyon Holdings, Inc.'s ("DCH") claim Under Debtor's Proposed Plan.

1.    A true and correct copy of the April 14, 2010 hearing transcript is attached hereto as **Exhibit "1"**.

2.    A true and correct copy of the PCF/DCH First Subscription signed by Alan Parrin is attached hereto as **Exhibit "2"** and incorporated herein by reference and was previously introduced into evidence before this Court without objection.

3.    A true and correct copy of the PCF/DCH Second Subscription Agreement is attached hereto as **Exhibit "3"** and incorporated herein by reference and was previously introduced into evidence before this Court without objection.

DATED:  May 17, 2010                    **GOE & FORSYTHE, LLP**

By: /s/Robert P. Goe
      Robert P. Goe
Attorneys for Beneficiaries by and through
authorized agent, Point Center Financial, Inc.

EXHIBIT "7"   14                                              PAGE 132